IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ORIGINAL

2005 MR 30  PM 3: 23

WESTERN DISTRICT OF TEXAS
U.S. CLERK'S OFFICE

BY:_____
                    DEPUTY

| | | |
|---|---|---|
| DDB Technologies, L.L.C., | § | |
| | § | Civil Action No. A04CA352 LY |
| Plaintiff, | § | |
| | § | |
| v. | § | Judge Lee Yeakel |
| | § | |
| MLB Advanced Media, L.P., | § | |
| | § | |
| Defendant. | § | |

## DDB TECHNOLOGIES, L.L.C.'S OPENING *MARKMAN* BRIEF

Ross Spencer Garsson
Texas State Bar Number 00784112
WINSTEAD SECHREST & MINICK P.C.
401 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 474-4330
(512) 370-2850  Facsimile

and

Michael H. Baniak
Michael D. Gannon
Christina L. Brown
Christopher E. Haigh
BANIAK PINE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois  60606
(312) 673-0360
(312) 673-0361  Facsimile

Attorneys for Plaintiff DDB Technologies, L.L.C.

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...........................................................................................1

II.     THE PATENTS-IN-SUIT ............................................................................2

        A.      The "Computer Simulation Patents": U.S. Patent Nos. 5,526,479,
                5,671,347, And 6,204,862 ...............................................................2

        B.      The "Pattern-Matching Patent": U.S. Patent 5,189,630 ............................4

III.    LAW OF CLAIM CONSTRUCTION .....................................................5

        A.      The Markman Process ......................................................................5

        B.      Use Of Intrinsic As Well As Extrinsic Evidence ........................................5

        C.      A Party Cannot Rewrite Claims By Importing Limitations From The
                Specification Into The Claims ...........................................................7

        D.      The Ordinary Meaning Is To Be Used ...............................................7

        E.      Claim Interpretation Includes Patents In A Family......................................8

        F.      Claim Differentiation.........................................................................9

IV.     CLAIM TERMS TO BE CONSTRUED ...............................................9

        A.      Live Event ....................................................................................9

        B.      Broadcasting ...............................................................................11

                1.      The Patent Specification Of The Computer Simulation
                        Patents Supports DDB's Proposed Construction .........................12

                2.      The Words Of The Claims Themselves Fully Support DDB's
                        Proposed Construction...............................................................15

                3.      The Prosecution History Also Supports DDB's Proposed
                        Construction ............................................................................17

                4.      DDB's Proposed Construction Is Consistent With The
                        Ordinary Meaning Of The Term "Broadcasting"...........................18

        C.      Computer Simulation.......................................................................18

                1.      The Asserted Claims Merely Require A Computer
                        Simulation, Not An Animation......................................................20

                2.      The Patent Specification Is Clear That A Computer
                        Simulation Can Include Graphics, Text, Or Animation ...............20

                3.      The Inventors Never Said That A Computer Simulation Must
                        Include Animation During The Prosecution Of The
                        Computer Simulation Patents ......................................................22

        D.      Combining ...................................................................................22

1.      The Patent Specification Fully Supports DDB's Proposed
        Construction ............................................................................. 24

2.      DDB's Proposed Construction Is Consistent with the
        Ordinary Meaning Of "Combining" ....................................... 25

E.      Other Terms That MLBAM Contends Should Be Construed .................. 25

        1.      First Computer ........................................................................ 26

        2.      Second Computer ..................................................................... 28

        3.      Transmission Data ................................................................... 28

        4.      Enter ......................................................................................... 29

        5.      Database file ............................................................................ 30

        6.      Symbolic Description .............................................................. 30

V.      CONCLUSION ..................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Autogiro Co. of Am. V. United States*
  384 F.2d 391 (Ct. Cl. 1967) .......................................................................................6

*CCS Fitness, Inc. v. Brunswick Corp.*
  288 F.3d 1359 (Fed. Cir. 2002) ..........................................................................7, 8, 15

*Cybor Corp. v. FAS Techs., Inc.*
  138 F.3d 1448 (Fed. Cir. 1998) ................................................................................5

*Elkay Mfg. Co. v. Ebco Mfg. Co.*
  192 F.3d 973 (Fed. Cir. 1999) .................................................................................8

*Embrex, Inc. v. Serv. Eng'g Corp.*
  216 F.3d 1343 (Fed. Cir. 2000) ................................................................................5

*Honeywell, Inc. v. Victor Co. of Japan*
  298 F.3d 1317 (Fed. Cir. 2002) ................................................................................7

*In re Paulsen*
  30 F.3d 1475 (Fed. Cir. 1994) .................................................................................8

*Intellicall, Inc. v. Phonometrics, Inc.*
  952 F.2d 1384 (Fed. Cir. 1992) ................................................................................8

*Interactive Gift Express, Inc. v. Compuserve, Inc.*
  256 F.3d 1323 (Fed. Cir. 2001) ................................................................................6

*Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*
  309 F.3d 1365 (Fed. Cir. 2002) ................................................................................8

*Karlin Tech. Inc. v. Surgical Dynamics Inc.*
  177 F.3d 968 (Fed. Cir. 1999) .................................................................................9

*Markman v. Westview Instruments, Inc.*
  52 F.3d 967 (Fed. Cir. 1995) .................................................................................5, 8

*Masco Corp. v. United States*
  303 F.3d 1316 (Fed. Cir. 2002) ................................................................................8

*Scripps Clinic v. Genentech, Inc.*
  927 F.2d 1565 (Fed. Cir. 1991) ................................................................................5

*Tandon Corp. v. United States Int'l Trade Comm'n*
  831 F.2d 1017 (Fed. Cir. 1987) ...............................................................................26

*Teleflex, Inc. v. Ficosa N. Am. Corp.*
  299 F.3d 1313 (Fed. Cir. 2002) .............................................................................5, 7

*Texas Digital Sys., Inc. v. Telegenix, Inc.*
  308 F.3d 1193 (Fed. Cir. 2002) .............................................................................7, 8

*Texas Instruments, Inc. v. United States Int'l Trade Comm'n*
   988 F.2d 1165 (Fed. Cir. 1993)................................................................................6

*Vitronics Corp. v. Conceptronic, Inc.*
   90 F.3d 1576 (Fed. Cir. 1996) ...............................................................................6

*Vivid Tech., Inc. v. Am. Sci. Eng'g, Inc.*
   200 F.3d 795 (Fed. Cir. 1999) ...............................................................................5

**Statutes**

35 U.S.C. § 112 ..........................................................................................................17

**Other Authorities**

LANDIS ON MECHANICS OF PATENT CLAIM DRAFTING, p. III-17 (4th ed., Dec. 1999).............27

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991 Edition) ............................18, 25, 29

## I.   INTRODUCTION

In its motion for summary judgment of non-infringement, defendant MLBAM focused solely on the meaning of four claim terms:   "computer simulation," "broadcasting," "combining," and "live event."[1]   Subsequently, each party exchanged its list of claim terms to be construed by this Court.   Plaintiff DDB identified three of the four claim terms addressed in MLBAM's summary judgment motion, namely, "computer simulation," "broadcasting," and "combining."   (Ex. B).   MLBAM, on the other hand, identified *no less than 39* claim terms to be construed.   (Ex. C).

MLBAM's request to have this Court construe 39 claim terms is totally unreasonable and should be denied.   Having this Court construe 39 claim terms would result in nothing more than a waste of time and judicial resources.

DDB believes that the more reasonable approach is for this Court to construe only those claim terms that MLBAM focused on in its summary judgment motion. Accordingly, this opening brief will focus primarily on those four claim terms.

As demonstrated below, DDB offers proposed constructions for these four claim terms that are consistent with the intrinsic evidence of record, i.e., the patents-in-suit themselves, including the claims, the specification, and the prosecution history.   MLBAM's proposed constructions, on the other hand, violate the most fundamental principle of claim construction by improperly importing limitations from the specification into the claims. Accordingly, this Court should adopt DDB's proposed definitions, and reject MLBAM's proposed definitions.

---

[1] *See* section II. D. of MLBAM's motion for summary judgment of non-infringement entitled "Meaning of Certain Terms Used In The DDB Patents," pages 24-35, Ex. A. Exhibits A-K, referred to herein, are attached to the Declaration of Christopher E. Haigh in Support of DDB's Opening Markman Brief, attached at Attachment 1 herewith.

## II.    THE PATENTS-IN-SUIT

At the technical tutorial on March 15, 2005, DDB provided to this Court a power-point presentation that explains the technology set forth in the patents-in-suit. Thus, DDB will only provide a brief summary of that technology here.

### A.    The "Computer Simulation Patents": U.S. Patent Nos. 5,526,479[2], 5,671,347[3], And 6,204,862[4]

The specifications of the Computer Simulation Patents are identical. As a result, the following summary applies to all three of these patents. The Computer Simulation Patents relate generally to a method for generating a computer simulation of a live event for display on a viewer's computer. In one embodiment described in the patents, illustrated on the following page,[5] an observer watches a live event, such as a baseball game, and enters data representative of plays. A database stores the data and is updated as new data is received. A representation of the progression of plays is displayed at a viewer computer.

---

[2] Ex. D.

[3] Ex. E.

[4] Ex. F.

[5] *See also*, Figure 1 of the Computer Simulation Patents, along with the accompanying written description.



**Observer enters data representative of a given play**

**Database computer stores data and is updated as new data is received**

**The viewer computer displays a representation of the progression of the plays**

According to the specifications, after each play, the observer uses a computer to record the play by using symbols. The symbols represent the play (sub-event) that occurred on the field. The data representative of a given play is transmitted from the observer's computer to a centralized database computer, which receives the data and updates the database with the new data. Information about the live event is then sent from the database computer to a viewer's computer. In the example of baseball, this information may include: score, inning, outs, count, batter, player on base, etc., as well as details of the plays. The information can be broadcast to the viewer using one-way or two-way communication techniques. The viewer computer then displays a simulation of the live event to the viewer. The simulation may use a variety of display techniques, including text, graphics, or animation, or any combination thereof.

### B.  The "Pattern-Matching Patent": U.S. Patent 5,189,630[6]

The Pattern-Matching Patent relates generally to a method that allows a viewer to search for certain information relating to a live event, such as a baseball game.  After a viewer requests information, a pattern matching technique is utilized in order to match the viewer's information request with information from the live event.  Delivery of the requested information can be made in any of a number of formats, including audio, video, text, or any combination thereof.

Like the Computer Simulation patents, the Pattern-Matching Patent teaches that an observer may watch a live event, such as a baseball game, and enter data representative of that event, as shown below.



**Observer enters data representative of a given play**

**Compare each play in the game to see if it matches the viewer's information of interest**

**Codes defining the information of interest are entered into the database computer**

**Information of interest is transferred to viewer**

**Viewer selects information of interest**

The data is transmitted to a database.  When the viewer requests information of interest, codes defining the information of interest are entered into the database computer.  The database computer compares each play in the game to see if it matches the viewer's

---

[6] Ex. G.

information of interest.   If there is a pattern match, the information of interest is transferred to the viewer.

## III.   LAW OF CLAIM CONSTRUCTION

### A.    The Markman Process

A two-step process is used in the analysis of patent infringement.  First, the meaning of the claims is determined as a matter of law.  Then, the properly construed claims are compared to the allegedly infringing device to determine, as a matter of fact, whether all of the limitations of at least one claim are found.  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002).  The Supreme Court and the Court of Appeals for the Federal Circuit have clearly stated that the first step of determining the meaning of claim terminology must be decided by the Court as a legal matter, and not by the jury.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

Claim construction is simply a way of elaborating the normally terse language of the claims, in order to understand and explain, but not to change, the scope of the claims. *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000), *quoting Scripps Clinic v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991).  The words of the claims are construed independent of the accused product.  *Id.*  Further, not all claim terms need to be construed.  *See, e.g., Vivid Tech., Inc. v. Am. Sci. Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (only claim terms in controversy need to be construed).

### B.    Use Of Intrinsic As Well As Extrinsic Evidence

In construing a claim, courts can neither broaden nor narrow the claim to give the inventor something different than what was set forth.  *Texas Instruments, Inc. v. United*

*States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993), *quoting Autogiro Co. of Am. V. United States*, 384 F.2d 391, 396 (Ct. Cl. 1967). Rather, "[i]t is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."[7] *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001), *quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The court's consideration of extrinsic evidence is not mandatory in order to pronounce, as a matter of law, the meaning of claim language. Rather, it is discretionary:

> The court may, in its discretion, receive extrinsic evidence in order "to aid the court in coming to a correct conclusion" as to the "true meaning of the language employed" in the patent. Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims.

*Markman*, 52 F.3d at 980-81 (citations omitted).

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583. Moreover, "extrinsic evidence in general... may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language .... Nor may it contradict the import of other parts of the specification." *Id.* at 1584.

---

[7] The "intrinsic evidence" is the evidence before the United States Patent and Trademark Office ("PTO") when the PTO was considering whether to allow issuance of the patent. See *Vitronics*, 90 F.3d at 1582.

**C.    A Party Cannot Rewrite Claims By Importing Limitations From The Specification Into The Claims**

It is reversible error in claim construction to import limitations from the specification into the claims. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In *CCS Fitness*, the Federal Circuit reversed the district court's determination of summary judgment where it improperly limited the term "member" to only the types depicted in the specification's drawings. *Id.* at 1364-1367. The Federal Circuit admonished that it "indulges a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Id.*, at 1366. Further "[i]f an apparatus claim recites a general structure without limiting that structure to a specific subset of structures, we will generally construe the term to cover all known types of that structure that the patent supports." *Id.*

Moreover, the "heavy presumption" may not be overcome simply by "pointing to the preferred embodiment or other structures or steps disclosed in the specification ..." *Id.* The described embodiments will not limit the claims unless the patentee has explicitly disclaimed subject matter. *See Honeywell, Inc. v. Victor Co. of Japan*, 298 F.3d 1317, 1325-27 (Fed. Cir. 2002) (specification did not expressly disclaim subject matter where it did not use "broad and unequivocal" language in a way that excluded subject matter).

**D.    The Ordinary Meaning Is To Be Used**

Claim construction analysis begins with the words of the claims themselves. *Teleflex*, 299 F.3d at 1324. The claims are the language the inventors chose to define the scope of the patent, and so in construing claims, the court must begin and remain centered on the words of the claim. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1201 (Fed. Cir. 2002). The general rule is that terms within a claim are to be accorded their ordinary and accustomed meaning. *CCS Fitness*, 288 F.3d at 1366.

7

"The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as sort of a dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. "The terms used in the claims bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *CCS Fitness*, 288 F.3d at 1366.

In determining the ordinary meaning of a disputed term, often "dictionaries provide evidence of a claim term's 'ordinary meaning.'" *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1369 (Fed. Cir. 2002); *Texas Digital*, 308 F.3d at 1202 (recognizing "that dictionaries, encyclopedias and treatises are particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms"). However, "the presumption in favor of a dictionary definition will be overcome where the patentee, acting as his or her own lexicographer, has clearly set forth an explicit definition of the term different from its ordinary meaning." *Texas Digital*, 308 F.3d at 1204, *citing In re Paulsen,* 30 F.3d 1475, 1480 (Fed. Cir. 1994); *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387-88 (Fed. Cir. 1992).

### E.     Claim Interpretation Includes Patents In A Family

The history regarding a claim term in a related patent applies to patents that contain the same or similar term, particularly when the patents are derived from the same initial application. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999); *see also, Masco Corp. v. United States*, 303 F.3d 1316, 1324 (Fed. Cir. 2002) ("The prosecution history of a parent application may be considered in construing claim terms.").

**F.     Claim Differentiation**

Finally, claim terms must be interpreted in light of other claims in the same patent. Under the doctrine of claim differentiation, different claims are presumed to have different scope. In particular, limitations stated in dependent claims are not to be read into the independent claims from which they depend. *Karlin Tech. Inc. v. Surgical Dynamics Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999).

**IV.     CLAIM TERMS TO BE CONSTRUED**

**A.     Live Event**

DDB proposed construction:   an event that is occurring in real time.

MLBAM's proposed construction: "Live" means that information is "being transmitted as the event/game is occurring."

As set forth above, claim construction begins with the words of the claim. Certain, but not all, of the claims of the patents-in-suit include the claim term "live event." For example, Claim 8 of the '347 Patent is set forth below, with the "live event" limitation highlighted in yellow for this Court's convenience:

8. A method for simulating a live event that is composed of a sequence of discrete sub-events at a viewer computer at a location different from the location of the live event, with the event being governed by a set of rules that predetermines the consequences of the actions that define the sub-events, comprising the steps of:
creating a set of symbols useful in a computer simulation, wherein each symbol is representative of an action involving physical exertion and skill;
generating a sequence of symbolic descriptions wherein each symbolic description is a representation of a discrete sub-event of the live event and includes at least one symbol from said set of symbols, wherein an indicated status of the event may be affected by an action described by the symbol;
creating a database file corresponding to the event;

> updating said database file using said generated sequence of symbolic descriptions;
> creating transmission data from said generated sequence of symbolic descriptions,
> broadcasting said transmission data;
> receiving the broadcasted transmission data at the viewer computer;
> storing the received transmission data, and
> generating a computer simulation of the live event at the viewer computer using said received transmission data.

(Ex. E, col. 17, ll. 15-41, emphasis added).

DDB believes that the meaning of the term "live event" is self-evident and thus does not require any construction by this Court. Nonetheless, if this Court does render a construction for this term, then DDB submits that this term should be construed to mean just what is says, namely, an event that is occurring in real-time.

MLBAM, on the other hand, takes a far different approach to the construction of this claim term. According to MLBAM, the term "live" means information "being transmitted as the event/game is occurring." (Ex. H, p. 1).

There are two fundamental flaws in MLBAM's construction. First, as Claim 8 above reveals, the word "live" is used in the claims to describe an "event." Thus, the proper term to construe is "live event," not "live."

Second, MLBAM's proposed construction goes far beyond what is meant by a "live event," and instead focuses on *when* information *about* the live event is sent out to the viewer. MLBAM is improperly reading limitations into this claim element that are simply not there.

As Claim 8 above clearly reveals, the term "live event" is just that--a live event. *When* information about that live event is transmitted to a viewer (i.e., whether the information is sent as the live event actually occurs) has nothing whatsoever to do with

10

the live event itself.   Thus, MLBAM's overly narrow construction of "live" or "live event" must be rejected

### B.   Broadcasting

> <u>DDB proposed construction</u>:  The transmission of data to multiple viewers using one-way or two-way communication techniques.

> <u>MLBAM's proposed construction</u>:  A one-way transmission of a single message simultaneously to multiple recipients.

Claim 1 of the '347 Patent (set forth below) is an example of a claim that includes the term "broadcasting," which is highlighted in yellow for this Court's convenience:

> 1.  A method of broadcasting information about a live event that is composed of a sequence of discrete sub-events wherein a set of rules governs the event so that a status change resulting from the occurrence of a sub-event is determined by the set of rules, comprising the steps of:
> creating a set of symbols useful in a computer simulation, wherein each symbol is representative of an action involving physical exertion and skill;
> generating a sequence of symbolic descriptions, each description being a representation of one of the discrete sub-events, and includes at least one symbol from said set of symbols wherein said symbol may be used in a computer simulation to effect a change in an indicated status of an event in connection with a computer simulation program that operates in accordance with the set of rules governing the event;
> creating a database file corresponding to the event;
> updating said database file using the generated sequence of symbolic descriptions;
> creating transmission data from the generated sequence of symbolic descriptions; and
> broadcasting said transmission data.

(Ex. E, col. 16, ll. 30-52, emphasis added).

DDB believes that the term "broadcasting" should simply be construed to mean: the transmission of data to multiple viewers.  DDB also believes that it would be wholly improper to limit the definition to a "one-way transmission" as urged by MLBAM.  Thus, DDB clarifies in its proposed definition that the transmission of data to multiple viewers

can be accomplished using one-way *or* two-way communication techniques.   DDB's proposed construction is consistent with (1) the patent specification, (2) the wording of the claims themselves, (3) the prosecution history, and (4) the ordinary meaning of "broadcasting."  Each of these is discussed below.

**1.    The Patent Specification Of The Computer Simulation Patents Supports DDB's Proposed Construction**

Figure 1 of the Computer Simulation Patents, set forth below, illustrates how information about a live event is sent from the database computer 4 to the viewer's computer 6.



OBSERVER WITH          ENCODED          DATABASE          TRANSMISSION          VIEWER WITH
COMPUTER               DESCRIPTION       COMPUTER                                COMPUTER

# FIG.1

(Ex. E, Fig. 1).  Significantly, Figure 1 refers to the information being sent from the database computer to the viewer's computer simply as a "transmission."

The specification then goes on to describes two different communication techniques used to carry out this transmission.  In particular, the patent specification states that "[t]here are two basic techniques for transmitting [information] from the centralized data base computer to a viewer's computer."  (Ex. E, col. 8, ll. 9-11).  These

two techniques are illustrated in Figures 6 and 8.  Figure 8, which is reproduced below, illustrates an example of a one-way communication technique:



# FIG.8

(Ex. E, Fig. 8).

As described in the patent specification, a transmitter 85 transmits information to a viewer's computer via an antenna mechanism 86.  (Ex. E, col. 8, ll. 51-56).  The reason why this technique is referred to as a "one-way" technique is that the viewer does not make a request for the information.  Instead, the information is automatically transmitted by the transmitter 85 even if no action is taken by the viewer to request the information.[8]

---

[8] The Computer Simulation Patents describe Figure 8 as follows: "Fig. 8 illustrates a transmission technique for one-way communication between a centralized data base computer and a viewer's computer."  (Ex. E, col. 3, ll. 18-20).

A two-way communication technique is shown in Figure 6, which is reproduced below:



FIG.6

(Ex. E, Fig. 6).

As described in the patent specification, a viewer 68 makes a request for information, and in response to that request, information is transmitted back to the viewer. This is what is commonly referred to as a two-way request-and-receive communication technique.[9]

The one-way and the two-way communication techniques described above each have one important characteristic in common: *they each transmit information to a viewer's computer*. The only difference between the two techniques is that in the two-way communication technique, a request signal is first sent by the viewer before the response signal is transmitted back to the viewer's computer. In the one-way technique, no such request is sent by the viewer. In short, Figures 6 and 8 (and the corresponding written description) fully support DDB's position that "broadcasting" should be

---

[9] The Computer Simulation Patents describes Figure 6 as follows: "Fig. 6 illustrates a transmission technique for transmitting information between a centralized data base computer and a viewer's computer in accordance with the method of the present invention." (Ex. E, col. 3, ll. 11-14).

14

construed to mean: the transmission of data to multiple viewers using one-way or two-way communication techniques.

Moreover, the description of Figure 1, which as shown above refers to the information being sent to the viewer's computer simply as a "transmission," states: "FIG. 1 is a pictorial representation of a *transmission system* utilizing the *broadcast* method of the present invention." (Ex. E, col. 2, ll. 62-64, emphasis added). This description of Figure 1 indicates that the word "broadcasting," as used in the context of the Computer Simulation Patents, broadly means transmitting information to multiple viewers. This further supports DDB's proposed construction of "broadcasting."

MLBAM's construction of the term "broadcasting," which is limited to a one-way transmission, is erroneous because it imports limitations from the patent specification. As demonstrated above, the one-way communication technique described in the patent specification is merely *one example* of a way to transmit data to multiple viewers. As set forth above, it is black letter patent law that examples from the patent specification are not to be imported into the claims. *CCS Fitness, Inc.*, 288 F.3d at 1366. Thus, MLBAM's proposed definition of "broadcasting" must be rejected.

### 2. The Words Of The Claims Themselves Fully Support DDB's Proposed Construction

Reference to other claims of the Computer Simulation Patents also supports DDB's proposed construction. In particular, the claims of the Computer Simulation Patents explicitly state that "broadcasting" includes one-way and two-way communication techniques.

For example, independent Claim 13 of the '347 Patent, like Claim 1 set forth above, recites "[a] method for broadcasting information . . . " and the step of

"broadcasting said transmission data." (Ex. E, col. 17, l. 58 – col. 18, l. 21). Claim 15, which depends from Claim 13,[10] states:

> 15. The method of claim 14, wherein said *step of broadcasting* comprises the step of *automatically transmitting* updated contents of said database files along a multiplexed communication channel.

(Ex. E, col. 18, ll. 26-28, emphasis added). Thus, Claim 15 covers broadcasting using the one-way communication technique (the one-way technique being characterized by information being *automatically* transmitted even if no action is taken by the viewer to request the information, as discussed above).

Claim 16, which also depends from Claim 13,[11] states:

> 16. The method of claim 14, wherein said *step of broadcasting* comprises the steps of:
> *receiving* a request from a viewer computer for access to a database file corresponding to one of said plurality of events and
> *transmitting* an update of the requested database file to the requesting viewer computer.

(Ex. E, col. 18, ll. 30-36, emphasis added). Thus, Claim 16 covers broadcasting using the two-way communication technique (the two-way technique being characterized by first receiving a request from a viewer and then transmitting the response back, as discussed above).

In short, because dependent Claim 15 recites broadcasting using the one-way communication technique and because dependent Claim 16 recites broadcasting using the two-way communication technique, the term "broadcasting" in independent Claim 13 must be broadly construed to encompass both types of techniques. Otherwise the claims would make no sense.

---

[10] Claim 15 depends from Claim 14, which in turn depends from Claim 13.

[11] Claim 16 depends from Claim 14, which in turn depends from Claim 13.

In view of the above, DDB's proposed construction must be adopted. MLBAM's proposed construction, which is limited to a one-way communication, is inconsistent with the claims themselves and thus must be rejected.

### 3.   The Prosecution History Also Supports DDB's Proposed Construction

Something very significant happened during the prosecution of one of the Computer Simulation Patents (in particular, the '479 Patent) that sheds light on the meaning of the term "broadcasting." Certain of the pending claims that were before the Patent Examiner were rejected under 35 U.S.C. § 112 as being indefinite. In particular, the Patent Examiner indicated that the term "broadcast" was "vague and ambiguous." (Ex. I, p. 2). In order to overcome that rejection, the Applicants argued that the term "broadcast" was "clearly understood by the skilled artisan." (Ex. J, p. 11). The Applicants then explained what the term "broadcast" covers: "[b]roadcast covers the transmission of [data] to the multiple end users who would be interested in the information." [12] (Ex. J, p. 11). This statement--that a broadcast covers the transmission of data to multiple users--is perfectly consistent with DDB's proposed construction.

---

[12]  DDB notes that this quote states in full: "[b]roadcast covers the transmission of the symbolic descriptions that describe the subevents to the multiple end users who would be interested in the information." (Ex. J, p. 11). DDB omitted the phrase "the symbolic descriptions that describe the subevents" in this quote and replaced it with the word "data" because some of the claims of the patents-in-suit actually require the transmission of the "symbolic descriptions" (see, for example, Claim 1 of the '479 Patent) (Ex. D, col. 16, ll. 38-59), while other claims of the patents-in-suit have no such requirement (see, for example, Claim 8 of the '347 Patent set forth above, which specifies creating transmission data *from* the symbolic descriptions, and then broadcasting the transmission data) (Ex. E, col. 17, ll. 15-41). Thus, the relevant portion of this file history statement as it relates to the meaning of the term "broadcasting" is the transmission of information (whether it be the symbolic descriptions themselves or simply transmission data based on the symbolic descriptions) to multiple end users.

It is important to note that the Applicants *never* said during the prosecution that "broadcast" only means a one-way transmission. For this additional reason, MLBAM's construction must be rejected.

### 4. DDB's Proposed Construction Is Consistent With The Ordinary Meaning Of The Term "Broadcasting"

Finally, DDB's construction is consistent with the ordinary meaning of the term of "broadcasting." WEBSTER'S DICTIONARY (1991 Edition)[13] defines broadcast or broadcasting (as a verb) as "1: to scatter or sow (as seed) broadcast 2: to make widely known 3: to transmit as a broadcast ~ *vi*: 1: to transmit a broadcast . . .", and as noun "broadcast" is defined as "1: the act of transmitting . . . ." (Ex. L). These definitions are perfectly consistent with DDB's proposed construction.

In view of all of the above, the term "broadcasting" means, in the context of the Computer Simulation Patents, the transmission of data to multiple viewers using one-way or two-way communication techniques.

### C. Computer Simulation

DDB proposed construction: the use of graphics, text, or animation to display on a computer a representation of the progression of the plays (sub-events) of an event in a manner that correlates to the actual event, wherein the representation is derived from the plays.

MLBAM's proposed construction: a computer program which (1) uses a mathematical model of a system to calculate the state (update the status) of the system as a function of sub-events (plays) which serve as input to the system, and (2) uses graphical animation to display the changing state of system in response to these sub-events.

---

[13] WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991 Edition).

Claim 1 (set forth below) of the '347 Patent is an example of a claim that includes the term "computer simulation," which is highlighted in yellow for this Court's convenience:

> 1. A method of broadcasting information about a live event that is composed of a sequence of discrete sub-events wherein a set of rules governs the event so that a status change resulting from the occurrence of a sub-event is determined by the set of rules, comprising the steps of:
> creating a set of symbols useful in a computer simulation, wherein each symbol is representative of an action involving physical exertion and skill;
> generating a sequence of symbolic descriptions, each description being a representation of one of the discrete sub-events, and includes at least one symbol from said set of symbols wherein said symbol may be used in a computer simulation to effect a change in an indicated status of an event in connection with a computer simulation program that operates in accordance with the set of rules governing the event;
> creating a database file corresponding to the event;
> updating said database file using the generated sequence of symbolic descriptions;
> creating transmission data from the generated sequence of symbolic descriptions; and
> broadcasting said transmission data.

(Ex. E, col. 16, ll. 30-51, emphasis added).

DDB and MLBAM generally agree that in order for a computer simulation to be generated on the viewer's computer screen, the progression of the changes of the event has to be derived (or calculated) based on the plays (sub-events) as they occur. In other words, the Computer Simulation Patents teach that in order to display the computer simulation on the viewer's screen, a computer program is used to calculate the state of the game based on the rules of the game and the particular plays as they occur (i.e., update the status of the game).[14]

---

[14] DDB, however, disagrees with MLBAM's use of the word phrase "mathematical model" in its definition, because "mathematical" would not normally be used to describe, for example, the rules of baseball.

The parties, however, sharply disagree as to whether a computer simulation must include the display of an animation, as MLBAM claims. DDB believes that the term "computer simulation" should be construed to include the use of graphics, text, *or* animation as the display mechanism. DDB's proposed construction should be adopted because it is consistent with the words of the claims, the patent specification, and the prosecution history.

1.    **The Asserted Claims Merely Require A Computer Simulation, Not An Animation**

It is significant to note that the word "animation" does not appear in Claim 1, set forth above, *or any* of the claims of the Computer Simulation Patents, for that matter. This supports DDB's position that the term "computer simulation" should not be limited to an animation.

2.    **The Patent Specification Is Clear That A Computer Simulation Can Include Graphics, Text, Or Animation**

The patent specification of the Computer Simulation Patents repeatedly and consistently states that animation is *just one* of the many techniques that can be used to display the computer simulation of the live event at the viewer's computer. For instance, the patent specification states:

> Essentially, the viewer's computer . . . shows each sub-event received from the centralized database computer in *either* a graphical representation *or* a textual representation *or* an audio/visual representation.

(Ex. E, col. 9, ll. 61-67, emphasis added)

> The actions can be represented to the viewer *either with* visuals images, audio images, or text, *or some combination thereof.*

(Ex. E, col. 2, ll. 34-36, emphasis added).

> The viewer 7 then selects the *type of display* warranted for the event in question, *either* a textual display, *or* a visual display *or* visual-audio display.

(Ex. E, col. 3, ll. 60-65, emphasis added).

> the viewer... can also choose to have information about the event displayed in graph or chart form rather than as visual images.

(Ex. E, col. 1, l. 65 - col. 2, l. 1)

All of the above quotes are clear that any one of these display techniques (i.e., text *or* graphics *or* animation) may be used to display the simulation. Thus, the term "computer simulation" as used in the Computer Simulation Patents cannot be limited to an animation, but instead must be construed to include graphics, text, or animation consistent with the patent specification.

Moreover, a careful reading of the patent specification reveals that the inventors referred to the term "computer simulation" and the term "animation" as separate and distinct concepts. For example, the patent specification states:

> A further difference between with the Law et al. algorithm is that the *simulation algorithm* of the present invention is combined with *graphical animation* techniques, as described below.

(Ex. E, col. 11, ll. 39-43). The fact that a simulation algorithm could be combined with "graphical animation techniques" proves that the term "computer simulation" and the term "animation" mean two different things. It would be illogical and improper to define "computer simulation" as requiring "animation" when the inventors used the terms differently in the patent specification.[15]

---

[15] Another example of the inventors referring to the term "computer simulation" and the term "animation" as distinct concepts is as follows: "[t]he viewer's computer maintains a description of the status of real event by using well-known techniques in the art of computer simulation and animation . . .) (Ex. E, col. 10, ll. 1-4).

MLBAM's proposed definition, which is limited to an animation, is erroneous because it once again imports limitations from the patent specification. As demonstrated above, the animation described in the patent specification is merely *one example* of a way to display the simulation on the viewer's computer. MLBAM invites reversible error by urging this Court to import the concept of animation into the claims.

> **3.    The Inventors Never Said That A Computer Simulation Must Include Animation During The Prosecution Of The Computer Simulation Patents**

Finally, there is not one shred of evidence in the Computer Simulation Patents or their file histories that the inventors defined a computer simulation to require an animation as the display mechanism. Although the inventors did explain during prosecution that their invention dealt with a computer simulation to distinguish prior art, the inventors *never* distinguished their invention from the prior art based on animation. Thus, they never limited the claims of the Computer Simulation Patents, either by argument or amendment, to require a computer simulation having animation. For this additional reason, DDB's proposed construction should be adopted, and MLBAM's unduly narrow construction should be rejected.

> **D.    Combining**

> > DDB proposed construction:  combining means that two signals are transmitted concurrently over the same medium.

> > MLBAM's proposed construction:  combining means to come or bring into union; act or mix together; unite; join together

The claims in the '630 patent use the term "combine" or "combining" when referring to a broadcast signal that is produced by combining two signals. For instance,

Claim 1 of the '630 Patent (set forth below) is an example of a claim including the term "combining," which is highlighted in yellow for this Court's convenience:

> 1. A method for broadcasting information about a live event that is constituted by a plurality of subevents, each subevent including at least one action, comprising the steps of:
> producing a first information signal comprising an audio description of the event;
> producing a second information signal, said second information signal including a sequence of symbolic representations for each subevent of the event, each sequence including a value for at least one status variable that defines the status of the event at a particular time in relation to the subevent represented by that sequence, said second information signal comprising a signal from which a computer simulation of the event described by the first information signal can be produced;
> producing a broadcast signal by combining said first and second second information signals;
> transmitting said broadcast signal from a first location;
> receiving said broadcast signal at a second location;
> separating said broadcast signal into said first and second information signals;
> analyzing said second information signal using pattern-matching techniques to detect subevents and status information of interest;
> selectively producing an audio representation of the event using said first information based on the detection of subevents and status information of interest by said step of analyzing.

(Ex. G, col. 25, l. 55 – col. 26, l. 16).

DDB asserts that the term "combining" should be construed to mean: two signals that are transmitted concurrently over the same medium. DDB's proposed construction is consistent with the patent specification of the patents-in-suit, their file histories, and the ordinary meaning of "combining." Accordingly, it would be improper to narrowly limit the definition to two independent signals that are *intermixed* prior to transmission, as urged by MLBAM.[16]

---

[16] In their summary judgment motion, MLBAM asserted that "combining" means "that two independent signals are intermixed prior to transmission, so that they can be transmitted as one." (Ex. A, p. 34). This is essentially the same construction that MLBAM is currently urging this Court to adopt.

1.    **The Patent Specification Fully Supports DDB's Proposed Construction**

The patent specification of the '630 patent illustrates and describes how information (in particular, an encoded description of the live event) is combined with other signals. Specifically, the patent specification states that "the encoded description is combined with other signals such as an audio signal or a video signal to produce a combined signal. . ." (Ex. G, col. 15, ll. 6-8). The combination of signals is illustrated in Figure 20 of the '630 Patent, which is reproduced below:



FIG.20

(Ex. G, Fig. 20).

There are at least two examples set forth in the patent specification of combining the encoded description with other signals. One way to combine them is by intermixing them. For example, data representative of the play may be broadcast between the images in a video signal (i.e., data and video signals are intermixed). (Ex. G, col. 18. ll. 44-47).

A second way to combine signals is to transmit the data representative of the play on one channel while the video signal is transmitted on another channel. (Ex. G, col. 18, ll. 54-55). Thus, in this scenario, the signals are not intermixed, and yet they are concurrently transmitted (i.e., they are combined).

Because the patent specification uses the word "combining" to cover each of the two scenarios above, the term "combining" must be construed to cover the intermixing of signals as well as the transmission of signals concurrently over the same medium. Thus, DDB's proposed construction should be adopted, and MLBAM's proposed construction, which improperly imports the example of intermixing signals, must be rejected.

### 2.    DDB's Proposed Construction Is Consistent with the Ordinary Meaning Of "Combining"

DDB's construction is also consistent with the ordinary meaning of the term combine. WEBSTER'S DICTIONARY (1991 Edition)[17] defines combine as "2: to act together *syn* see JOIN." (Ex. M). Likewise, the term "join" is defined as "2: to put or bring into close association or relationship." (Ex. N).

Two signals that are transmitted concurrently over the same medium are "combined" because they are put into close association or relationship with each other. Thus, DDB's proposed construction is consistent with the ordinary meaning. Accordingly, the term "combining" means, in the context of the '630 Patent, two signals transmitted concurrently over the same medium.

### E.    Other Terms That MLBAM Contends Should Be Construed

MLBAM offers *35 additional terms* for construction. DDB believes that there is no need to construe these additional terms because their meaning is self-evident. Having this Court construe these additional 35 claim terms would result in nothing more than a waste of time and judicial resources.

Accordingly, DDB requests that the Court simply decline to construe these additional terms. In the alternative, should this Court deem it necessary to provide

---

[17] WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991 Edition).

constructions for these terms, then DDB requests that this Court adopt the constructions set forth by DDB in the chart attached as Exhibit K, which contains DDB's proposed constructions for these additional terms, as well MLBAM's proposed constructions.[18]

The definitions proposed by MLBAM for these additional 35 terms demonstrate just how far MLBAM is willing to go to improperly read limitations into the claims. A few noteworthy examples of the unreasonableness of MLBAM's positions are set forth below.

### 1.   First Computer

DDB's proposed construction: A computer.

MLBAM's proposed construction:  observer computer, except in Claim 10 of '630 where it is the viewer computer.

MLBAM violates at least five rules of claim construction (as set forth in Section III, above) in arriving at its proposed definition for first computer. First, terms used in the claims bear a "heavy presumption" that they mean what they say. Second, that "heavy presumption" may not be overcome simply by pointing to the preferred embodiment. Third, it is improper for a party to import limitations from the specification into the claims. Fourth, if a claim recites a general structure without limiting that structure to a specific subset, the term should be construed to cover all types of that general structure. Fifth, a claim term

---

[18] DDB notes that in many instances MLBAM improperly lumps together claim terms and assigns just one definition for those terms. For example, as shown in Ex. C on the top of page 3 (under column labeled "Definition"), MLBAM lumps together the claim terms "transmission data," "data representative of symbolic descriptions," and "information corresponding to said sequence of symbolic descriptions," and provides the same definition for these terms. However, as demonstrated below, each of these terms has its own distinct meaning. If the inventors had intended the same meaning, they would have used the same words – but in this case they did not. Different words or phrases are presumed to have different meanings in the claims. *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987).

should not take on a different meaning in different claims (i.e., the proposed claim construction must be applicable to all claims).

In the claims, the term "first computer" means just that-- a (first) computer. It is therefore unnecessary to construe this claim term as anything other than its ordinary meaning. When drafting the '630 Patent, the inventors could have used the limiting terms "viewer computer" or "observer computer" in the claims if they so desired. However, the inventors instead chose to use the broader term "first computer." A "first computer" means just what it says--a computer.

The word "first" is used to modify the word "computer" simply to distinguish a "first computer" from another computer (i.e., a second computer) called out in the claims. The use of the word "first" to refer to something in a patent claim (in this case a computer) is a common and universally understood claim drafting technique. "[R]eciting only the adjectives first, second, etc. is useful where there are two or more ways of arranging elements and the claim writer wishes to encompass all of the ways, so that one location or arrangement would be first and the other would be second, without specifying which is which." LANDIS ON MECHANICS OF PATENT CLAIM DRAFTING, p. III-17 (4th ed., Dec. 1999).

MLBAM's proposed construction unduly limits the term "first computer" to a *specific type* of computer, namely, an "observer computer" or a "viewer computer." There is no basis whatsoever to limit the claims in this fashion. Thus, a "first computer," if construed at all, should be construed to simply mean "a computer."

There is another important reason why MLBAM's proposed construction must be rejected. If adopted, it would result in the term "first computer" taking on different

meanings in different claims. For instance, MLBAM claims that "first computer" should mean an "observer" computer for certain claims, but that it should mean something else (i.e., a "viewer" computer) for Claim 10 of the '630 Patent. MLBAM's shifting and non-sensical proposed construction must be rejected for this additional reason.

### 2.    Second Computer

DDB's proposed construction:  Another computer.

MLBAM's proposed construction:  viewer computer, except in Claim 10 of '630 where it is the observer computer.

A second computer is simply another computer (as opposed to a "first computer" mentioned above). Here again, MLBAM is improperly attempting to read limitations into the claims by proffering a definition that is limited to a specific type of computer (i.e., a viewer computer or an observer computer). For the reasons discussed above in connection with the term "first computer," MLBAM's proposed construction must be rejected.

### 3.    Transmission Data

DDB's proposed construction:  data that is transmitted.

MLBAM's proposed construction:  sub-event information based on the sub-event code entered by the observer.

DDB believes that the term "transmission data" is clear and unambiguous and means exactly what is says--data that is transmitted. MLBAM's definition, on the other hand, yet again reads limitations into the claims that are not there. In particular, MLBAM seeks to have "transmission data" limited to a specific type of transmission data (i.e., sub-event information based on the sub-event code entered by the observer). There is nothing in this claim term that requires the "data" to be sub-event information based on

the sub-event code entered by the observer. Thus, MLBAM's construction must be rejected.

Moreover, MLBAM's proposed construction of "transmission data" is inconsistent with the wording of the asserted claims themselves. For example, independent Claim 16 of the '862 patent recites "creating transmission data from information stored in a database file." (Ex. F, col. 19, ll. 18-20). In this case, the "transmission data" is created from information in the database file, *not* from "sub-event code entered by the observer," as urged by MLBAM. Because MLBAM's construction would render this claim non-sensical, MLBAM's flawed construction must be rejected.

Finally, adding the "observer" limitation into the definition of "transmission data" is contrary to the intrinsic evidence. For instance, every independent claim of the '862 patent that recites "transmission data" does not even mention the word "observer" (*see*, for example, independent claims 1, 5, 10, 16, 21, 25, 29, and 33 of the '862 patent). (Ex. F). In fact, the only claims in the '862 patent that include the term "observer" are claims that *do not* include the term "transmission data." Thus, it would be wholly improper to read the "observer" limitation into the "transmission data" claim term.

### 4.    Enter

DDB's proposed construction:  to put into.

MLBAM's proposed construction:   input of information into a computer by a human.

DDB believes that the term "enter" means exactly what is says--to put into. This is perfectly consistent with the ordinary meaning of the term: "4: to put in: insert."[19] (Ex.

---

[19]WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991 Ed.).

O). Once again, MLBAM takes a single, self-evident word, and proposes a construction that imports a number of limitations. For instance, MLBAM claims that this term should be limited to inputting information into a computer *by a human*. There is no such requirement in the term "entering." It is common knowledge that information can be transferred between computers (i.e., entered into computers) without human intervention. Thus, MLBAM's overly narrow construction must be rejected.

### 5.    Database file

DDB's proposed construction:  a repository containing data.

MLBAM's proposed construction:  a nonredundant collection of relational, interrelated data items that can be shared and used by several different subsystems.

DDB believes that the term "database file" means exactly what it says--a repository containing data.   MLBAM, on the other hand, tries to inject numerous limitations into this readily understood term by arguing that the term requires "a nonredundant collection of relational, interrelated data items" and that these items "can be shared and used by several different subsystems." There is no support for reading these limitations into the term "database file." Thus, MLBAM's construction should be rejected.

### 6.    Symbolic Description

DDB's proposed construction:  a description that uses symbols.

MLBAM's proposed construction:  sub-event code entered by the observer.

DDB believes that a symbol, as used in the patents-in-suit, simply refers to a representation of something (e.g., a representation of an action). Thus, a "symbolic description" simply means: a description that uses symbols.

MLBAM's construction is unduly narrow because it improperly imports into the claim term "a sub-event code entered by the observer." MLBAM's proposed construction is not supported by the claims or the specification. For example, the term "symbolic description" appears in Claim 1 of the '347 patent in the following context.

> Generating a sequence of symbolic descriptions, each description being a representation of one of the discrete sub-events, and includes at least one symbol from said set of symbols...

(Ex. E, col. 16, ll. 38-41). Similar passages can be found in independent claims 8 and 13 of the '347 patent (Ex. E, cols. 17-18), independent Claims 1, 9, and 15 of the '479 patent (Ex. D, cols. 16-18), and independent Claims 1, 5, 10, 16, 21, and 25 of the '862 patent. (Ex. F, cols. 16-20). Significantly, nowhere in any of those independent claims does the word "observer" appear.

In contrast, independent Claim 18 of the '347 patent recites "an observer computer generating a sequence of symbolic descriptions from a set of symbols..." (Ex. E, col. 18, ll. 45-46). Similar passages can be found in independent Claim 19 of the '479 patent (Ex. D, col. 19, ll. 1-2), and independent claim 24 of the '862 patent (Ex. F, col. 20, ll. 26-27).

Thus, it is clear that certain claims specifically refer to an observer computer, while other claims specifically omit the reference to an observer computer. It is therefore improper for MLBAM to import the "sub-event code entered by the observer" limitation into the meaning of the term symbolic description. Accordingly, DDB's proposed

construction should be adopted, and MLBAM's proposed construction should be rejected.

## V.   CONCLUSION

There is no need to construe all of the 39 terms identified by MLBAM. The more reasonable approach is to construe the four claim terms that MLBAM focused on in its motion for summary judgment.

DDB's proposed definitions are consistent with the intrinsic evidence, namely, the claims, the specification, and the prosecution history. MLBAM's proposed definitions, on the other hand, improperly import limitations from the patent specification into the claims. Accordingly, this Court should adopt DDB's proposed definitions, and reject MLBAM's proposed definitions.

Respectfully submitted,

DDB Technologies, L.L.C.,

Date: March 30, 2005

_____

Michael H. Baniak
Michael D. Gannon
Christina L. Brown
Christopher E. Haigh
BANIAK PINE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois  60606
(312) 673-0360
(312) 673-0361  Facsimile

and

Ross Spencer Garsson
Texas State Bar Number 00784112
WINSTEAD SECHREST & MINICK P.C.
401 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 474-4330
(512) 370-2850  Facsimile

Attorneys for Plaintiff DDB Technologies, L.L.C.

33

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of DDB TECHNOLOGIES, L.L.C.'S OPENING *MARKMAN* BRIEF was served upon:

> Hal L. Sanders
> Witcher F. McCullough III
> HAYNES AND BOONE LLP
> 600 Congress Ave., Suite 1300
> Austin, Texas 78701-3236
> (512) 867-8400
> (512) 867-8470 Facsimile
> *via hand delivery*
>
> Sharon R. Barner
> Anat Hakim
> James T. McKeown
> FOLEY & LARDNER LLP
> 321 North Clark
> Suite 2800
> Chicago, Illinois 60610-4764
> (312) 832-4500
> (312) 832-4700 Facsimile
> *via federal express*

this 30th day of March, 2005.

Ross Spencer Garsson

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

## NOTICE OF DOCUMENT(S) NOT IMAGED
## AND CONTAINED IN FOLDER

Civil Case No.        A-04-CA-352-LY

DDB Technologies, L.L.C.

VS.

MLB Advanced Media, L.P.

Attachments to
Document #:        58

Description:        exhibits to Markman Brief

Filed By:        pltf

File Date:        3/30/05

_____
DEPUTY CLERK