UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
AUSTIN DIVISION

2005 AP 29  PM 4: 23

WESTE...  ...  OF TEXAS
U.S. CLERK'S OFFICE

BY:_____
DEPUTY

| | |
|---|---|
| DDB TECHNOLOGIES, LLC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Civil Action No. A04 CA 352 |
| MLB ADVANCED MEDIA, L.P., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**INITIAL MARKMAN BRIEF OF DEFENDANT**

63

## TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

II.     BACKGROUND ......................................................................................................... 2
        A.      The Technology At Issue And DDB's Patents ..................................................... 2
        B.      The DDB Patents ...................................................................................................... 4
                1.      The Simulation Patents .................................................................................. 5
                2.      The Audio/Video Patent. ................................................................................ 13

III.    LEGAL STANDARD FOR CLAIM CONSTRUCTION ........................................... 16

IV.     CONSTRUCTION OF CLAIM TERMS & PHRASES .............................................. 17
        A.      "Simulation" ............................................................................................................. 17
                1.      The Definition of "Simulation" Requires Updating State
                        Variables Using Mathematical or Logical Relationships, in
                        Response to Input Events ................................................................................ 19
                2.      The Definition of "Simulation" Also Requires Graphical
                        Animation ......................................................................................................... 21
        B.      "Broadcast" ................................................................................................................ 24
        C.      "Live Event" .............................................................................................................. 31
        D.      "Combine" .................................................................................................................. 34
        E.      "Transmission Data" ................................................................................................. 36
        F.      "Enter" ........................................................................................................................ 38
        G.      "Database File" .......................................................................................................... 39
        H.      "Symbolic Description" ............................................................................................ 40
        I.      "Useful in a Computer Simulation" ........................................................................ 40
        J.      Claim Terms and Phrases Included in Means Plus Function Claims ............ 41
        K.      "Automatically Transmitted" .................................................................................. 45
        L.      "First Computer" ...................................................................................................... 46
        M.      "Second Computer" .................................................................................................. 47
        N.      "Symbol/Code" .......................................................................................................... 47
        O.      "Separating" ............................................................................................................... 48
        P.      Additional Terms/Phrases To Be Construed ......................................................... 49

CONCLUSION .................................................................................................................................. 50

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bell & Howell Doc. Mgmt, Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997)........... 17

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615 (Fed. Cir. 1995) ....................................................................................................................... 44

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002) ....... 43

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998) ....................................................................................................................... 43

*Cultor Corp, supra* 224 F.3d at 1331 ........................................................................................ 24

*Cultor Corp. v. A. E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000) ............................. 20

*Greenberg v. Ethicon-Endo Surgery*, 91 F.3d 1580, 1584 (Fed. Cir. 1996)................................. 42

*In re Donaldson, Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994).......................................................... 42

*Inc. v. Brown, 939 F.2d 1558, 1562 (Fed. Cir. 1991)* .................................................................. 21

*Johnson v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989) ..................................................... 42

*Nazomi Communications, Inc. v. Arm Holdings, PLC*, 2005 WL 820491 (Fed. Cir. Apr. 11, 2005) ....................................................................................................................... 40

*NTP v. Research In Motion*, 392 F.3d 1336 (Fed. Cir. 2004)........................................................ 44

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) .............. 17

*Senior Unsecured Cred. Comm.*, 749 F. Supp. at 772 ................................................................. 43

*Southwall Techs., Inc. v. Cardinal IG Co.* 54 F.3d 1570, 1574 (Fed. Cir. 1995) ......................... 21

*Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ................. 19

*Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002) ....................... 40

*Unique Concepts, Inc. v. Brown, 939 F.2d 1558, 1562 (Fed. Cir. 1991)* ...................................... 21

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ............................... 17

*Vivid Techs., Inc. v. Am. Sci. & Eng'g*, 200 F.3d 795, 803 (Fed. Cir. 1999)................................. 18

011.588453.1

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Claim construction is an issue of law for the Court to decide, and it is the necessary first step to determining infringement and invalidity of the patents-in-suit.  A thorough Markman process is particularly vital here given the parties' dispute concerning infringement and invalidity issues. This Court's claim construction must ensure that the patent claims are not construed one way for purposes of infringement and then construed another way for purposes of validity.  DDB Technologies, L.L.C. ("DDB") argues that based upon the pending summary judgment motion of MLB Advanced Media, L.P. ("MLBAM"), only four patent terms are in dispute.  DDB's position is premised on its misreading of MLBAM's summary judgment submission.  The parties dispute the meaning of 39 terms and phrases.  While DDB protests that the need to construe 39 claim terms is "totally unreasonable," its criticism is disingenuous and tactical.  DDB's failure to reduce the number of claims at issue or to take a clear position on how its patents differ from the prior art, means that at this time there are 92 claims being asserted.

DDB has ignored MLBAM's and this Court's repeated requests to narrow and focus its case by reducing the number of patent claims at issue  MLBAM attempted, through a series of in-person and written exchanges, to persuade DDB to reduce the number of claims at issue and to narrow any claim terms in dispute before this Markman briefing.  (Exs.[1] 5-9, correspondence between MLBAM and DDB).  Despite these requests, DDB refused to engage in substantive dialog to facilitate the reduction of claims or narrowing of disputed terms.  (Ex. 10, MLBAM letter dated 4/27/05).  DDB is well aware that the large number of claims it continues to assert in this case directly impacts this Markman process, making it more costly and time-consuming for the parties and the Court.  In addition to refusing to reduce the number of claims, DDB also has

---

[1] All Exhibits referenced in this Brief are attached to the Declaration of Jason J. Keener, included at Appendix A.

1

failed to provide any definition or support (and in some cases both) for numerous claim terms and phrases in dispute. If DDB reduces the number of claims it is asserting against MLBAM from 92 to some reasonable number, construction of some of these terms and phrases may prove to be unnecessary.

MLBAM's proposed constructions of these 39 terms are supported by both the intrinsic evidence of record and governing law; where applicable, MLBAM's proposed constructions are likewise supported by the extrinsic evidence. In contrast, DDB's undisclosed constructions and circular arguments are a veiled attempt to argue, on the one hand, for a broad construction for purposes of infringement, and on the other hand, a narrow construction for purposes of invalidity. Not only should DDB's position be rejected, but also, since DDB has refused to provide definitions and support in its opening brief, DDB should be estopped from further defining or supporting its constructions at this late stage.[2] This Court should therefore adopt MLBAM's interpretation for each of the terms and phrases in dispute.

## II.        BACKGROUND

### A.    The Technology At Issue And DDB's Patents

As suggested by the text of the DDB patents:

The present invention relates to a method for broadcasting and viewing live events. In particular, the present invention utilizes computer simulation techniques to characterize the actions of a live event and broadcasts those computer characterizations to viewers who desire such information. The event is then simulated by the viewer's computer, utilizing the computer simulation characterizations of the actions of the event and known simulation techniques. (Ex 1, '479 Patent at Col 1 Lines 15-22).

---

[2] The parties exchanged disputed claim terms and definitions prior to any briefing. DDB has failed to address the definitions of MLBAM with the likely tactical position of doing so only in its reply brief so that MLBAM could not meaningfully respond.

2

DDB has accused five products offered on MLB.com of infringing DDB's four patents.[3] Three of the DDB patents (i.e. the '479, '347 and '862, collectively the "Simulation Patents", Exs. 1-3) are directed to a broadcast of a live event (e.g., a baseball game), where the viewer's computer generates a graphical, animated, computer simulation of the game and each play as it is occurring. The key limitation contained in these three DDB patents requires simulation at the viewer computer of a live event using computer generated graphical animation. The claims require the viewer's computer to calculate the new status of the game based on each play and display each play on the viewer's computer using animation. A fourth, but closely related DDB patent (i.e. the '630 patent, the "Audio/Video Patent", Ex. 4), requires that the specific game information needed to generate the simulation is combined with an audio or video representation of the game before being transmitted to the viewer using computer matching algorithms.

By the time the DDB patents were filed in 1991, the broadcasting of live events was well-known. (Ex. 1, '479 Patent at Col 1, line 24). It was also well-known to utilize computers to simulate activities. (Ex. 1, '479 Patent at Col 1, lines 41-42). Moreover, at least four patents issued over a hundred years ago reflect that mechanical means for providing baseball updates to viewers were well known long before the applications for these patents were filed. (Ex. 13-15, old baseball patents; Ex. 16, pictures of old baseball displays).[4] How, then, was DDB able to define its invention so that it was patentable – i.e., distinguishable from the prior art? It did so by including limitations in the claims – the portions of the patent that actually define the metes and bounds of the patented invention – that distinguished the patented invention from the prior art systems in several respects. DDB specifically distinguished its invention from the prior art

---

[3] MLBAM refers the Court to the materials MLBAM provided at the March 15, 2005 technology tutorial. Those materials describe the DDB patents in more detail.

3

systems by pointing out that its invention requires simulation of a live event using computer generated graphical animation. In fact, DDB spent years trying to convince the USPTO to issue the DDB patents and was able to do so only after including specific limitations in the claims of the patents and setting forth exactly what those claim limitations mean. Significantly, those specific limitations and what they mean heavily focus on the limitation that the invention require that a simulation take place at the viewer computer. Moreover, "simulation" is specifically defined in this invention to require an algorithm that is implemented in such a way that the system will know the "rules of the game" and be able to calculate, based on pre-determined programming, what happens as a result of a given play. An additional limitation on DDB's definition of "simulation" is the use of computer generated graphical animation. Having been issued a patent only after incorporating these specific claim limitations and only after specifically and painstakingly defining and narrowing them in respect to the USPTO Examiner's objections, by law, DDB cannot now re-write the claims or the prosecution history in order to secure broader definitions in litigation.

**B.    The DDB Patents**

DDB's four patents are based on a string of related applications filed by DDB's predecessor-in-interest.[5]  DDB filed its first application, serial number 07/542,990 ("the '990 application"), on June 25, 1990, but abandoned it in favor of a continuation-in-part ("CIP") application[6] that resulted in the '479 patent. The '347 patent resulted from a continuation of the

---

[4] These patents were not cited during the prosecution of the DDB Patents.

[5] The applications for the patents at issue were filed in the name of the inventors, David and Daniel Barstow, and originally assigned to DDB's predecessor in interest. In the following discussion for convenience, we refer to the patent applicant as "DDB."

[6] A CIP is an application that claims priority to an earlier application and contains newly added subject matter. *Augustine Medical, Inc. v. Gaymar Industries, Inc.,* 181 F.3d 1291, 1302-03 (Fed. Cir. 1999). Generally, claims based on newly added subject matter are accorded the filing date of the CIP, while claims adequately supported by

011.588453.1

'479 patent application, and the '862 patent resulted from a continuation of the '347 patent application. (Ex. 12, DDB Patent family tree).

DDB filed a second patent application, serial number 07/641,716, on January 15, 1991. It resulted in the '630 patent. While the '630 patent does not claim priority to the '990 application, its specification includes the originally-filed specifications and drawings of the '990 application. (Ex. 12, DDB Patents family tree).

The disclosure of the '479, '347, and '862 patents are identical and claim similar subject matter.[7] However, the disclosure of the '630 patent includes additional subject matter, and differs significantly from that recited in the '479, '347, and '862 patents. Specifically, the '630 patent is generally directed to the broadcasting of a video or audio signal that is combined with codes to facilitate searching or other functions by a viewer.

## 1. The Simulation Patents

### a) Background

The Simulation Patents ('479, '347, and '862 patents) are directed to a common invention that provides for broadcasting a live event ("game") by means of capturing the event ("game") as a series of sub-event ("particular play") descriptions, sending the sub-event ("particular play") information to a central location, which then broadcasts the sub-event ("particular play") information to a viewer's computer, and produces a simulation of the live event ("game") at the viewer's computer. (Ex. 1, '479 Patent at Col 3 Lines 53-59, Col 9 Lines 55-57). This process is depicted in the first figure of each Simulation Patent, reproduced below:

---

the original application may be accorded the filing date of the "parent" application to which the CIP claims priority. *Id.*

[7] Because the '479, '347, and '862 Patents have an identical specification, we refer to the relevant portions of the '479 Patent but the discussion applies equally to the specification of the '347 and '862 Patents.

5



OBSERVER WITH          ENCODED          DATABASE    TRANSMISSION   VIEWER WITH
COMPUTER             DESCRIPTION        COMPUTER                    COMPUTER

**FIG.1**

While the Simulation Patents purport to apply broadly to any live event requiring

physical exertion, the specification describes the invention in relation to a sporting event such as

baseball. (Ex. 1, '479 Patent at Col 2 Lines 54-55). As described in the Simulation Patents, an

observer, likely at the game itself, generates a symbolic description of the play-by-play action

that occurs at the game. (Ex. 1, '479 Patent at Col 3 Lines 49-59). The symbolic sub-event

("particular play") information is then sent to a central database. (*Id.*). From there, the symbolic

description of each sub-event ("particular play") is broadcast to a viewer's computer. (*Id.*).

The viewer's computer receives the symbolic descriptions of each particular play in the

game and runs a simulation program to determine how to display a graphical animation of each

particular play. (*Id.*). In order to perform the simulation at the viewer computer, the viewer

computer must: (1) calculate the state of the game based on the play (i.e. update the status); and

(2) show the particular play to the viewer using graphical animation:

> The viewer's computer maintains a description of the status of the real
> event by using well-known techniques in the art of computer simulation
> and animation in discrete-event simulation. (Ex. 1, '479 Patent at Col 10
> Line 1).

The figure below schematically depicts the process in the Simulation Patents:

6



The Simulation Patents thus require, among other things, that particular play (sub-event) information suitable for a computer simulation is transmitted to the viewer computer, that the information is broadcast to the viewer, that the information transmitted to the viewer is of a live event, and that there be a simulation, including graphical animation, at the viewer computer of each play of the live game.

### b) Prosecution History of the Simulation Patents

As noted above, the Simulation Patents each claim priority to the first-filed '990 application, which DDB abandoned in favor of the continuation-in-part application that resulted in the '479 patent. The '347 patent resulted from a continuation of the '479 patent application and the '862 patent resulted from a continuation of the '347 patent application. (Ex. 12, DDB Patents family tree).

#### (1) Prosecution history of the abandoned '990 patent application

DDB filed the '990 application on June 25, 1990. The original application included 19 claims and figures 1-19 of the Simulation Patents. The original specification contained a much shorter description of the alleged invention. The Examiner rejected DDB's original claims in the

'990 application based in part on DDB's failure to "provide sufficient detail to enable one skilled in the art to construct a system which simulated an actual event from the stored codes representative of actual events." (Ex. 17, '990 Pros. History). The Examiner stated:

> The instant invention is direction (sic) to a system in which an observer of an event inputs codes corresponding to sub-event associated with an observed event in order to allow the user to recall a display of the event at a later time. . .This passage merely states that the user inputs codes corresponding to the observed event but fails to provide details on how the codes are developed for each event or associated sub-event.
>
> Pages 20-23, 25-26 discuss simulation of the event from the stored codes.  The Examiner asserts that the details provided in the abovecited (sic) passage in Figures 11-12 do not provide sufficient detail to enable one skilled in the art to construct a system which simulated an actual event from the stored codes representative of actual events.  Instead, the above cited passage and figures appear to provide results desired to be obtained. (Id. at 2).

In a reply on May 17, 1991, DDB argued that the information described in a general fashion was adequate and that to the extent certain information is necessary to implement the invention such specific information was "well known to those of ordinary skill in the art."  (Ex. 18 at 2, '990 Pros. History).  With respect to simulating an event based on stored codes, DDB asserted that based on the general description in the specification, one of ordinary skill in the art would know to provide discrete event simulation, because it was well known to provide discrete event simulation when a system is modeled and the model evolves depending on the change of state variables at different points in time.  In support of its argument, DDB cited to a text called *Simulation Modeling and Analysis,* by *Law, et al.,* 1982.  (Id. at 5).  Furthermore, DDB maintained that graphical animations with computers was also well known, and referred to an article by Reynolds[8] for support.  (Id. at 6).

---

[8] "Computer Animations with Scripts and Actors," Reynolds, Computer Graphics, Vol. 16, No. 3, July 1982, pp. 289-296.

011.588453.1

The Examiner again rejected DDB's arguments but suggested to DDB that if it incorporated material into the specification relevant to the claimed encoding of events and the simulation of the encoded events, it might overcome the pending rejections. (Exs. 19-20, '990 Pros. History). DDB then twice attempted to incorporate into the specification certain matter, including that disclosed in the *Law* and *Reynolds* references (Exs. 21-22, '990 Pros. History), and the USPTO twice denied the proposed amendments because "essential material" may not be incorporated by reference, and because they raised issue of new matter. (Exs. 23-24, '990 Pros. History). DDB subsequently abandoned the '990 application in favor of a continuation-in-part application which incorporated the subject matter previously denied entry in the '990 application. That application resulted in the '479 patent.

### (2) Prosecution history of the '479 patent

DDB filed its CIP application on July 29, 1992. In the initial office action, the Examiner rejected the claims of the application as being indefinite and, in particular, found that several terms used in the claims were ambiguous, including "event," "sub-event," "broadcast," "simulation," and "viewer computer." (Ex. 25 at 2-3, '479 Pros. History). The Examiner also rejected the claims as being anticipated by U.S. Patent No. 5,195,092 ("Wilson"). (*Id.* at 8).

In response, DDB amended the claims and added new claims to recite "a sequence of symbolic descriptions" in which each description was representative of a discrete sub-event of the event. DDB asserted that the terms indicated in the office action as being indefinite were understandable to one skilled in the art:

> Similarly, the terms "broadcast" and "simulation" are clearly understood by the skilled artisan. "Broadcast" covers the transmission of the symbolic descriptions that describe the subevents to multiple end users who would be interested in the information. Also, "simulation" is clearly directed to the technical area of computer simulation....

9

Another disputed phrase is "viewer event file". It is respectfully submitted that one skilled in the art would understand that this refers to a data file on the viewer's computer, and that the data describing a given event are stored in that file. (Ex. 26 at 11, '479 Pros. History).

With respect to the term "symbolic descriptions", after explaining that an observer of the event generates a description of the event using "symbolic descriptions" that describe each "sub-event" as it is transpiring, DDB stated "[t]he viewer has a computer that processes the symbolic descriptions to generate a computer simulation of the subevents represented by the symbolic descriptions. Thus, the viewer is given the opportunity to view a computer simulation of the event, either as it occurs or well after the event has concluded." (Ex. 26 at 12-13).

Again, the Examiner rejected all the pending claims as being indefinite[9] and also obvious, and therefore not patentable based on the Wilson reference combined with U.S. Patent No. 4,794,534 ("Millheim"). (Ex. 27, '479 Pros. History). DDB then conducted two separate office interviews with the Examiner, on June 12, 1995 and again on November 22, 1995, to discuss some of the vague and ambiguous terms. (Ex. 12, '479 Pros. History) At these interviews, the Examiner suggested more elaboration. (*Id.*) Specifically, during the June 12, 1995 interview, after discussing the terms "action" and "symbolic description", the Examiner suggested more elaboration on data selection and conversion since DDB suggested that this was where "inventive elements lay." (*Id.*) DDB filed an amendment on December 14, 1995. (Ex. 28, '479 Pros. History). The claims were amended to further describe the symbolic descriptions as including a symbol from a set of symbols useful in a computer simulation and that each symbol was representative of an action involving physical exertion and skill. (*Id.*) The '479 patent issued on June 11, 1996. (Ex. 1, '479 Patent). The Notice of Allowance states:

Independent claims 8, 20, 23, 25, and 27 each cite broadcast of a computer simulation of a live event resulting in sub events determined by rules, the simulation represented by symbols in turn representing physical exertion and skill fed into and from a database. None of the art of record teaches or suggests this combination. The symbolic representation of physical exertion and skill eliminates the well known iconic simulations of card and board games such as bridge or chess. The live rather than simulated or historic nature of the simulation eliminates purely random or fictional representations or historic replays, such as an obvious combination of historic bridge and chess replays with sports games and is a non obvious embodiment of computer simulation. The determination of sub events by rules within the system eliminates purely descriptive representations such as live telecasts which would merely perform all actions fed into the system without deriving their own intermediate results. (Ex. 40, '479 Pros. History).

### (3) Prosecution history of the '347 patent

DDB filed a continuation on June 10, 1996, which resulted in the '347 patent. (Ex. 3, '347 Patent). The Examiner rejected all pending claims under the judicially created doctrine of obviousness type double patenting[10] over claims of the '479 patent. (Ex. 29 at 2, '347 Pros. History). The Examiner specifically noted that the only difference between the claims of the application that resulted in the '347 patent and those of the '479 patent related to creation of transmission data and specifically asserted that:

> it would have been obvious to one of ordinary skill in the art at the time the invention was made to apply creating transmission data and using state variables to the parent because the parent claims use transmission data which would therefore need to have been created and use computer processes which use state variables. (Ex. 29 at 2, '347 Pros. History).

---

[9] The Examiner indicated that the term "symbolic description", which had been inserted by DDB into each claim, was indefinite, because the term was vague and ambiguous. The Examiner asserted that all computer data is symbolic and descriptive since it symbolizes and describes the values such data stands for. (Ex. 26).

[10] Essentially, this doctrine prohibits claiming an obvious variation of an invention that has already been patented. *In re Longi*, 759 F.2d 887 (Fed. Cir. 1985) Such rejection, however, may be overcome by filing a "terminal disclaimer," which disclaims any additional term of any patent issuing from the rejected application, and which requires common ownership of the rejected application and the earlier issued patent. *Id.* at 894.

In response to the Examiner's rejection, DDB filed a terminal disclaimer over the statutory term of the '479 patent. (Ex. 30, '347 Pros. History). The USPTO mailed a notice of allowance on March 14, 1997 which included a statement of the Examiner's reasons for allowance that was similar to reasons for allowance in the '479 patent. (Ex. 31, '347 Pros. History). The '347 patent issued on September 23, 1997. (Ex. 2, '347 Patent).

### (4) Prosecution history of the '862 patent

DDB filed a continuation application on June 9, 1997, which issued as the '862 patent. (Ex. 3, '862 Patent). The Examiner again rejected all pending claims under the judicially-created doctrine of obviousness type double patenting over claims of the '347 and '479 patents. (Ex. 32 at 3, '862 Pros. History). In response to the Examiner's rejection, DDB filed a terminal disclaimer over the statutory term of the '347 and '479 patents. (Ex. 33, '862 Pros. History). The USPTO mailed a notice of allowance on April 24, 2000 which included a statement that the claims are allowed for the same reasons for allowance provided in the '479 patent. (Ex. 34, '862 Pros. History). The '862 patent issued on March 20, 2001. (Ex. 3, '862 Patent).

### c) Claims of the Simulation Patents

The '479 patent contains twenty-one claims, of which claims 1,9,15,19 and 21 are independent; the '347 patent contains eighteen claims, of which claims 1,8,13 and 18 are independent; and the '862 patent contains thirty-four claims, of which claims 1, 5, 10, 15, 16, 21, 24, 25, 29, and 33 are independent. A representative claim from the Simulation Patents is set forth in Claim 9 of the '479 Patent, (Ex. 1):

> 9. A method for simulating a live event that is composed of a sequence of
> discrete sub-events at a viewer computer at a location different from the
> location of the live event, with the event being governed by a set of rules
> that predetermines the consequences of actions that define the sub-events,
> comprising the steps of:

12

creating a set of symbols useful in a computer simulation, wherein each
symbol is representative of an action involving physical exertion and skill;

generating a sequence of symbolic descriptions wherein each symbolic description is a
representation of a discrete sub-event of the live event and includes at least one symbol
from said set of symbols, wherein an indicated status of the event may be affected by an
action described by the symbol;

creating a database file corresponding to the event;

updating said database file with a generated sequence of symbolic descriptions;

broadcasting said symbolic descriptions after updating said database file;

receiving the broadcasted symbolic descriptions at the viewer computer;

storing the received symbolic descriptions; and

generating a computer simulation of the live event at the viewer computer using said received
symbolic descriptions by calculating new status information from a combination of the
received symbolic descriptions and previously calculated status information in
accordance with the rules that govern the event.

## 2.  The Audio/Video Patent.

The Audio/Video Patent ("'630 patent") describes two embodiments, although the claims

are derived only from the second embodiment.[11]  The second embodiment differentiates the

Audio/Video Patent from the Simulation Patents by describing a process whereby the same

symbolic sub-event/play information is combined with an audio or video signal of the event, the

combined signal is broadcast to the viewer computer, and then the viewer computer analyzes the

sub-event/play information to selectively reproduce portions of the audio or video signal.[12]  (Ex.

4 at Col 17, Lines 30-60).   This is shown in FIG 20 of the Audio/Video Patent:

---

[11] The first embodiment consists of a specification substantially identical to that of the abandoned '990 application.
The nineteen figures of this embodiment are identical to those in the Simulation Patents, and the language describing
Figure 1, summarizing the invention, as quoted above, is identical.

[12] "In addition, the encoded description is combined with other signals such as an audio signal or a video signal to
produce a combined signal that is transmitted to a viewer with a computer." (Ex. 4, '630 Patent at Col 15 Line 6).
In fact, the patent describes how to do this only with video signals, for which the description of the game may be
sent during the video vertical blanking interval, over the video secondary audio channel, simply as a video frame of
encoded data or as a separate cable channel. (*Id.*).

13



FIG.20

The below figure schematically depicts the process in the Audio/Video Patent.



The purpose of combining the symbolic play descriptions with the audio or video signal is to provide index marks indicating when the sub-events/plays happen: "The basic idea is to add identification marks at the start and end of each subevent and to add the entire subevent description immediately after the end of the event." (Ex. 4, '630 Patent at Col 18 Lines 8-11). The Audio/Video Patent teaches that the perceived advantage this provides is that the viewer has enhanced means to watch or listen to the game by having the viewer computer selectively reproduce portions of the audio or video signal based on the event information indexes stored at the viewer computer. (Ex. 4, '630 Patent at Col 22 Lines 29-39, Col 23 Lines 63-65).

14

### a) Prosecution History of the Audio/Video Patents

DDB filed the application that led to the '630 patent on January 15, 1991. (Ex. 4, '630

Patent). The Examiner rejected certain claims of the application as being indefinite. (Ex. 35,

'630 Pros. History).  In response, DDB amended its claims.  (Ex. 36, '630 Pros. History).  The

Examiner then rejected all the pending claims as lacking written description and not being

enabled.  Specifically, the Examiner found that the specification described "in detail how

computer simulation techniques are utilized in creating broadcast signals classified into events

and sub events.  The specification, however, does <u>not</u> describe how to classify an actual video

and audio signal into events and sub-events, without computer simulation techniques." (Ex. 37

at 3, '630 Pros. History, *emphasis in original*).  It is noted that in reference to the originally filed

figures, the Official Action indicated that the invention was concerned with the computer

simulation of a live event, rather than a traditional live broadcast of the event itself.  (*Id.*).  In

response to the second office action, DDB again amended its claims, canceling certain claims

and incorporating the limitations of those claims into independent claims.  (Ex. 38, '630 Pros.

History).  The '630 patent issued on February 23, 1993.  (Ex. 4, '630 Patent).

### b) Claims of the Audio/Video Patent

The '630 patent contains nineteen claims, of which claims 1,2,10,17,18 and 19 are

independent.  Representative claim 2 from the Audio/Video Patent is set forth below:

2. A method for broadcasting information about a live event that is constituted by a
plurality of subevents, each subevent including at least one action, comprising the steps
of:

producing a first information signal comprising a video description of the event;

producing a second information signal, said second information signal including a
sequence of symbolic representations for each subevent of the event, each sequence
including a value for at least one status variable that defines the status of the event at
a particular time in relation to the subevent represented by that sequence, said second

information signal comprising a signal from which a computer simulation of the event described by the first information signal can be produced;

producing a broadcast signal by combining said first and said second information signals;

transmitting said broadcast signal from a first location;

receiving said broadcast signal at a second location;

separating said broadcast signal into said first and second information signals;

analyzing said second information signal using patternmatching techniques to detect subevents and status information of interest; and

selectively producing a video representation of the event using said first information signal based on the detection of subevents and status information of interest by said stp [sic] of analyzing.

## III.   LEGAL STANDARD FOR CLAIM CONSTRUCTION

Construction of patent claims must begin with "a full understanding of what the inventor actually invented and intended to envelop with the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

To make this determination, a court should look to the intrinsic evidence of record, *i.e.*, the claims of the patent, the specification and drawings of the patent, and the prosecution history.[13] If the meaning of a disputed claim term is clear from the intrinsic evidence, that meaning, and no other, must prevail. *Id* at 1583. If, after considering the intrinsic evidence, the claim language "remains genuinely ambiguous," then a court can also rely on extrinsic evidence such as testimony from experts as well as technical treatises so long as these sources are not used to vary or contradict the interpretation derived from the claim language and intrinsic evidence.[14] Dictionary definitions can be consulted by the Court to ascertain the ordinary meaning of the claim term so long as the intrinsic record is also consulted "to identify which of the different

---

[13] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

011.588453.1

possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1203 (Fed. Cir. 2002). Accordingly, an examination of dictionary definitions of the key words in the terms in question, when considered in light of the intrinsic evidence, provides a path for properly construing these terms. The claims are to be construed without reference to the accused device.[15]

## IV.   CONSTRUCTION OF CLAIM TERMS & PHRASES

### A.   "Simulation"

| MLBAM's proposed construction: a computer program which (1) uses a mathematical model of a system to calculate the state (update the status) of the system as a function of sub-events/plays which serve as input to the system; *and* (2) uses a graphical animation to display the changing state of the system in response to these sub-events/plays. | DDB's proposed construction: the use of graphics, text, or animation to display on a computer a representation of the progression of the plays (sub-events) of an event in a manner that correlates to the actual events, wherein the representation is derived from the plays. |

The Simulation Patents all require a "simulation,"[16] which must be generated *at the viewer computer.*[17] The above definition of "simulation" offered by MLBAM is the same one that DDB offered during prosecution of its patents and which DDB specifically set forth in the specification of the Simulation Patents.[18] "Simulation" is clearly used as a technical term in the patent, and was the subject of much discussion during the prosecution of the '479 patent and the

---

[14] *Bell & Howell Doc. Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997).

[15] *Vivid Techs., Inc. v. Am. Sci. & Eng'g*, 200 F.3d 795, 803 (Fed. Cir. 1999).

[16] For example, claims 1, 9, 19, and 21 of the '479 patent; claims 1, 8, and 18 of the '347 patent; and claims 1, 5, 15, 17, 24, 25, 29, and 33 of the '862 patent require a "simulation."

[17] *See e.g.* '479 Patent, Ex. 1, Claims 9, 19, 21; '347 Patent, Ex. 2, Claims 8 and 18; '862 Patent, Ex. 3, Claims 5, 15, 24, and 25. Likewise, during prosecution of the '990 application, DDB stated that the simulation take place at the viewer computer. ('990 Pros. History, Ex. 21 at 9 ("the present specification sets forth the framework for developing the routines necessary for simulation at the user's end"); '990 Pros. History, Ex. 18 at 4 (stating that the codes created by the observer at the event are transmitted to the viewer's computer)).

[18] The law mandates that "simulation" must be limited by the arguments and amendments made during prosecution to obtain allowance of the Simulation Patents. *See Honeywell Inc. v. Victor Co. of Japan, Ltd.*, 298 F.3d 1317, 1323-24 (Fed. Cir. 2002) ("Frequently, a definition offered during prosecution is made in response to a rejection,

abandoned '990 application.  (*See supra*, Ex. 17-28, '990 and '479 Pros. History; Ex. 58, Schmandt Decl. at 12-14).

DDB's original '990 application was rejected by the USPTO because the term "simulation" in the claims was vague. (Ex. 17, '990 Pros. History).  DDB responded:

> The textbook titled "Simulation Modeling and Analysis" by Law et al. describes major components of discrete-event simulation model and evidences the scope of knowledge of the artisan. The major components identified by Law include a system state, a simulation clock, an event list, an initialization routine, a timing routine, and an event routine. (Ex. 18 at 5, '990 Pros. History).

In subsequent communications with DDB, the Examiner made it clear that he viewed the definitions and descriptions from *Law et al.* as *__essential__* to the patent.[19]  (Ex. 18; Ex. 58, Schmandt Decl. at 13).  Failing to overcome the Examiner's rejections, DDB ultimately abandoned the '990 application and subsequently incorporated into the new specification of each of the Simulation Patents a lengthy quote from the Law, et. al, textbook.  (Ex. 1, '479 Patent at Col 10 Line 23 - Col 11 Line 16).  In response to the Examiner's rejection based on the vagueness of the term "simulation," DDB expressly limited the definition to the technical definition of computer simulation. (Ex. 26 at 11, '479 Pros. History; Ex. 58, Schmandt Decl. at 11).  Though primarily relying on the Law text to define "simulation," DDB further clarified what it meant by "simulation" with reference to several texts discussing techniques for graphic animation. (Id.).  Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002) (the patentee may further limit the plain and ordinary meaning of a term through restrictions in the specification).

---

and is entered in conjunction with a narrowing amendment … Such a definition limits the scope of the claim, preventing the patentee from later recapturing what was previously surrendered.").

[19] *Kubota v. Shibuya*, 999 F.2d 517, 519 (Fed. Cir. 1993) (essential information in non-patent publications cannot be incorporated by reference).

011.588453.1

### 1. The Definition of "Simulation" Requires Updating State Variables Using Mathematical or Logical Relationships, in Response to Input Events

Both MLBAM and DDB agree that at the core of the definition of "simulation" is a program which updates the status of the event based on the a model of the rules of the game being applied to the incoming sub-events. (DDB Br. at 19). In response to the Examiner's rejection of DDB's claims on the grounds that DDB failed to sufficiently explain what was meant by "simulation," DDB defined the term with reference to the *Law* book. DDB directly addressed the meaning of "simulation" during prosecution by incorporating entire sections of the *Law* book into the specification of the Simulation Patents. (Ex. 1, '479 Patent at Col 10 Line 23 – Col 11 Line 16).[20] The express definition in the specification is conclusive in claim interpretation. *See Cultor Corp. v. A. E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000).

The reference to the *Law* book provides the critical definition of "simulation," *i.e.* using a mathematical model to represent, in a computer program, a real world system. (Ex. 39 at 24, *Law* Reference). While DDB objects to MLBAM's use of the phrase "mathematical model" on the grounds that it does not cover the rules of baseball, as with all simulations, these rules are transformed into mathematical rules for the simulation program to process. (Schmandt Supp. Decl. at 1-2). Moreover, according to teachings of *Law*, on which DDB relied to obtain issuance of the claims, a simulation algorithm is implemented using a mathematical model. (Ex. 39 at 3 ("In this book we restrict our attention to a particular type of mathematical model of a system which we call a simulation model")). Thus, for example, the simulation program described in DDB's invention would know that three strikes increases the number of outs by one; or that after three outs one side is retired and the other side bats; or that with one runner on base, if the batter

011.588453.1

hits a home run, then the batting team's score should be increased by two.[21]  As the Examiner

noted, a simulation – as defined by DDB -- must derive the output of status information/game

information based on the input of sub-event/play information, instead of merely displaying the

inputted information.  (Ex. 40 at 3, '479 Pros. History).  Accordingly, in the context of the patent

claims, such as Claim 8 of the '347 Patent which reads "generating a computer simulation of the

live event at the viewer computer…", "simulation" requires, at a minimum, that the viewer

computer understand the rules of the game and be able to calculate the new status of the game

based on the received play information and the rules of the game.

While DDB clearly agrees with this portion of the definition of "simulation" (DDB Br. at

19), DDB's current proposed definition does not clearly account for the specific definition that

DDB itself offered for "simulation" during prosecution.  Specifically, DDB's current definition

uses vague words such as "correlates" and "derived."  (DDB Br. at 18).  However, in order to

obtain the patent claims and overcome the Examiner's rejections that the term was vague, DDB

used the more precise terms now proposed by MLBAM such as "calculation of state", "update

the status", and "sub-events which serve as input to the system."[22]  (DDB Br. at 19).  This clarity

was critical to allowance and is critical to proper claim construction.  DDB cannot have it both

ways: "[c]laims may not be construed one way in order to obtain their allowance and in a

different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.* 54 F.3d

---

[20] It is well settled that the prosecution history "is always relevant to a proper interpretation of a claim." *Amhil Enters. Ltd. v. Wawa, Inc.,* 81 F.3d 1554, 1559 (Fed. Cir. 1996) (quoting, *SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n,* 718 F.2d 365, 376 (Fed. Cir. 1983)).

[21] Specifically, for an embodiment used to simulate baseball games, the '479 patent lists a set of eleven status variables, such as "HomeScore," "VisitorScore," "Outs," "Balls," "Strikes," etc, which are updated via a "status table."  (Ex. 1, '479 Patent at Col 12 Lines 63-64).  These concepts are specifically applied to describe the Simulation Patents.  (*Id.* at Col 11 Line 27).

[22] DDB uses these more specific terms in its brief when explaining its proposed construction but not in the proposed definition itself.  (DDB Br. at 19).

1570, 1574 (Fed. Cir. 1995) (citing *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991) ).  In addition, since the Simulation Patents require that the simulation take place at the viewer computer, understanding exactly what "simulation" means in the context of the Simulation Patents is critical to a specific understanding of what calculations must be performed at the viewer computer.  *See* Figure 2 and fn. 16 *supra.*

### 2.  The Definition of "Simulation" Also Requires Graphical Animation

In attempting to overcome the Examiners' rejection of the abandoned '990 application due to the vagueness of "simulation", DDB specifically added a further limitation to the simulation algorithm described in the ***Law et. al.*** book by requiring graphical computer animation *of the actions of the game.* (Ex. 1, '479 Patent at Col 12 Lines 41-47).  In support thereof, DDB cited to and discussed several texts teaching graphical animation techniques.  DDB also incorporated those texts and a discussion of graphical animation techniques into the specification of the Simulation Patents.

DDB's references to animation as an additional limitation to the traditional algorithm for simulation are incorporated throughout the specification (see examples below) and must be understood in the context of the various statements about the definition of "simulation" that DDB made during prosecution of the Patents. (Ex. 18, '990 Pros. History).  For example, the specification of the Simulation Patents states:

> A further difference with the Law et al. algorithm is that the simulation algorithm of the present invention is combined with graphical animation techniques, as described below.  (Ex. 1, '479 Patent at Col 11 Lines 34-37).

Thus, displaying the output of the simulation model using graphical animation is incorporated into the simulation algorithm:

> These two primary functions of the viewer's computer, namely, maintaining a description of the status of the real event, and displaying an **animation** of the real event, are performed by a **single combined algorithm.**  The algorithm is applied

21

to each sub-event in a sequence of sub-events which constitute the description of an event. (Ex. 1, '479 Patent at Col 12 Lines 15-20, emphasis added).

This explicit limitation is evident throughout the Simulation Patents:

> The viewer's computer displays an animation of each sub-event by using techniques derived from those used in computer-based animation. The basic principle is described, for example, by Kingslake[23].... Thus, in the present invention, each sub-event is animated by displaying a sequence of pictures, giving the viewer the illusion of physical actions and movements.
>
> The sequence of pictures for a sub-event may be produced by using any of the well-known computer-based animation techniques.... (Ex. 1, '479 Patent at Col 11 line 38 – Col 12 Line 15).

In describing graphical animation, the '479 patent's specification also states that "in the present invention, each sub-event is animated by displaying a sequence of pictures, giving the viewer the illusion of physical actions and movements." (Ex. 1, '479 Patent at Col 11 Lines 55-58). In the context of the Simulation Patents, graphical animation requires the viewer to perceive such actions as the pitcher pitching, the batter swinging, the players running, and the ball traveling. (*Id.*). An example of graphical animation on the viewer's computer is also illustrated in Patent FIGs. 17-19 of the Simulation Patents:.

---

[23] The patent quotes from this text, explaining that although a film consists of many separate images, we perceive smooth and continuous motion when they are projected on the screen because of persistence of vision:

> 'If the new picture is slightly different from the first, then to the eye it appears that the picture has moved – hence: moving pictures.' Thus, in the present invention, each sub-event is animated by displaying a sequence of pictures, giving the viewer the illusion of physical actions and movements. (Ex. 1, '479 Patent at Col 11 Lines 53-58).

011.588453.1



FIG.17                FIG.18                FIG.19

The Simulation Patents explain that in the diagram the "dashed arrows indicate specific motions – such as a baseball moving from the batter's box to deep left field, a player moving from the batter's box to first base, and a player running toward the left field wall to catch the batted ball – that occurred to simulate the various actions of the sub-event." (Ex. 1, '479 Patent at Col 15, Lines 51-67 – Col 16, Lines 1-25). Of course, in an implementation of the teachings of the Simulation Patents, the viewer sees motion representing physical action and movements, rather than little arrows. Thus, contrary to DDB's litigation-inspired assertions, computer simulated animation does not occur by merely displaying the current status of the game, using text or static graphic icons (*e.g.*, a dot with the name of a player near second base) or an estimate of pitch location.

With respect to graphical animation, DDB now argues that animation is a separate element from simulation. (DDB Br. at 20-22). In support, DDB points to the absence of the word "animation" from the patents' claims. That "animation" does not appear as an element of the claims is not surprising, however, because animation is in fact not an element separate from simulation but rather an integral part of the definition of "simulation." As illustrated above, the specification repeatedly describes animation as a key aspect of the definition of simulation and DDB spends considerable time explaining in detail how the animations are calculated and performed. Animation was never made or intended to be a separate element of the invention;

23

instead, it is and always has been a component of how DDB defined "simulation." *Cultor Corp,*

*supra* 224 F.3d at 1331 (express definition in specification is conclusive).

Another way by which DDB is attempting to shift the focus away from its own earlier

definition of "simulation" is to cite to four sections of the specification and argue that the

definition of "simulation" is not limited to animation but also includes graphics or text.  (DDB

Br. at 21-22).  This is a non-starter because the four sections to which DDB cites are vestiges of

the abandoned '990 application, which the Examiner rejected because the invention was vague.

The inclusion of language from the earlier abandoned '990 application in the continuation-in-part

'479 application does not avoid the subsequent and clear narrowing of "simulation," discussed

above, that was added during prosecution of the continuation-in-part '479 application.  The

specification and prosecution history make clear that "simulation" requires graphical animation.

**B.     "Broadcast"**

| MLBAM's proposed construction: a one-way transmission of a single message simultaneously to multiple recipients | DDB's proposed construction:  the transmission of data to multiple viewers using one-way or two-way communication techniques. |
|---|---|

All of the DDB Patents require a "broadcast"[24] and all clearly distinguish between

broadcast technology and request and receive technology.  According to the specification of the

DDB Patents, the plain meaning of "broadcasting" is "well known" to a person of skill in the art

as a transmission such as radio and television.[25]  (Ex. 1, '479 Patent at Col 1 Lines 24-27).  This

is in fact true.  The plain meaning[26] of "broadcast", as a verb is "3: to transmit, as to a large

---

[24] For example, claims 1, 2, and 15 of the '479 patent; claims 1, 8, 13 of the '347 patent; claims 1, 5, 10, 16, 25, 29, and 33 of the '862 patent; and claims 1, 2, 10, 17, 18, and 19 of the '630 patent require a "broadcast."

[25] The specification expands upon the definition of broadcast to also include microwaves.  (Ex. 1, '479 Patent at Col 8 Lines 49-51).

[26] Webster's Dictionary, 1991 edition was chosen as being widely available contemporaneous dictionary of General American English, for a non-technical audience, around the time of issuance of the DDB Patents.  Dictionary

audience, by radio or television", and as a noun, is: "1: the act of broadcasting 2: a radio or television program." (Ex. 41, Webster Def.).[27]  The reference to radio and television in both the specification and dictionaries is significant, as explained below.  Moreover, it is telling that, although DDB also quotes from the same Webster's Dictionary in its opening Markman brief, *DDB leaves out the portion of the definition that limits broadcast to radio and TV.*  (Compare Ex. 41, Webster Def. to DDB Br. at 18).  Presumably, this is more than mere oversight on DDB's part -- DDB cannot fail to recognize that its proposed construction for "broadcast" is inconsistent with the plain meaning of the term.

Use of the term "broadcasting" in the patents is consistent with these commonly accepted definitions of the term.  Like the dictionary definitions, the patent specification refers specifically to television, radio, and microwaves. (Ex. 1, '479 Patent at Col 1 Lines 24-27, Col 8 Lines 47-51).  The DDB Patents identify two ways of transmitting information -- a broadcast and a request-and-receive technology.  (Ex. 1, '479 Patent at Col 8 Line 10 – Col 9 Line 8; Ex. 4, '630 Patent at Col 8 Line 34 – Col 9 Line 38).  A broadcast entails repeated transmission of a signal that is received by multiple viewers, as with a radio or television broadcast tower and an antenna. (Ex. 58, Schmandt Decl. at 17; Schmandt Supp. Decl. at 3-4; Shaffer Decl. at ¶¶ 7-8; Inzerillo Decl. at ¶¶ 5-10).  That the DDB Patents intend the broadcast mechanism to work like broadcast radio and television is clear from the DDB Patents:

> A special receiving device is attached to the viewer's computer and receives the broadcast transmission and stores the encoded sequence of new sub-events on the viewer's computer. (Ex. 1, '479 Patent at Col 8 Lines 62-65).

---

definitions should come from dictionaries used at the time of the application. *Texas Digital Sys., Inc.*, 308 F.3d at 1202-03.

[27] Likewise, the McGraw-Hill Dictionary of Scientific and Technical Terms (1989 edition) provides a technical definition from the domain of communication which is also consistent with the plain meaning of "broadcast": "A television or radio transmission intended for public reception." (Ex. 42, McGraw Def.).

25

A second technique by which a viewer may access material regarding an event or have the viewer's computer data base updated utilizes a one-way broadcast technology such as radio, television or microwave, either through the air or through a cable. This technique is illustrated in FIG. 8 where the centralized data base computer 84 outputs updates of the event, based on updates received from the observer, through a transmitter, such as a broadcast transmitter 85, to be received at the viewer's computer location by antenna mechanism 86. (*Id.* at Col 8, Lines 46-56).

The broadcasting of live events is well-known. Most commonly live events are broadcast as audio information or a combination of video and audio information utilizing either radio transmission techniques or television transmission techniques, respectively. There are limitations to both of these broadcasting techniques. (*Id.* at Col 1 Lines 24-30).

The reference to television and radio is significant to a person of ordinary skill in the art. When a television station broadcasts a program, many television sets receive the same program; in order for it to be sent again later, it must be "re-broadcast." ( Inzerillo Decl. at ¶ 6). It does not matter if zero, one, or many viewers are actually receiving the message; a single message is being transmitted to all viewers. (Schmandt Supp. Decl. at 3-4; Inzerillo Decl. at ¶¶ 4-5). During the prosecution of the '479 Patent, DDB argued that broadcast should be given its technical definition. (Ex. 26 at 11, '479 Pros. History). Based on the plain meaning, the specification, and how a person of ordinary skill in the art would define the term, the essential characteristics of "broadcast" transmission is that a single message or signal goes to all recipients over a one-way channel. (Schmandt Supp. Decl. at 3-4; Shaffer Decl. at ¶¶ 7-8; Inzerillo Decl. at ¶ 5, 10).

In contrast to "broadcast", request-and-receive technology is the standard method use in webpage transmissions; it sends information to a *single* viewer in response to a specific request for the information from that viewer. (Schmandt Supp. Decl. at 3-4; Shaffer Decl. at ¶ 9). DDB mischaracterizes the difference between these two technologies. DDB purports to distinguish the two technologies based on the presence or absence of a request for the transmission. (DDB Br.

26

at 14).  However, this is a false distinction because a broadcast signal can be first requested by a producer, a viewer, or anyone.  (Schmandt Supp. Decl. at 5).  The true difference between these two transmission technologies lies in the method of transmission.  A broadcast signal is a single message transmitted simultaneously to all viewers; while a request and receive technology transmits a requested file *only* to the viewer who requested the file, instead of to all viewers. (Schmandt Supp. Decl. at 3-5; Shaffer Decl. at ¶¶ 9-10).All of the DDB Patents explain this distinction.  (Ex. 1, '479 Patent at Col 8 Line 10 – Col 9 Line 7).

The only way that DDB can support its proposed construction of "broadcast" is by attempting to confuse the definition of "broadcast" with the definition of "transmit," which is what it does in its opening brief, as follows.  (DDB Br. at 12-14).  The DDB Patents broadly define "transmit" to include both broadcast technology and request and receive technology. (*Id.*).  Without support, DDB states in its brief that "transmit" is synonymous with "broadcast", and therefore, that "broadcast" includes both broadcast technology and request and receive technology.  (*Id.*).  In fact, DDB's entire construction is based on the erroneous proposition that "transmit" and "broadcast" can be used interchangeably.  This proposition, is also unsupported by the specification and flies in the face of both the plain and the technical definitions of the term broadcast.  (Schmandt Supp. Decl. at 4-5; Shaffer Decl. at ¶¶ 7-10; Inzerillo Decl. at ¶¶ 8-9). The specification and the claims both use broadcast and transmit in different places and for different meanings.  Where DDB wanted to claim the broader "transmission" it clearly knew to draft such a claim using the word "transmit" instead of the narrower "broadcast."[28]

---

[28] See for example, claim 21 of the '862 Patent where DDB claims a "method for communicating information" instead of a "method for broadcasting information".  (Ex. 3, '862 Patent).  Additionally, in claim 21, DDB claims "sending said transmission data" instead of "broadcasting said transmission data."  If these phrases were synonymous, there would be no reason for the different terminology.

DDB further attempts to justify its construction of "broadcast" by stating, without support, that a broadcast is different from a one-way broadcast and that a two-way request and receive is actually a two-way broadcast. (DDB Br. at 12-14). Not only is this construction inconsistent with the plain meaning of "broadcast", as discussed above, it is also not supported by the specification or prosecution history for at least three reasons.

First, the specification uses the term "broadcast" only when referring to the one-way broadcast and in places in the patent where the term can only be construed as a one-way transmission. (Ex. 1, '479 Patent at Col 8 Lines 56-62). DDB cannot point to any place in the specification where a "*two-way broadcast*" is mentioned; there is no such fiction. More importantly, during a discussion of the preferred embodiment[29] which is shown in the DDB Patents as FIG 10 and which describes both broadcast and request and receive methods of transmission, DDB evidences its clear understanding of the distinction between these two terms:

> Regardless of the choice of algorithms for communication between the data base computer and the viewer, i.e., either one way or two-way communication, the algorithms expressed in the flow charts FIGS. 7(a) and 9(a) as corresponding to the algorithms of the centralized data base computer, are best implemented in a multi-processing manner....Process 1003 repeatedly **broadcasts** event files stored in the database according to a one-way communication scheme. Process 1004 carries out **two-way communication** between the centralized data base computer and a viewer by responding to viewers' requests for event files that are stored in the centralized data base computer. (Ex. 1, '479 Patent at Col 9 Lines 36-54, emphasis added).

---

[29] Contrary to DDB's assertions in its brief, MLBAM is not reading limitations from the specification, diagrams or preferred embodiment into the claims. The contents of the specification, including the diagrams and preferred embodiment, are what the Court must look to as part of the intrinsic evidence for claim construction purposes. *Watts v. XL Systems, Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2001) ("One purpose for examining the specification is to determine if the patentee has limited the scope of the claims"); *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) ("the written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.").

Second, during the prosecution of the '479 patent, DDB stated that "broadcast" should be given its technical definition. (Ex. 26 at 11, '479 Pros. History; Ex. 58, Schmandt Decl. at 16-19). As described above, the technical definition to a person of skill in the art, is limited to a single message transmitted simultaneously to all viewers such as a radio or TV transmission. (Ex. 41-42, Webster and McGraw Defs.). That the message is sent one-way is inherent in the definition of "broadcast". (Schmandt Supp. Decl. at 3-4; Shaffer Decl. at ¶¶ 7-8; Inzerillo Decl. at ¶ 9).

Third, DDB also cites to claims 13, 15, and 16 of the '347 patent in an attempt to support its argument that "broadcast" includes both broadcast and request and receive technology. (DDB Br. at 15-16). Conceding that claim 13 requires a broadcast of information to the viewer, DDB then states that claim 15, which depends on claim 13, requires that the broadcast is automatically transmitted, limiting the dependent claim to only include the one-way broadcast technology. (*Id.*). This is an improper reading of claim 15. "Automatically transmitted"[30] refers not to the transmission medium (i.e. broadcast vs. request and receive), but rather to the way the message is transmitted, either through an automated or manual method.[31] For example, where the broadcast is originating at the central location, under claim 13, a person at the central location can decide when to start and stop various broadcasts, in addition to manually deciding what information to broadcast. In contrast, claim 15 requires the information to be automatically broadcast, requiring

---

[30] "Automatically transmitted," which is construed below, requires the sending computer to send the information without being requested by a person at the sending computer.

[31] Notably, although MLBAM identified the term "automatically transmitted" as a term in dispute that must be construed by the Court, DDB has refused to provide the Court or MLBAM any guidance on what it contends the term means. This is presumably due to the fact that when "automatically transmitted" is properly construed, it clearly refers not to the transmission medium (i.e. broadcast vs. request and receive), but to the way the message is transmitted. Any support DDB provides in its Reply Brief to support a different construction of this term would be new and should properly be rejected. *Senior Unsecured Cred. Comm. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990) (court should not consider new arguments raised in a reply brief).

the central computer to automatically begin broadcasting the play information as it is received

from the ballpark. Thus, claim 13 includes both sending the broadcast manually and

automatically. Claim 15 requires automatic transmission of the broadcast. This construction is

supported by looking to the same language used in claim 6 where the play information from the

observer is required to be "automatically transmitted" to the central location, in contrast to claim

5 where it could be manually transmitted:

> 6. The method of claim 5 wherein said step of generating occurs at a first
> location remote from said step of creating a database file and wherein said
> step of updating comprises the step of automatically transmitting said
> symbolic descriptions representing a sub-event from said first location to
> said database file.... (Ex. 1).

As described in the specification, the observer records the plays in a special purpose computer

which is preferably permanently in communication with the central computer, allowing for

automatic transmission of the plays. (Ex. 1, '479 Patent at Col 6 Line 66 – Col 7 Line 2). It

should be noted that the phrase one-way broadcast is never used in connection with the observer-

central computer transmissions.

Further in support of its construction of "broadcast," DDB points to claim 16 of the '347

patent, which also depends on claim 13, and further requires a request from a viewer. (DDB Br.

at 16). DDB asks the Court to infer that since the independent claim requires a broadcast and the

dependent claim further requires a request, that the term "broadcast" must also include request

and receive technology. There are two problems with this logic. First, as noted above, the

preferred embodiment of the Simulation Patents is a structure that simultaneously allows for *both*

broadcast and request and receive, as shown in FIG. 10. (Ex. 1, '479 Patent at Col 9 Lines 36-

54). This allows the majority of viewers to receive the broadcast, while viewers who begin late

or missed a certain message can independently request the missing information, which is then

broadcast again to all viewers. (Schmandt Supp. Decl. at 3-4). Therefore, claim 16 is simply the

30

claim that covers the preferred embodiment of the invention. Second, the '347 patent was the last Simulation Patent to issue in the patent family, filed six years after the original applications. If the earlier filed and issued '479 and '862 patents were construed, DDB would not have the benefit of relying on this late added claim of the '347 patent. Hence, the interpretation given to the term "broadcast" which appears in the specification and originally filed patent must be based on the interpretation given in the original patent and cannot be broadened in the later filed claim. *See Microsoft Corp. v. Multi-Tech*, 357 F.3d 1340, 1347-49 (Fed. Cir. 2004). In *Microsoft*, the first patent claimed transmission over a telephone line, the first continuation claimed generally transmission over a modem, and the second continuation claimed just transmission. *Id.* The court held that since the specification was identical in all three patents and it only specifically disclosed transmission over a telephone line, that the patentee could not subsequently broaden its claim term definitions in the later filed continuations. *Id.* Accordingly, all three "transmissions" were limited to telephone transmissions.

### C.    "Live Event"

| MLBAM's proposed construction: the information is being transmitted as the event/game is occurring. | DDB's proposed construction: an event that is occurring in real time. |
|---|---|

All of the DDB patents require a transmission of information about a "live event."[32] While the parties' competing definitions appear similar, there is a nuanced but important distinction that is not readily apparent in DDB's opening brief. DDB's definition is so broad as to encompass historical replays of games that have concluded, including games that were played

---

[32] For example, claims 1, 9, 15, 19, and 21 of the '479 patents; claims 1, 8, 13, and 18 of the '347 patent; claims 1, 5, 10, 15, 16, 21, 24, 25, 29, and 33 of the '862 patent; and claims 1, 2, 10, 17, 18, and 19 of the '630 patent all require a "live event." DDB does not dispute that "live" is a limitation on the claims. *Catalina Mktg Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 808-09 (Fed. Cir. 2002) (where the patentee uses the preamble to distinguish the invention from the prior art, it is properly interpreted as a claim limitation); see Ex. 40, '479 Pros. History (distinguishing DDB's invention from the prior art based on "live" limitation); Ex. 44 at 5, DDB's Interrogatory

31

in the 1920's and the prior art cited by the Examiner in rejecting the DDB Patents. MLBAM's definition, in contrast, requires that the claimed invention allow viewers to watch games as they occur.

DDB argues that the proper phrase to be construed should be "live event" instead of just "live." Following DDB's logic, the Court should look to even greater context in the claims as the phrase "live event" is used in various longer phrases such as "broadcasting information about a live event," "simulating a live event," and "generating computer simulation information about a live event." A plain, ordinary interpretation of the term "live" in the context of the claim and specification language requires that the broadcasting, simulating, and generating occur as the event is occurring, or else it would not be "live" but "pre-recorded."

Beyond the support for MLBAM's construction provided by the patents, MLBAM's construction is also supported by the plain meaning of the word "live." Webster's Dictionary defines "live" as: "12a: transmitted during the actual performance." (Ex. 45, Webster Def.). This definition is consistent with the technical definition. (Ex. 46, McGraw Def. ("being broadcast directly at the time of production instead of from recorded or filmed program material")).

DDB's proposed construction is also incomplete. By only saying that the event must occur in "real-time," DDB fails to state what the "real-time" is in relation to. All events take place in real-time in relation to themselves. By failing to account for what "real-time" is in relation to, DDB's proposed definition is boundless. For example, DDB's definition does not address whether the observer must record the information in real-time, whether the information must be transmitted in real-time to the central computer, whether the information must be transmitted in real-time to the viewer, whether the simulation must be generated in real-time, or

Responses (stating that Barstow conceived "that broadcasting the information in *real-time* would enable a variety of

32

whether the viewer must watch the event in real-time. Although DDB itself concedes that terms must be construed in the context in which they are used in the patents, DDB fails to follow its own advice. As it currently stands, DDB's proposed construction is meaningless and ambiguous. Moreover, DDB fails to support its construction with any intrinsic evidence. In fact, the intrinsic evidence supports MLBAM's construction of "live."

The specification of the DDB Patents discusses an invention for enhancing the viewing experience of baseball games in contrast to traditional radio and TV broadcasts:

> In particular, the present invention utilizes computer simulation techniques to characterize the actions of a live event, providing symbolic representations for the actions of the event rather than direct audio or visual signals. (Ex. 1, '479 Patent at Col 1 Lines 55-59; see also Col 1 Lines 60-64 and Col 2, Lines 37-52).[33]

MLBAM's construction is further mandated by the prosecution history. The Examiner of the '479 patent explicitly relied upon the "live" limitation to distinguish the invention over the prior art that includes historical replays of games. (Ex. 40, '479 Pros. History; Ex. 58, Schmandt Decl. at 19). In the Notice of Allowance of the '479 Patent, the PTO Examiner specifically distinguished the claimed invention from prior art simulation of *historical* events on the basis of the "live event" limitation:

> The live rather than simulated or historic nature of the simulation eliminates purely random or fictional representations or historic replays, such as an obvious combination of historic bridge and chess replays with sports games and is a non obvious embodiment of computer simulations. (Ex. 40 at 3, '479 Pros. History).

DDB's proposed construction of "live" is so broad that it would encompass the prior art historical replays of games, all of which were live at some point. This is a telling example of why DDB's broad construction of the term is unworkable – it would read on the prior art over

---

interesting services to be provided to baseball fans.") (emphasis added).

33

which it was specifically intended and required to distinguish in the course of the prosecution of the patents.

### D. "Combine"

| MLBAM's proposed construction: to come or bring into union; act of mix together; unite; join together. | DDB's proposed construction: two signals are transmitted concurrently over the same medium. |
|---|---|

The Audio/Video Patent requires "combining" of an audio or video signal with the symbolic event information before transmitting the combined signal to the viewer.[34] If the transmission medium were analogized to a highway, the difference between the two proposed constructions is that MLBAM believes that combining requires that the two signals to travel together in the same car, while DDB believes that combining merely requires the two signals enter the highway from the same place at the same time. MLBAM's construction is supported by both the plain meaning and the patent specification. There are at least two common and significant limitations inherent in both MLBAM's and DDB's definition: (1) that the two signals be sent at the same time; and (2) that the two signals be sent from the same place. However, this Court should adopt MLBAM's proposed construction as it is properly supported by the plain and ordinary meaning as well as the patent specification.

The ordinary meaning of the verb "combine," as defined by the first definition from Webster's dictionary is: "to come or bring into union; act or mix together; unite; join." (Ex. 47, Webster Def.). This can be likened to combining ingredients from a recipe. Here, instead of sugar, flour and eggs, what is combined are two signals. *See Gemstar v. ITC*, 383 F.3d 1352,

---

[33] While the Simulation Patents do discuss the viewer's computer recording and later replaying certain information to the viewer, the specifications do not discuss any alternative to the transmission of information to the viewer in real-time.

[34] This term is found in claims 1, 2, 10, 18 and 19 of the '630 patent.

011.588453.1

1358 (Fed. Cir. 2004) (ordinary meaning of combine means "to mix together: MINGLE: BLEND"). This plain meaning is so apparent, that the only support that DDB can offer for its proposed construction of the term is based not on the definition of "combine" but on the definition of a different term – "join." (DDB Br. at 25).

MLBAM's definition of "combine" is also supported by the patent specification. In the context of the Audio/Video Patent, the combining occurs *when two independent signals are intermixed prior to transmission, so that they can be transmitted as one*:

> In addition, the encoded description is combined with other signals such as an audio signal or a video signal *to produce a combined signal* that is transmitted to a viewer with a computer. (Ex. 4, '630 Patent at Col 15 Line 6).

Combining does not, as DDB states, include merely storing two signals at the same location, transmitting them as independent messages over the same communication medium, or receiving them independently at the same destination, *e.g.,* by several programs running on the same computer. The Audio/Video Patent specification describes various ways of combining the signals, including vertical blanking, adding a single screen image, and using a secondary audio channel. (Ex. 4, '630 Patent at Col 18 Lines 44-52).[35] The specification refers to this combining as "physically adding." (Ex. 4, '630 Patent at Col 18 Line 42). This required combination of sub-event/play information with a video signal is even confirmed in DDB's discovery responses. DDB states in response to MLBAM's Interrogatory No. 2, that Barstow "developed the basic mechanisms for coupling *the play-by-play data with video clips.*" (Ex. 44 at 5, emphasis added).

---

[35] The "vertical blanking interval" is a particular time in the television signal in which synchronization pulses are sent but video is not displayed, as the electron beam in an ordinary CRT (video monitor) has, at this point, finished scanning the image and is moving back to the upper left corner of the screen to display the next video field. The secondary audio channel is a portion of the audio spectrum in the television signal; the combined signal is used to modulate a carrier signal at the frequency of the particular television channel. (Ex. 4, '630 Patent Col 18 Lines 42-60; Ex. 58, Schmandt Decl. at 20).

35

"Coupling" is defined as "the act of joining together, pairing, copulating, etc." (Ex. 48, Webster Def.).

Additionally, for every claim that requires two signals to be combined and then transmitted, the receiving computer is required to then separate the combined signal. (Ex. 4, '630 Patent at Claims 1, 2, 16, 18, and 19). Under DDB's proposed construction, if the two signals are simply both transmitted over the same medium, for example air waves, then all radio waves are "combined" with each other and the "combining" limitation is meaningless. Likewise, under DDB's proposed construction, if the two signals are both transmitted over the same medium – e.g. air waves – the patent claims' *separating* limitations also are meaningless.

### E.    "Transmission Data"

| MLBAM's proposed construction: sub-event information based on the sub-event code entered by the observer | DDB's proposed construction: data that is transmitted |
|---|---|

The phrase "transmission data" was not used in the original '479 Patent, but was later introduced in the '347 Patent (Claims 1, 8, 13) and the '862 Patent (Claims 1, 5, 10, 16, 21, 25, 29, and 33). The phrase "transmission data" is never used in the specification of any of the Simulation Patents. Since DDB cannot claim in a continuation anything that was not fully supported by the original '479 Patent specification, the phrase must be related to some similar phrase in the specification. Specifically, the "transmission data" in the claims of the later '347 patent is transmitted from the central location to the viewer computer. The only such information discussed in the specification is the transmission of the sub-event information based on the sub-event code entered by the observer. Therefore, "creating transmission data" must refer to whatever formatting of the sub-event information is required for transmission. Such formatting may include modulating it on a particular carrier frequency (i.e. TV or radio channel).

36

In any event, it is symbolic sub-event/play information that is being transmitted to the viewer computer.

Under MLBAM's proposed construction of "transmission data," Claim 1 of the '347 Patent is essentially the same as Claim 1 of the earlier filed '479 Patent, despite slightly different language. The Examiner of the '347 and '862 Patents agreed with this interpretation. The Examiner stated that if creating "transmission data" represented a significant difference with the '479 Patent, it would constitute a different invention. However, the Examiner, understanding these claims to be essentially identical, rejected both the later '347 and '862 Patents specifically because they did *not* disclose a different invention from the '479 Patent. (Ex. 30, '347 Pros. History; Ex. 33, '862 Pros. History). The Examiner specifically honed in on "transmission data":

> It would have been obvious to one of ordinary skill in the art at the time the invention was made to apply *creating transmission data* and using state variables to the parent because the parent claims use transmission data which would therefore need to have been created and use computer processes which use state variables." (*Id.*).

DDB did not dispute this claim construction by the PTO Examiner and failed to clarify the difference between the "transmission data" of the '347 and '862 Patents and the "sub-event information" of the '479 Patent. Instead, DDB filed a terminal disclaimer to overcome the Examiner's rejection. (Ex. 30, '347 Pros. History; Ex. 33, '862 Pros. History). Accordingly, DDB has waived any argument that "transmission data" should be broadly construed. The term must be construed consistent with the '479 patent.

DDB's argument in its Markman brief that Claim 16 of the '862 patent -- "creating transmission data from information stored in a database file associated with said event" -- supports a contrary construction is a red herring. (DDB Br. at 28). In that claim, as in all other claims and throughout the specification of the Simulation Patents, the sub-event information is what is stored in the database file. (*See e.g.* Ex. 3, '862 Patent at Claim 16 ("updating said

37

database file using said generated sequence of symbolic descriptions")).  Logically, if the database contains the sub-event information and the transmission data is created by the information stored in the database, Claim 16 supports MLBAM's construction that the transmission data contains the sub-event information recorded by the observer.

    **F.**   **"Enter"**

| MLBAM's proposed construction: input of information into a computer by a human | DDB's proposed construction: to put into |
| --- | --- |

      "Enter" requires a human inputting information into a computer and does not cover one computer transmitting information to another computer.  The specification uses the term "enter" when discussing the observer entering play information into the observer computer, (*see e.g.* Ex. 1, '479 Patent at Col 3 Lines 49-51 ("[t]he observer enters the actions into the observer computer")), or additionally, in the '630 Patent, when describing the viewer entering a pattern of interest into the viewer computer (*see e.g.* Ex. 4, '630 Patent at Col 19 Lines 60-62 ("FIG. 30 illustrates an algorithm which supports the viewer for entering a subevent pattern indicative of a subevent of interest")).  Notably, DDB does not and cannot cite to any portion of the specification which characterizes a transmission of information from one computer to another computer as "entering" information.  Instead, when such a transmission occurs between the observer computer and the central location, or the central location and the viewer computer, the DDB patents specifically refer to this as "updating," "transmitting," or DDB more specifically calls out "broadcasting" or "requesting" and "receiving."

      DDB's proposed construction of "enter" to mean "to put into" would broaden the scope of many of the claims beyond that disclosed in the specification.  For example, Claim 10 of the '630 patent claims "entering sub-event descriptors in a second computer, said subevent descriptors describing the subevent and status of the event."  This element is supported in the

011.588453.1

specification by the description of an observer entering sub-event information into an observer computer. Under DDB's proposed construction, this element would cover inventions where there is no observer, but the sub-event information is still "entered" into the observer computer by virtue of receiving the observer computer information from some other undisclosed computer. There is no support for such a broad construction in the specification.

G.    "Database File"

| MLBAM's proposed construction: a nonredundant collection of relational, interrelated data items that can be shared and used by several different subsystems. | DDB's proposed construction: a repository containing data |
|---|---|

DDB's proposed construction is meaningless. DDB's definition would have this Court interpret "database file" as encompassing anything that contains information. This construction would yield absurd results: a book is a database file, a piece of paper with writing is a database file, a brain is a database file, the courtroom is a database file, etc. Such meaningless constructions are not favored by Courts. Moreover, DDB offers no support, either intrinsic or extrinsic, for its proposed construction.

Since the patent specifications do not provide any assistance in construing "database file", MLBAM looks to what one of ordinary skill in the art would interpret the phrase to mean.[36] According to the Microsoft Computer Dictionary from 1991, a database is "a file consisting of a number of records (or tables), each of which is constructed of fields (columns) of a particular type, together with a collection of operations that facilitate searching, sorting, recombination, and similar activities." (Ex. 50, Microsoft Def.). This technical definition, contemporaneous to the patents at issue, supports MLBAM's construction.

---

[36] *Nazomi Communications, Inc. v. Arm Holdings, PLC*, 2005 WL 820491 (Fed. Cir. Apr. 11, 2005); *Texas Digital Sys., Inc.*, 308 F.3d at 1202.

011.588453.1

### H.     "Symbolic Description"

| MLBAM's proposed construction: sub-event code entered by the observer | DDB's proposed construction: a description that uses symbols |
|---|---|

DDB's proffered definition is circular and in fact is not a definition at all in that it uses the words of the term to define the term.  Moreover, DDB ignores the intrinsic evidence, and more importantly the words and phrases of which the term forms a part in the patent claims.  In the DDB Patents, the claims that include the term "symbolic description" use the term as part of the larger phrase "symbolic descriptions, each description being representative of one of the discrete sub-events…" (*e.g.* Ex. 1, '479 Patent, Claim 1).  Accordingly, the claims themselves limit the definition of "symbolic description" to sub-event code.  In addition, during prosecution of the Simulation Patents, the Examiner rejected DDB's claims based on the fact that "symbolic description" was vague and ambiguous.  (Ex. 27 at 2, '479 Pros. History).  DDB later amended the claims to add language such as that quoted above in order to clarify that each symbolic description represents one discrete sub-event.  (Ex. 28 at 2, '479 Pros. History).

### I.     "Useful in a Computer Simulation"

| MLBAM's proposed construction: having practicable utility as input to a computer simulation | DDB's proposed construction: capable of being put to use in a computer simulation |
|---|---|

While MLBAM identified "useful in a computer simulation" as a term in dispute, and the parties could not agree on the proper construction of the term, DDB declined to argue for any particular construction of the term in its Markman brief.  As such, MLBAM's construction should be adopted.

The only difference between the two constructions is that MLBAM limits it to "practicable utility" and DDB desires that it merely be "capable" of being used in a computer simulation.  As with the previous terms, DDB's construction provides no limits.  It is conceivable that information is "capable" of being used in an undefined simulation.  However,

40

the Simulation Patents specify a simulation of a live event. That simulation is a particular simulation governed by the particular rules of that event. Therefore, MLBAM believes that the term should be interpreted as being limited to only that information which has practicable utility in relation to the rules for the particular event. (Schmandt Supp. Decl. at 2-3). For example, if the event is baseball, recording that the stadium ran out of hotdogs, while being capable of being put into a computer simulation regarding hotdog consumption, has no practicable utility in the baseball game computer simulation, and thus, that information would not be useful in a computer simulation. Notably, MLBAM's construction is also supported by the plain meaning of the term "useful", which Webster's defines as "often having practicable utility." (Ex. 51, Webster Def.).

## J.    Claim Terms and Phrases Included in Means Plus Function Claims[37]

Title 35 of the United States Code at § 112 ¶ 6 specifies the manner in which the Court must construe claims which are drafted as "means" for performing functions, when the claim itself does not specify the structure corresponding to the "means." These claims must be construed to cover *only* the particular structures described in the patent's specification that perform the claimed function and the equivalents of those disclosed structures. *In re Donaldson, Co.,* 16 F.3d 1189, 1195 (Fed. Cir. 1994) (*in banc*). Section 112 ¶ 6 "operates to cut back on the types of means which could literally satisfy the claim language." *Johnson v. IVAC Corp.,* 885 F.2d 1574, 1580 (Fed. Cir. 1989) (emphasis in original). When claims expressly use the words "means for" they are presumed to be in means-plus-function form. *Greenberg v. Ethicon-Endo Surgery,* 91 F.3d 1580, 1584 (Fed. Cir. 1996).

Identifying a "means" term and its corresponding structure are matters of claim construction and, thus, questions of law. *Chiuminatta Concrete Concepts, Inc. v. Cardinal*

---

[37] MLBAM provided definitions of all means-plus-function terms to DDB on March 18, 2005.

41

011.588453.1

*Indus., Inc.,* 145 F.3d 1303, 1308 (Fed. Cir. 1998). "Construction of a means-plus-function limitation involves two steps. First, the court must identify the claimed function." *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,* 296 F.3d 1106, 1113 (Fed. Cir. 2002). "After identifying the claimed function, the court must then determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Id.*

Although MLBAM has proposed definitions of nine means-plus-function phrases, DDB's proposed constructions of those phrases completely ignores not only the fact that they are means-plus-function limitations, but also well-established law on how such limitations should be construed.[38]  As a result, the definitions that DDB offers for these phrases are broader than is legally permissible for a means-plus-function claim, which is by its very nature limited to the means disclosed in the specification. The Court should adopt MLBAM's proposed constructions because DDB offers no alternatives. *Senior Unsecured Cred. Comm.,* 749 F. Supp. at 772  (court should not consider new arguments raised in a reply brief).

| Means-plus-function Phrase | MLBAM's Construction and Support | DDB's Construction and Support |
|---|---|---|
| "Means for combining said code sequence and said information signal"[39] | Construction: means by which the coded description is physically added to the other signal by using any of the following (1) the vertical blanking interval between images, (2) the second audio signal sometimes used for stereo/television broadcasting, (3) a single screen image, or (4) a separate cable channel  Support: The specification clearly discloses only the identified ways of combining the two signals. (*See* Ex. 4, '630 Patent at Col 18 Lines 42-60). | Construction: no construction offered  Support: None |
| "Means for separating said received combined | Construction: means by which the coded description is physically removed from the other signal that was combined by using any of | Construction: with regard to the term "separating," see |

---

[38] In some cases, DDB does not offer any definition for the means-plus-function term at issue.

[39] The term is used in claims 18, and 19 of the '630 Patent.

| | | |
|---|---|---|
| signal into code sequence and said information signal"[40] | the following (1) the vertical blanking interval between images, (2) the second audio signal sometimes used for stereo/television broadcasting, (3) a single screen image, or (4) a separate cable channel<br>Support: Since the specification describes separating what was previously combined, the means for separating should be construed to be separating the two signals by reversing the combining of the two signals via one of the four methods identified in the '630 Patent. (Ex. 4, '630 Patent at Col 18 Lines 42-60). | definition for "Separating". The meaning of the remainder of this phrase is self-evident. It means that the received combined signal is separated into said code sequence and said information signal<br>Support: None |
| "Means for transmitting said code sequence from said first computer to said second computer"[41] | Construction: means by which the code sequence is sent using a broadcast technology<br>Support: while the specification discloses two ways of transmitting -- broadcasting and request/receive technology -- the preamble for all three claims where this term is used limits the means to only include broadcasting. (See Ex. 4, '630 Patent at Claims 17-19 ("A system for broadcasting")).[42] | Construction: to transmit code sequence from said first computer to said second computer<br>Support: None |
| "Means for storing a subevent pattern defining a subevent of interest in a second computer"[43] | Construction: means by which a viewer computer is programmed to receive a subevent pattern entered manually by a person at a viewer computer or to implement the algorithm of Fig. 30, so as to allow that person to enter and store a subevent pattern that defines a subevent of interest<br>Support: It is the only means described in the specification. (See Ex. 4, '630 Patent at Col 15 Lines 32-37, Col 19 Line 60 – Col 20 Line 40, Col 23 Lines 54-57). | Construction: to store a subevent pattern defining a subevent of interest in a second computer<br>Support: None |
| "Means for receiving said transmitted code sequence at said second computer"[44] | Construction: means by which a viewer computer is programmed to receive the code sequence, which was previously entered by a person at the first computer (observer computer) and transmitted from the first | Construction: to receive said transmitted code sequence at said second computer<br>Support: None |

---

[40] The term is used in claims 18, and 19 of the '630 Patent.

[41] The term is used in claims 17, 18, and 19 of the '630 Patent.

[42] As such, the preamble properly limits the scope of the disclosed "means" in the specification. *NTP v. Research In Motion*, 392 F.3d 1336 (Fed. Cir. 2004); *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615 (Fed. Cir. 1995).

[43] The term is used in claims 17, 18, and 19 of the '630 Patent.

[44] The term is used in claims 17, 18, and 19 of the '630 Patent.

011.588453.1

| | computer to the second computer<br>Support: It is the only means described in the specification.. (*See* Ex. 4, '630 Patent at Col 9 Lines 24-27 ("A special receiving device is attached to the viewer's computer and receives the broadcast transmission and stores the encoded sequence of new subevents on the viewer's computer")). | |
|---|---|---|
| "Means for analyzing said received code sequence to detect the occurrence of a desired subevent in the event"[45] | Construction: means by which a computer includes special purpose software that performs a computer pattern matching algorithm and produces a notification signal<br>Support: It is the only means described in the specification. (*See* Ex. 4, '630 Patent at Col 20 Lines 40-47). | Construction: to analyze said received code sequence to detect the occurrence of a desired subevent in the event<br>Support: None |
| "Means for comparing said code sequence to said subevent pattern to determine if the code sequence matches the subevent pattern"[46] | Construction: means by which a pattern matching algorithm determines if the code sequence entered by the observer matches the sub-event pattern entered by the viewer<br>Support: It is the only means described in the specification. (*See* Ex. 4, '630 Patent at Col 20 Lines 40-64). | Construction: no construction offered<br>Support: None |
| "Means for producing a notification signal when said means for comparing detects a match"[47] | Construction: means by which a special audio or visual signal is generated to notify the viewer that a successful match was found<br>Support: It is the only means described in the specification. (*See* Ex. 4, '630 Patent at Col 22 Lines 29-42). | Construction: no construction offered<br>Support: None |
| "Means for entering a code sequence to define each subevent into a first computer"[48] | Construction: means by which either (1) a computer is configured to receive a code sequence from an observer who manually enters the code sequence, for example, by typing, as set forth at column 16, lines 28-32, or (2) a computer programmed uses special purpose software that implements the algorithms described in reference to Figs. 23-25<br>Support: It is the only means described in the specification. (*See* Ex. 4, '630 Patent at Col 16 | Construction: putting a code sequence to define each subevent into a first computer<br>Support: None |

---

[45] The term is used in claims 17, 18, and 19 of the '630 Patent.

[46] The term is used in claims 17, 18, and 19 of the '630 Patent.

[47] The term is used in claim 17 of the '630 Patent.

[48] The term is used in claims 18, and 19 of the '630 Patent.

44

| | Lines 28-32, Col 16 Line 40 – Col 18 Line 4). | |
|---|---|---|

### K.   "Automatically Transmitted"[49]

| MLBAM's proposed construction: sent from one computer to another computer, without first being requested | DDB's proposed construction: to transmit without requiring a request from a recipient |
|---|---|

The Court should adopt MLBAM's proposed construction because DDB fails to provide any support for its proposed construction of this claim term. *Senior Unsecured Cred. Comm.*, 749 F. Supp. at 772. Additionally, only MLBAM's proposed construction is fully supported by the intrinsic evidence. The plain meaning of "automatic" is "3(a) moving or operating, etc. by itself; regulating itself." (Ex. 52, Webster Def.). As such, the transmission must occur without being requested by anyone. Despite DDB's arguments, which MLBAM addresses in Section B above (see MLBAM's discussion of claims 13 and 15 of the '347 patent in connection with the discussion of the term "broadcast"), that this limitation merely directs the use of broadcast technology for transmission, this limitation in fact has nothing to do with the transmission means, but rather, limits the broadcast technology to preclude a "producer" or anyone else at the central computer from requesting that the broadcast start or stop, or requesting that only certain information be broadcast. In other words, this limitation requires that the central computer must be automated to automatically broadcast the information as it is received by the observer computer, in contrast to such broadcasting being performed manually.

This construction is further supported by how the phrase "automatically transmitted" is used in the remainder of the DDB patent claims. In claims 4 and 6 of the '479 Patent and claims 4 and 6 of the '347 patent "automatically transmitted" refers not to the communication between the central computer and the viewer computer, but instead to the communication between the

45

observer computer and the central computer.  As such, the limitation requires that the observer

computer be programmed to automatically send the sub-event information to the central

computer as the sub-events are entered into the observer computer by the observer, without the

observer having to specifically request the computer to send the information to the central

computer. (*See e.g.* Ex. 1, '479 Patent at Col 6 Line 66 – Col 7 Line 8 ("This updating is best

accomplished by maintaining a permanent communications link between the observer's

computer and the centralized data base computer....Thus, the sequence of sub-events stored in

the data base computer file 5 will always be complete and accurate shortly after the actual sub-

event has occurred.")).

### L.    "First Computer"

| MLBAM's proposed construction: the observer computer | DDB's proposed construction: a computer |
|---|---|

The phrase "first computer" is used in Claims 10, 17, 18 and 19 of the '630 Patent.  DDB

is correct that the observer limitation from the specification should not be applied to claim 10,

but this is because claim 10 is not a means-plus-function claim, whereas the elements of claims

17-19, are written in means-plus-function language.  Why is this relevant?  As it does with

respect to all of the means-plus-function claims in all of the DDB Patents, DDB does not even

acknowledge for the Court that the claims in dispute are means-plus-function claims under 35

U.S.C. § 112 ¶ 6.  This failure to acknowledge the character of these claims is inherently

misleading given the strict and established rules for construing means-plus-function claims.[50]

---

[49] The term is used in claims 4, 6, 13, 17 of the '479 Patent; claim 12 of the '862 Patent; and claims 4, 6, 15 of the '347 Patent.

[50] Neither does DDB argue that any of the claims are not means-plus-function elements, although this would be difficult for DDB to argue given the presumption in patent law that use of the phrase "means for" in a claim signals a means-plus-function claim.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002).

46

The fact that claims 17-19 are means-plus-function claims therefore directly effects how they are construed. DDB's failure to even address the issue is a significant omission on its part.

Under the rules for construing means-plus-function claims, set forth in Section J above, "first computer" is limited to the observer computer in claims 17-19. This is because the only structure disclosed in the specification for a first computer (in the phrase "means for entering a code sequence to define each sub-event into a first computer") is the observer computer. (*See e.g.* Ex. 4, '630 Patent at Col 15 Lines 21-23 ("as described above, the observer 21 encodes an event using computer 22 to produce an encoded description 23")).

**M.     "Second Computer"**

| MLBAM's proposed construction: the viewer computer | DDB's proposed construction: a computer |
|---|---|

As with "first computer," "second computer" is used in Claims 10, 17, 18 and 19 of the '630 patent. As used in Claims 17-19, "second computer" should be limited to the viewer computer, because, as discussed above, "second computer" is a means-plus-function limitation as used in those three claims, and the means disclosed in the specification for "means for receiving the combined signal at said second location" is the viewer computer. (*See e.g.* Ex. 4, '630 Patent at Col 15 Lines 27-28 ("That combined signal is transmitted by transmitter 26 to a viewer receiver")). Again, DDB's failure to acknowledge or address the means-plus-function character of these elements is significant.

**N.     "Symbol/Code"[51]**

| MLBAM's proposed construction: | DDB's proposed construction: |
|---|---|
| Symbol – something that stands for, represents, or | Symbol - a representation of something |

---

[51] The term "symbol" is used in claims 1-2, 4-11, 13-16, and 19-21 of the '479 Patent; claims 1-2, 4-7, 9-11, 14-17, 20-31, and 33-34 of the '862 Patent; claims 1-2, 4-10, 12-14, and 17-18 of the '347 Patent; and claims 1-4, 6, and 9 of the '630 Patent. The term "code" is used in claims 2, 3, 16, and 20 of the '479 Patent; claim 3 of the '862 Patent; claim 3 of the '347 Patent; and claims 4, 7, 10, and 17-19 of the '630 Patent.

47

| | |
|---|---|
| suggests another thing;<br>Code – a system of symbols in which letters,<br>figures, etc. are arbitrarily given certain meanings | (e.g., a representation of an action)<br>Code - symbols (e.g., letters, numbers, or<br>words) used to represent information |

The Court should adopt MLBAM's proposed construction because DDB fails to provide any support for its proposed construction of these claim terms. *Senior Unsecured Cred. Comm.*, 749 F. Supp. at 772. Additionally, only MLBAM's proposed constructions are fully supported by the plain meaning of the terms. The dictionary defines "symbol" as "something that stands for, represents, or suggests another thing," and defines code as "a system of symbols in which letters, figures, etc. are arbitrarily given certain meanings." (Ex. 53, Webster Def.). Although DDB's proposed constructions appear similar to MLBAM's, the difference is significant. DDB's definition is basically – "something that means something." Not only is this definition meaningless, but is contrary to the plain and ordinary meanings. The symbols or code must represent something other than themselves. For example, the word "hit" is not a symbol or code for the word "hit", just as the phrase "it is sunny" is not a symbol or code for the sentence "it is sunny."

O.    "Separating"[52]

| | |
|---|---|
| MLBAM's proposed construction: to set or put apart,<br>disunite things previously united, joined or assembled | DDB's proposed construction: to<br>separate |

The Court should adopt MLBAM's proposed construction because DDB fails to provide any support for its proposed construction of this claim term. *Senior Unsecured Cred. Comm.*, 749 F. Supp. at 772. Furthermore, DDB's proposed definition is not a definition at all because it merely uses the term to define itself. The reason for DDB's failure to define "separating" is likely related to DDB's overbroad definition of "combining" discussed *infra* which treats every

---

[52] The term is used in claims 1, 2, and 16 '630 Patent.

48

radio or TV station as already combined with every other station. Under that overly broad

definition of "combine" – in which signals are never united or mixed together -- there is no way

to separate. MLBAM's proposed construction, on the other hand, is based on the dictionary

definition which defines separating as "to set or put apart, disunite things previously united,

joined or assembled." (Ex. 54, Webster Def.). MLBAM's proposed construction not only gives

meaning to the term "combining," but is fully supported by the plain meaning of the term.

## P.  Additional Terms/Phrases To Be Construed

| Means-plus-function Phrase | MLBAM's Construction and Support | DDB's Construction and Support |
|---|---|---|
| "Status"/"State"[53] | Construction: a set of circumstances or attributes characterizing a person or thing at specific time<br>Support: The dictionary defines "state" as "a set of circumstances or attributes characterizing a person or thing at any given time." (Ex. 55, Webster Def.). | Construction: information about the state of an event<br>Support: None |
| "Selectively Producing"[54] | Construction: to choose or to pick out a portion or segment to bring to view<br>Support: The dictionary defines "select" as "chosen in preference to another or others, picked out," and defines "produce" as "1. to bring to view." (Exs. 56-57, Webster Defs.). | Construction: to produce a selected portion<br>Support: None |
| "Searching the stored signals to detect a match between a stored symbolic representation and a symbolic representation of subevents and status information of | Construction: to examine electronically the symbols recorded by the observer to locate a match with the pattern of interest entered by the viewer<br>Support: The claim language itself and the specification explains that the computer searches through the sub-event information to locate a match with the pattern of interest entered by the viewer (symbolic representation of subevents and status information of interest). (See Ex. 4, | Construction: looking for something<br>Support: None |

---

[53] The term "status" is used in claims 1, 9, 15, 19, and 21 of the '479 Patent; claims 1, 5, 10, 15-16, 21, 24-25, 29, and 33 of the '862 Patent; claims 1, 8, 13, 18 of the '347 Patent; and claims 1-4, 6, 7, 9-11, 13, and 15 of the '630 Patent. The term "state" is used in claims 9, 14, 20, 23, 28, and 32 of the '862 Patent and claims 7, 12, and 17 of the '347 Patent.

[54] The term is used in claims 1 and 2 '630 Patent.

[55] The term is used in claims 3, 6, and 9 '630 Patent.

011.588453.1

| interest"[55] | '630 Patent at Col 20 Lines 40-64). | |
|---|---|---|
| "Viewer Event File"[56] | Construction: data file on the viewer's computer storing data describing a given event<br>Support: the specification explains that the viewer event file is a file located on the viewer's computer that is updated with the subevent information received from the central computer. (*See* Ex. 1, '479 Patent at Col 9 Lines 31-35). | Construction: a repository containing data for the viewer about an event<br>Support: None |
| "Each symbol is representative of an action involving physical exertion and skill" | Construction: a symbolic representation of a physical action involving skill<br>Support: Based on the claim language itself, the symbol recorded by the observer must represent a physical action (such as playing sports, drilling for oil, flying a plane, talking, etc.) that involves some amount of skill (as opposed to an automatic action such as breathing). | Construction: means physical exertion and skill<br>Support: None |

## CONCLUSION

For all the reasons set forth in this brief, MLBAM respectfully requests that the Court construe the claims and phrases as requested by MLBAM.

Respectfully submitted,

Dated: April 29, 2005                    By: _____

Hal L. Sanders                          Sharon R. Barner
F. Witcher McCullough III               Anat Hakim
Haynes and Boone                        James T. McKeown
600 Congress Avenue                     FOLEY & LARDNER LLP
Suite 1300                              321 North Clark
Austin, TX  78701                       Suite 2800
(512) 867-8400                          Chicago, Illinois  60610-4764
(512) 867-8470 Facsimile                (312) 832-4500
                                        (312) 832-4700 Facsimile

                                        Attorneys for Defendant

---

[56] The term is used in claim 12 of the '479 Patent; claims 8 and 19 of the '862 Patent; and claim 11 of the '347 Patent.

50

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served upon the following counsel of record this _____ day of April, 2005.

Ross Spencer Garsson                    *Via Hand Delivery*
Winstead Sechrest & Minick P.C.
401 Congress Ave., Suite 2100
Austin TX  78701

Christopher Haigh                       *Via Federal Express*
Baniak Pine & Gannon
150 N. Wacker Drive, Suite 1200
Chicago IL  60606

_____
Hal L. Sanders

011.588453.1

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

## Notice of Document/Attachment(s) Not Imaged and Contained in Expandable Folder

### See Expandable File(s) to View/Copy Document/Attachment(s)

Civil Case No.        A-04-CA-352 LY

DDB TECHNOLOGIES

VS.

MLB ADVANCED MEDIA

Attachments to
Document #:        63

Description:        Initial Markman Brief of Defendant

File Date:        4/29/05

Prepared by:        MLC

**This sheet to be imaged as the last page.**