**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

FILED

MAY   9 2005

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| **DDB Technologies, L.L.C.,** | § | |
| | § | **Civil Action No. A04CA352 LY** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Judge Lee Yeakel** |
| | § | |
| **MLB Advanced Media, L.P.,** | § | |
| | § | |
| **Defendant.** | § | |

### DDB TECHNOLOGIES, L.L.C.'S *MARKMAN* REPLY BRIEF

Ross Spencer Garsson
Texas State Bar Number 00784112
Michael P. Adams
Texas State Bar Number 00872050
WINSTEAD SECHREST & MINICK P.C.
401 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 474-4330
(512) 370-2850  Facsimile

and

Michael H. Baniak
Michael D. Gannon
Christina L. Brown
Christopher E. Haigh
BANIAK PINE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois  60606
(312) 673-0360
(312) 673-0361  Facsimile

Attorneys for Plaintiff DDB Technologies, L.L.C.

64

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................1

II.     TERMS TO BE CONSTRUED.........................................................2

    A.      Live Event.............................................................................2

    B.      Broadcasting .........................................................................4

        1.      The Patentee Clearly Defined "Broadcasting" During
            Prosecution, And That Definition Controls ....................4

        2.      The Words Of The Claims Themselves Prove That
            "Broadcasting" Cannot Be Limited To A One-Way
            Communication Technique.............................................7

        3.      The Patent Specification Does Not Limit "Broadcasting" To
            Only A One-Way Communication Technique .............10

    C.      Computer Simulation...........................................................11

        1.      The Ordinary Meaning Does Not Require Animation.................11

        2.      MLBAM Misconstrues The File History.........................12

        3.      The Patent Specification Does Not Limit "Computer
            Simulation" To Require Animation...............................14

    D.      Combining ...........................................................................16

III.    OTHER TERMS THAT MLBAM CONTENDS SHOULD BE CONSTRUED .17

    A.      Transmission Data ...............................................................17

    B.      Enter.....................................................................................19

    C.      Means-Plus Function Claim Terms .....................................20

    D.      First Computer And Second Computer .................................20

    E.      Database File........................................................................21

    F.      Symbolic Description ...........................................................22

    G.      Useful In A Computer Simulation........................................22

    H.      Symbol/Code .......................................................................23

    I.      Separating ............................................................................23

    J.      Automatically Transmitted ..................................................24

    K.      Status/State...........................................................................25

    L.      Selectively Producing ..........................................................26

M.  Searching The Stored Signals To Detect A Match Between A Stored Symbolic Representation And A Symbolic Representation Of Subevents And Status Information Of Interest ..........................................26

N.  Viewer Event File ..................................................................26

O.  Each Symbol is Representative Of An Action Involving Physical Exertion And Skill ..............................................................26

IV.  CONCLUSION....................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*CCS Fitness, Inc. v. Brunswick Corp.*
288 F.3d 1359, 1366 (Fed. Cir. 2002) ...................................................................6, 15, 18

*Elkay Mfg. Co. v. Ebco Mfg. Co.*
192 F.3d 973, 980 (Fed. Cir. 1999). ......................................................................9

*Microsoft Corp. v. Multi-Tech*
357 F.3d 1340, 1349 (Fed. Cir. 2004) ..............................................................10

*Nellcor Puritan Bennett, Inc. v. Masimo Corp.*
402 F.3d 1364, 1368 (Fed. Cir. 2005); .............................................................17

*Omega Eng'g, Inc., v. Raytek Corp.*
334 F.3d 1314, 1326 (Fed. Cir. 2003) ..............................................................12

*Teleflex, Inc. v. Ficosa North America Corp.*
299 F.3d 1313, 1327 (Fed. Cir. 2002) .........................................................6, 12

*Texas Digital Sys., Inc. v. Telegenix, Inc.*
308 F.3d 1193, 1201-1202 (Fed. Cir. 2002) ....................................................21

*Vitronics Corp. v. Conceptronic, Inc.*
90 F.3d 1576, 1583 (Fed. Cir. 1996) ................................................................17

## Other Authorities

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991 Ed.)................................................19

## I.    INTRODUCTION

In the interest of judicial economy and in an effort to streamline this case, DDB has elected to drop certain claims of the Patents-in-Suit (identified below), thereby reducing the number of disputed terms by about 25% (from 39 to 30).  The remaining 30 disputed terms appear in most of the remaining claims.  Thus, a further reduction in the number of asserted claims will not necessarily result in a further reduction in the number of disputed terms.

Although DDB is doing everything it can to reduce the number of disputed terms so that this Court can focus on what really needs to be construed, MLBAM still continues to throw up numerous terms that are crystal clear on their face and require no construction[1].  For instance, does this Court really need to construe terms such as "enter," "first computer," "second computer," etc.?  The answer is no.[2]

MLBAM's motives are clear.  By identifying such a large number of terms to be construed, MLBAM is hoping to increase the odds that somewhere along the line this Court will mistakenly import limitations from the patent specification into the definitions so that MLBAM can escape liability for infringement.

But just as there is no requirement for this Court to construe each and every term contained in all of the asserted claims, there is also no requirement that this Court construe every term that MLBAM says should be construed.  Instead, this Court should

---

[1] Rather than trying to be reasonable, MLBAM has continued to add more and more terms to be construed.  In its Motion for Summary Judgment of Non-Infringement, MLBAM identified four terms to be construed.  In its letter identifying terms pursuant to the Scheduling Order, MLBAM's list of terms jumped to 39. (Ex. C).  Only four days later, when the parties exchanged *definitions* pursuant to the Scheduling Order, MLBAM added three more terms.  (Ex. H).

[2] MLBAM's claim that DDB failed to provide definitions for all of the terms identified by MLBAM is false.  Even for those terms that DDB believes are self-evident and do not require any construction by this Court, DDB nonetheless provided proposed constructions.

construe only those terms that truly require construction and that *both* parties agree need to be construed including, for example, the terms "broadcasting" and "computer simulation" -- terms that MLBAM focused on in its motion for summary judgment of non-infringement.

In its *Markman* brief, MLBAM continues to improperly import limitations from the patent specifications into its proposed definitions. Accordingly, MLBAM's proposed constructions should be rejected, and DDB's constructions should be adopted.

## II.    TERMS TO BE CONSTRUED

### A.    Live Event

In its opening brief, DDB established that the term "live" is always used in the claims to describe an "event," and thus the proper term to be construed is "live event," not "live." DDB also established that the term "live event"[3] means exactly what it says, namely, an event that is occurring in real time. Nothing more from this Court is required.

MLBAM's proposed construction for "live event" is as follows: "the information is being transmitted as the event/game is occurring." (MLBAM's Brief, p. 31). The flaw in MLBAM's construction is that the claims themselves do not say anything about *when* the transmission of information about the live event takes place. For instance, Claim 1 of the '347 Patent states "[a] method of broadcasting information about a live event . . ." (Ex. E,[4] col. 16, ll. 30-31). Although this Claim makes reference to "broadcast

---

[3] DDB never admitted that "live" is a limitation in each of the claims identified by MLBAM in footnote 32 of MLBAM's brief. For instance, in Claim 10 of the '630 Patent, the word "live" does not appear anywhere in the Claim. Also, DDB has never admitted that any of the preambles of the claims are in fact limitations.

[4] Exhibits A-O, as referred to herein, are attached to the Declaration of Christopher E. Haigh in Support of DDB's Opening Markman Brief. Exhibits P-T are attached to the Declaration of

information" and that such information must be "*about* a live event," it does not require a *live broadcast of the event*, as urged by MLBAM.

MLBAM's reliance on two dictionary definitions of "live" is misplaced for several reasons. First, as set forth above, the proper term to construe is "live event" in the context of the claims, as opposed to the word "live" alone. Second, definition 12a from Webster's Dictionary relied upon by MLBAM actually states in full: "transmitted during the actual performance [a *live* broadcast] . . ." (MLBAM's Brief, Ex. 45). Obviously, this definition is at odds with the claims and must therefore be rejected because, as stated above, there is nothing in the claims that requires a live broadcast or transmission.[5] Rather, the Claims merely state broadcasting information about the live event. Third, the definition from the McGraw-Hill Dictionary Of Scientific And Technical Terms should be rejected outright because, quite simply, the term "live event" (such as, for example, a baseball game) can hardly be considered a technical term.

MLBAM's reliance on the patent specification is also misplaced. For example, MLBAM cites the following passage:

> In particular, the present invention utilizes computer simulation techniques to characterize the actions of a live event, providing symbolic representations for the actions of the event rather than direct audio of visual signals (Ex. 1, '479 patent at Col 1 Lines 55-59; see also Col 1 Lines 60-64 and Col 2, Lines 37-52).

Contrary to MLBAM's claim, there is nothing in this passage (or any other passage for that matter) that requires a live broadcast (or transmission) of an event. Instead, this

---

Christopher E. Haigh in Support of DDB's Markman Reply Brief, filed contemporaneously herewith.

[5] Of course, other definitions of "live" in Webster's, which MLBAM totally ignores, are perfectly consistent with DDB's construction of "live event." In particular, "live" is defined simply as "1 to be alive; have life . . . 12a involving an appearance or performance in person . . ." (MLBAM's Brief, Ex. 45).

passage merely states that computer simulation techniques are used to characterize the actions of a live event (as opposed to a simulation that characterizes actions of an historical event that has happened in the past).

Finally, even the file history quoted by MLBAM (on page 33 of its brief) does not support its proposed construction. In a Notice of Allowance of the claims, the Examiner distinguished the claimed invention from prior art that simulated *historic replays* by pointing out that the claimed invention related to simulations of a "live event," rather than simulations of events that occurred in the past (for example, a computer simulation generated in 2005 of an event that occurred in 1890). (MLBAM's Brief, Ex. 40[6], p. 3). For this reason (among others), the Examiner concluded that the claims were patentable over the prior art. Importantly, contrary to MLBAM's assertions, *the Examiner never distinguished the claimed invention from the prior art based on a live broadcast or transmission.* Thus, the file history, if anything, supports DDB's construction that a "live event" simply means an event that is occurring in real time, not a live broadcast.

## B.    Broadcasting

### 1.    The Patentee Clearly Defined "Broadcasting" During Prosecution, And That Definition Controls

In its brief, MLBAM relies on no less than three alleged experts who provide their opinions as to the ordinary meaning of the term "broadcasting." It also relies on general and technical dictionaries that provide definitions for this term. In doing so, MLBAM is attempting to divert this Court's attention away from the single most important piece of

---

[6] DDB notes that some of the Exhibits used by MLBAM, including Exhibits 20 and 21, were not in the designated locations in DDB's copy of the Declaration of Jason J. Keener in Support of Defendant's Initial Markman Brief.

*intrinsic* evidence, namely, the Applicants' express definition of "broadcasting," which is contained in the '479 Patent prosecution history.

As DDB pointed out in its opening brief, the Applicants clearly defined "broadcast" during the prosecution of the '479 Patent as follows:

> [b]roadcast covers the transmission of [data] to the multiple end users who would be interested in the information.

(Ex. J, p. 11). This statement--that a broadcast covers the transmission of data to multiple users--is perfectly consistent with DDB's proposed construction. The above definition is clearly *not* limited to just a "one-way transmission" as set forth in MLBAM's proposed construction. It also says nothing about the transmission of "a single message simultaneously," which is another limitation that MLBAM is improperly attempting to read into the claims. Because "broadcasting" cannot be limited to a "one-way transmission of a single message simultaneously" as MLBAM claims, MLBAM's construction must be rejected.

Remarkably, MLBAM *ignores altogether* the definition set forth by the Applicants during prosecution. Instead, it argues that "during the prosecution of the '479 Patent, DDB stated that 'broadcast' should be given its technical definition." (MLBAM's Brief, p. 29). MLBAM is wrong--the Applicants *never* made such a statement during prosecution. What the Applicants actually said was as follows:

> the terms "broadcast" and "simulation" are clearly understood by the skilled artisan. "Broadcast" covers the transmission of [data] to the multiple end users who would be interested in the information.

(Ex. J, p. 11). Thus, what the Applicants really said is that the skilled artisan would clearly understand what the term "broadcast" means, and that such a skilled artisan would understand that the "broadcast" covers the transmission of data to multiple end users. In

other words, the Applicants were saying that the skilled artisan's understanding of the term would be consistent with the Applicants' express definition of the term.

It is important to note that the express definition provided by the Applicants during prosecution trumps any conclusion as to the ordinary meaning of the term "broadcasting." As stated by the Federal Circuit, "the claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) ("claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by refining the term . . .").

Thus, *even if* this Court were to conclude that the ordinary meaning of "broadcasting" is limited to a one-way transmission such as a radio or television transmission (and it should not, for the reasons set forth below), this Court is nonetheless bound by the broad definition set forth during prosecution. Accordingly, all of the extrinsic evidence relied upon by MLBAM (i.e., the opinion testimony and dictionary definitions) is entitled to no weight.

Finally, although not determinative, the broad definition set forth by the Applicants is in fact perfectly consistent with the ordinary meaning of the term "broadcasting."[7] For instance, even MLBAM's own dictionary definitions of

_____

[7] DDB notes that MLBAM's proposed ordinary meaning of "broadcasting," which is limited to a television or radio broadcast, is inconsistent with even the first sentence of the Summary of the Invention in the Patents-in-Suit. Specifically, that portion of the Summary states "[t]he present invention is directed to a method for broadcasting live events which overcomes the shortfalls of

"broadcasting" state: "*vt.* . . . 2: to spread (information, gossip, etc.) widely . . . –*adj.* 1 widely scattered . . . –*adv.* far and wide . . . " (MLBAM's Brief, Ex. 41). These broad definitions, which MLBAM completely ignores, are consistent with the Applicants' definition set forth in the file history--that "broadcasting" covers the transmission of data (i.e., spreading or scattering data far and wide) to multiple viewers. These broad definitions are also consistent with the fact that the Applicants never limited their definition to a one-way transmission of a single message simultaneously to multiple recipients (i.e., radio and television transmissions).

2.    **The Words Of The Claims Themselves Prove That "Broadcasting" Cannot Be Limited To A One-Way Communication Technique**

In its opening brief, DDB also pointed out that the words of the claims themselves demonstrate that the term "broadcast" must include both one-way and two-way communication techniques. In particular, dependent Claim 16 of the '347 patent[8] expressly states that the "step of broadcasting" includes a two-way communication technique. Because dependent Claim 16 recites broadcasting using the two-way communication technique, the term "broadcasting" in independent Claim 13 (from which Claim 16 depends) must be broadly construed to encompass both types of techniques. Otherwise, the claims would make no sense.

MLBAM advances two arguments in support of its assertion that Claim 16 does not define broadcasting as a two-way communication technique. Neither of the

---

radio and television broadcasting." (Ex. D, col. 1, ll. 52-54). Clearly, the inventors were differentiating between the claimed broadcasting and the traditional methods used in radio and television broadcasting. This is yet another reason why it is improper to limit the claim term "broadcasting" to a one-way communication technique such as that used in radio and television broadcasting.

[8] DDB notes that dependent claim 18 of the '479 Patent (Ex. D, col. 18, ll. 55-61) and dependent claim 13 of the '862 Patent (Ex. F, col. 18, ll. 30-36) have identical language.

arguments has any merit.  First, MLBAM erroneously argues that Claim 16 covers a one-

way broadcast (as MLBAM defines it) and that the "receiving a request" limitation is not

a part of "broadcasting," but instead is an *additional* requirement or step in the claim.

(MLBAM's Brief, p. 30).  That is not what Claim 16 says.[9]  Claim 16 is set forth below:

> 16.  The method of claim 14, wherein said step of *broadcasting comprises* the steps of:
> *receiving* a request from a viewer computer for access to a database file corresponding to one of said plurality of events and
> *transmitting* an update of the requested database file *to the requesting viewer computer*.

(Ex. E, col. 18, ll. 30-36, emphasis added).  As Claim 16 reveals, the term "broadcasting"

*is defined as* receiving a request from a viewer computer and transmitting the requested

file to the requesting viewer computer.  Thus, Claim 16 reveals that the term

"broadcasting" must cover the two-way communication technique.[10]

MLBAM also mischaracterizes what Figure 10 shows in an effort to support its

twisted and erroneous view of Claim 16.  In particular, MLBAM argues, without one

shred of support, that Figure 10 shows a one-way broadcast (as MLBAM defines it) and

that late viewers or viewers who missed the broadcast can send a request for a re-

broadcast (via process 1004).  This is totally false.  The patent specification does not state

this.  Instead, Figure 10 simply shows a one-way communication technique (process

---

[9]  MLBAM is also wrong when it states that Claim 16 covers a scenario wherein "a majority of viewers receive a broadcast, while viewers who begin late or missed a certain message can independently request the missing information, which is then broadcast again to all viewers." (MLBAM's Brief, p. 30).  As demonstrated herein, Claim 16 covers the scenario where there is (1) a request from a viewer computer and a (2) transmission back *to that same viewer computer*. For this additional reason, MLBAM's characterization of claim 16 is flawed.

[10]  If DDB had intended to merely add an additional step to the broadcast of Claim 13, as MLBAM erroneously contends, then Claim 16 would have read: "further comprising the step of receiving a request."  But, as set forth above, that is *not* how Claim 16 is drafted.  Instead, Claim 16 is drafted so that the "broadcasting" step set forth in claim 13 *is defined as* a two-way communication technique.

1003[11]) and *a separate and distinct*[12] two-way communication technique (process 1004[13]). There is nothing in Figure 10 (or the written description) that indicates or even suggests that these processes can somehow be mixed together in the manner suggested by MLBAM. In short, Figure 10 does not teach a "re-broadcast" to all computers after receiving a request from a viewer's computer.

MLBAM's second argument, that Claim 16 of the '347 Patent cannot support a construction of "broadcasting" that includes two-way communication techniques because it was added in a later-filed continuation application,[14] also has no merit.[15] The fact is, it makes no difference where a claim term is introduced in a chain of continuation applications. The claim term will have the same meaning throughout. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999). What is relevant is the intrinsic evidence in all of the Simulation Patents. As discussed above, this evidence includes the

---

[11] The patent specification states that Process 1003 "repeatedly broadcasts event files stored in the data base according to a one-way communication scheme." (Id., at col. 9, ll. 49-50).

[12] The one-way communication technique is claimed in Claim 15 of the '357 Patent, while the two-communication technique is claimed in Claim 16 of the '347 Patent.
MLBAM claims that DDB is reading Claim 15 incorrectly. According to MLBAM, "automatically transmitting" concerns how the transmission occurs--automatic versus manual-- and not whether the transmission is a one-way transmission. However, there is not a single reference in the patent specifications regarding "automatic" transmissions versus "manual" transmissions. In fact, the word "manual" doesn't appear in any of the patent specifications. MLBAM is once again misconstruing the facts. The reality is, the term "automatically transmitting" (also referred to as "repeatedly transmitting" or "repeatedly broadcasting" in the Specifications and Figure 10) is consistently used to describe a one-way communication technique, and is consistently distinguished from two-way communication techniques. *See. e.g.*, claims 15 and 16 of the '347 patent; claims 17 and 18 of the '479 patent; Fig. 10 of the simulation patents; and col. 8, ll. 10-58 of the '479 patent. Thus, "automatically transmitting" refers to the one-way communication technique.

[13] The patent specification states that Process 1004 "carries out two-way communication between the centralized data base computer and a viewer by responding to viewers' requests..." (Id., at col. 9, ll. 51-53).

[14] DDB notes that the '347 Patent *was not* the last Simulation Patent to issue, contrary to MLBAM's claim.

[15] Claim 16 of the '347 Patent was not a "late added claim" as asserted by MLBAM. In fact, all of the Simulation Patents--the '479 Patent, the '347 Patent, and the '862 Patent--contain claims that are identical to Claim 16 in the '347 Patent.

broad definition of "broadcasting" given by the Applicants during the prosecution of the
'479 Patent.  Claim 16 of the '347 Patent, as well as the identical claims found in the
other Simulation Patents, are consistent with this express definition.

　　　　MLBAM's reliance on *Microsoft Corp. v. Multi-Tech.*, 357 F.3d 1340 (Fed. Cir.
2004) is misplaced.  Contrary to MLBAM's claim, the *Microsoft* court *did not* hold that
"the patentee could not subsequently broaden its claim term definitions in the later filed
continuations."  (MLBAM's Brief, pg. 31).  Instead, the *Microsoft* court merely found
that the patentee made a number of clear disavowals in the specification and during
prosecution, and ruled that "[w]e cannot construe the claims to cover subject matter
*broader than that which the patentee itself regarded as comprising its inventions* and
represented to the PTO."  (357 F. 3d at 1349).  Here, MLBAM cannot point to a single
disavowal in connection with the term "broadcasting," because DDB never made one.
Accordingly, *Microsoft* does not apply.

### 3.　　The Patent Specification Does Not Limit "Broadcasting" To Only A One-Way Communication Technique

　　　　The only remaining piece of intrinsic evidence to consider is the patent
specification.  Here, MLBAM makes much of the fact that the specification uses the term
"broadcast" only when referring to a "one-way broadcast."  MLBAM mistakenly
concludes from this that the term "broadcast" must be construed to only cover a one-way
transmission.  MLBAM is wrong.  Referring to something as a "one-way broadcast" is
far different then saying that a broadcast is limited to a one-way communication
technique.  The fact that the word "one-way" *modifies* "broadcast" clearly suggests that
there are other types of broadcasts contemplated by the patent, such as a two-way

communication technique shown in Figure 6[16] of the Simulation Patents. Significantly, although the patent refers to certain broadcasts as one-way broadcasts, the patent specification never *defines* the term "broadcast" as only a one-way communication technique.

### C.   Computer Simulation[17]

#### 1.   The Ordinary Meaning Does Not Require Animation

With regard to "computer simulation," the central dispute between the parties is whether the term must be construed to require animation as MLBAM claims. As a starting point in this analysis, it is important to note that both DDB and MLBAM agree that the ordinary meaning of "computer simulation" *does not* require animation. For instance, DDB's technical expert, Dr. Perry, states that the commonly understood meaning of "computer simulation" does not *necessarily* include animation: "[c]omputer simulation consists of at least two parts--a model and a presentation . . . there are also many kinds of presentations, such as graphics, text, data, *or animation* . . ." (Ex. P, ¶10). MLBAM's expert, Chris Schmandt, agrees that animation is not required in the ordinary meaning of the term:

> [s]imulation is a technical term for a computer program, which uses a mathematical model of a system to calculate the state of the system as a function of event, which serve as input to the system.

---

[16] If the term "broadcast" is by definition a one-way transmission as MLBAM claims, then why did the Applicants bother to use the term "one-way" and "broadcast" separately? The fact that the Applicants did proves that the terms have different meanings, and proves that "broadcast" is not by definition limited to a one-way communication technique.

[17] MLBAM repeatedly represents that the "computer simulation" must take place at the viewer computer. This is simply not true. Certain of the claims of the Simulation Patents make no mention at all as to *where* the computer simulation takes place. In any event, DDB submits that the issue presented here is limited to the meaning of the term "computer simulation," not where the computer simulation occurs. The claims will speak for themselves on that issue.

(MLBAM Brief, Ex. 58, p. 11).  Note that the above quote makes no mention of the word animation.  Even the dictionary definition of "simulation" relied upon by Mr. Schmandt and MLBAM does not reference the word animation.  (Ex. R).

"Computer simulation" must therefore take on its ordinary meaning (which does not require animation), unless the patentee clearly deviated from the ordinary and accustomed meaning by (1) redefining the term or (2) characterizing the invention in the intrinsic evidence using "words or expressions of manifest exclusion or restriction, representing a *clear disavowal* of claim scope." *Teleflex*, 299 F.3d at 1327 (emphasis added).  More recently, the Federal Circuit has clarified the standard for what constitutes a disavowal of claim scope:

> for prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be *both clear and unmistakable.*

*Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003) (emphasis added).

Thus, this Court can construe "computer simulation" to require animation *only if* one of the two conditions set forth above are met.  As demonstrated below, the patentee *never* redefined "computer simulation" to require animation.  Moreover, there is no evidence in the intrinsic evidence of a clear and unmistakable disavowal of claim scope that limits "computer simulation" to require animation.

### 2.     MLBAM Misconstrues The File History

MLBAM argues that during prosecution, the Applicants defined simulation as requiring animation.  (MLBAM's brief, p. 18).  This is simply not true.  What really happened is that the Examiner rejected the then-pending claims based on his view that the

term "simulation" was vague and ambiguous.  (Ex. I, p. 3).  In response, the Applicants

specifically defined "simulation" as follows:

> "simulation" is clearly directed to the technical area of
> computer simulation as referred to at p. 2 lines 4 to 11 [of
> the original '479 patent application] . . .

(Ex. J, p. 11).  Page 2, lines 4 to 11 of the '479 Patent application is set forth below:

> [i]t is also well known to utilize computers to simulate
> activities.  In particular, computer simulation techniques to
> represent the testing of the operation of devices is well
> known.    Thus, computer programmers familiar with
> simulation techniques are familiar with programs required
> for simulating activities on a computer.  However, such
> simulation techniques have not been utilized in conjunction
> with the broadcast of live events, which can be represented
> as a sequence of well-defined actions.

(Ex. T, p. 2, ll. 4-11).  Importantly, the Applicants *never* referenced the word "animation"

in their definition.    Moreover, there is nothing in this quote that could possibly be

construed a disavowal of claim scope, let alone a clear and unmistakable disavowal.

After telling the Examiner what they meant by "simulation," the Applicants

referenced another portion of the '479 Patent application to simply make the point that

the term "is well known as indicated at page 27 lines 4 to 22."  (Ex. J, p. 11).   Page 27,

lines 4 to 22 of the application is set forth below:

> [t]he algorithm used by the viewer's computer is based on
> standard discrete-event simulation algorithms (such as that
> shown by Law et al. in figure 1.2 at p. 7).  The algorithm in
> Figure 11 relies on four tables, each indexed by the types of
> actions that may occur (in the same way that the "event
> routines" are indexed by "event types" in the Law et al.
> algorithm).  One table, the display table, has entries that
> describe how to display actions of that type.  The second
> table, the sound table, has entries that describe how to
> generate appropriate sounds for actions of that type.  The
> third table, the text table, has entries that describe how to
> produce a textual description of actions of that type.  The

> entries in these three tables all describe procedures that can
> be executed incrementally for each step of the time
> variable.   The procedures are implemented using
> techniques well known in the art, *such as* the animation
> techniques discussed in "Computer Animation with Scripts
> and Actors" by Reynolds in Computer Graphics, July 1982,
> Vol. 16, No. 3, pp. 289 to 296, and in "High-Performance
> Graphics in C: Animation and Simulation" by Adams,
> Windcrest Books, 1988 pp. 207-328, and can be
> implemented using well-known techniques.

(Ex. T, p. 27, ll. 4-22, emphasis added).  As set forth above, the Applicants identified this

passage merely to show that "simulation" was "well known" in the art, *not* to support

their definition of "simulation."   Nonetheless, even if it was being offered as support for

the definition, it still is *not* a clear and unmistakable disavowal of claim scope.   The

above quote refers to a display table used to display actions, a sound table used to

generate sounds for actions, and a text table used to generate textual descriptions of

actions.  The Applicants state that the procedures for generating the display, sound, and

text can be carried out using techniques well known in the art *such as* animation

techniques.  This demonstrates that the reference to animation techniques is just *one*

*example* of the techniques that can be employed to carry out the display, sound, and text

functions.  The Applicants *never* said that "computer simulation" requires animation or

that "computer simulation" means animation.   They also *never* distinguished their

invention from the prior art based on animation.  Thus, the file history does not in any

way limit "simulation" to requiring animation.

### 3.   The Patent Specification Does Not Limit "Computer Simulation" To Require Animation

On pages 21-23 of its Brief, MLBAM quotes four passages from the patent

specification, and claims that these passages prove that the Applicants limited the term

"computer simulation" to require animation.  MLBAM is wrong.  What these quotes do

show is that the inventors understood a "simulation" to be separate and distinct from an "animation" because they used the terms differently: "*simulation algorithm* of the present invention is combined with *graphical animation* techniques . . ." (Ex. D, col. 11, ll. 35-36, emphasis added).  More importantly, none of these quotes actually *defines* "computer simulation" to require animation as MLBAM claims.

The fact is, the references in the patent specification to animation, along with the details of how animations are carried out, are simply references to *a preferred embodiment* of displaying the computer simulation.  Preferred embodiments cannot and should not be read into the claims.  *CCS Fitness*, 288 F.3d at 1366.

Finally, the references to animation in the patent specification must be read in light of the portions of the patent specification that explicitly state that graphics, text, *or* animation can be used to display the mechanism:

> Essentially, the viewer's computer . . . shows each sub-event received from the centralized database computer in *either* a graphical representation *or* a textual representation *or* an audio/visual representation.

(Ex. E, col. 9, ll. 61-67, emphasis added)

> The actions can be represented to the viewer *either with* visual images, audio images, or text, *or some combination thereof*.

(Ex. E, col. 2, ll. 34-36, emphasis added).

> The viewer 7 then selects the *type of display* warranted for the event in question, *either* a textual display, *or* a visual display *or* visual-audio display.

(Ex. E, col. 3, ll. 60-65, emphasis added).

> the viewer… can also choose to have information about the event displayed in graph or chart form rather than as visual images.

(Ex. E, col. 1, l. 65 - col. 2, l. 1).

These portions of the specification demonstrate that it would be improper to limit the term "simulation" to require animation.  MLBAM erroneously argues that they should be disregarded because, according to MLBAM, the Applicants narrowed the scope of "simulation" to require animation.  However, this argument fails because, as demonstrated above, there was no clear and unmistakable disavowal of claim scope during prosecution.

In short, because the ordinary meaning of computer simulation does not require animation, and because the Applicants did not disavow claim scope during prosecution, the term "computer simulation" cannot be limited to require an animation, but instead must be construed to include graphics, text, *or* animation consistent with the patent specification.

### D.    Combining

In its opening brief, DDB identified an example of "combining" signals set forth in the patent specification wherein one signal (i.e., data representative of the play) on one channel is transmitted concurrently with another signal (i.e., a video signal) on another channel over the same medium.  (Ex. G, col. 18, ll. 54-55).  In this embodiment, there is no requirement that the signals be intermixed.  Tellingly, MLBAM completely ignores this specific example of combining.  Instead, it only mentions the other example of "combining," wherein two signals are intermixed, and mistakenly concludes from this that "combining" must be limited to signals that are intermixed.

The fundamental flaw in MLBAM's construction is that it excludes a preferred embodiment of "combining" wherein two signals are combined, not by intermixing, but

rather by transmitting them concurrently over the same medium.  The Federal Circuit has cautioned that constructions that exclude a preferred embodiment are "rarely, if ever, correct."  *Nellcor Puritan Bennett, Inc. v. Masimo Corp.*, 402 F.3d 1364, 1368 (Fed. Cir. 2005); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).  In view of the above, DDB's construction should be adopted, because it covers each of the two examples of "combining" set forth in the patent specification.[18]

## III.   OTHER TERMS THAT MLBAM CONTENDS SHOULD BE CONSTRUED

### A.    Transmission Data

MLBAM is once again improperly attempting to read limitations into the claims by arguing that "transmission data" must require a specific type of data, namely, symbolic sub-event/play information entered by the observer.  Where, in the claim term "transmission data," does the phrase "symbolic sub-event/play information entered by the observer" appear?

A close look at the claims of the Simulation Patents proves that the term "transmission data" cannot be defined as the "symbolic sub-event/play information," as MLBAM claims.  For instance, Claim 1 of the '479 Patent recites "broadcasting said symbolic descriptions in said updated database file."  (Ex. D, col. 16, ll. 58-59).  Thus, in this claim, it is the actual symbolic descriptions (i.e., symbolic sub-event/play

---

[18]  MLBAM reasons that because all radio waves, once transmitted, are "combined" with each other, DDB's proposed construction is rendered meaningless.  MLBAM's reasoning is flawed, however, because the claims of the '630 patent require combining signals *prior to* transmission. Thus, MLBAM's references to radio waves that have already been transmitted are utterly irrelevant.  Moreover, DDB's proposed construction of "combining" would not render the "separating" limitation meaningless either, because signals that are first combined and then transmitted over the same medium (even air waves) are separated after reception.

information) that are broadcast.  Claim 1 of the '347 Patent, on the other hand, recites
"creating transmission data *from* the generated sequence of symbolic descriptions" and
then "broadcasting said transmission data."  (Ex. E, col. 16, ll. 49-51).  Thus, in this
claim, transmission data is generated *from* the symbolic descriptions (i.e., symbolic sub-
event/play information), and then the transmission data is broadcast.  Accordingly, Claim
1 of the '347 Patent is clear that "transmission data" can be *any form of data*, not just the
symbolic sub-event/play information entered by the observer.

MLBAM makes three arguments in support of its unduly narrow proposed
construction, none of which has any merit.  First, MLBAM argues that the patent
specification only discloses transmitting the symbolic sub-event/play information.
MLBAM erroneously concludes from this that the broad term "transmission data" must
therefore be limited to the symbolic sub-event/play information.  This is a classic case of
reading limitations from the patent specification into the claims.  This, MLBAM cannot
do.  *CCS Fitness*, 288 F.3d at 1366.

Second, the terminal disclaimer filed during the prosecution of the '347 patent
*does not* support MLBAM's claim that "transmission data" found in Claim 1 of the '347
Patent is the same as "symbolic descriptions" (i.e., symbolic sub-event/play information)
found in Claim 1 of the '479 Patent.  What MLBAM fails to mention is that the terminal
disclaimer was filed in response to an obviousness-type double patenting rejection.  In
other words, the Examiner believed that Claim 1 of the '347 Patent was obvious or
"substantially similar" to Claim 1 of '479 Patent.  Significantly, the Examiner never said
that Claim 1 of the '347 patent is identical to Claim 1 of the '479 Patent, or that the term
"transmission data" means the exact same thing as "sub-event/play information."  The

fact that the Examiner merely thought the Claims were "similar" actually proves that there must have been differences in the Claims. One of those differences is broadcasting "transmission data" versus broadcasting the actual symbolic descriptions.

Finally, MLBAM argues that because sub-event information is stored in a database file, it is "logical" to assume that the transmission data that is broadcast is the sub-event information. MLBAM's "logic" is flawed. The fact is, transmission data can be created *from* the sub-event information stored in the database file (consistent with Claim 1 of the '347 Patent), and that data can then be broadcast. The data does not necessarily have to include the sub-event information.

Accordingly, if this Court concludes that construction of this term is even necessary, DDB submits that "transmission data" should be construed to mean exactly what is says, namely, data that is transmitted, nothing more.

### B.    Enter

In its opening brief, DDB established that the ordinary meaning of the term "enter" is simply: "4: to put in: insert."[19] (Ex. O). There is nothing in this ordinary meaning that suggests to put into "by a human" as MLBAM claims. Tellingly, MLBAM cannot point to one shred of intrinsic evidence that indicates that inventors intended the term "enter" to be different from its ordinary meaning. In others words, did the inventors depart from the ordinary meaning by redefining "enter" to mean: to put into *by a human*? Of course, the answer is no.

MLBAM yet again asks this Court to read a preferred embodiment into the claims. In particular, MLBAM cites to Claim 10 of the '630 Patent and argues that the

---

[19] WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991 Ed.).

patent specification only discloses a human being entering information. So what? This is just a preferred embodiment, which cannot be read into the claims. MLBAM's overly narrow construction must be rejected.

### C.    Means-Plus Function Claim Terms

MLBAM has identified nine means-plus-function claim terms that it believes require construction by this Court. DDB does not believe that these terms require any construction.[20] Nonetheless, in the interest of judicial economy and in an effort to streamline the case, DDB is dropping at this time[21] Claims 17-19 of the '630 Patent that include these nine claim terms.

### D.    First Computer And Second Computer

MLBAM has flip-flopped and now admits that with respect to Claim 10 of the '630 Patent, a "first computer" is simply "a computer" and that a "second computer" is simply "another computer" (i.e., a computer different from the first computer). MLBAM still maintains, however, that these terms take on different meanings in the means-plus-function Claims 17-19 of the '630 Patent. This is a moot point now because, as stated above, DDB is presently not asserting Claims 17-19 of the '630 Patent.

---

[20] DDB believes that MLBAM's proposed construction for these terms is totally incorrect. A proper construction of a means-plus-function claim element requires (1) identifying the function of the means-plus-function limitation and then (2) identifying the specific structure in the patent specification that performs that particular function. MLBAM's constructions are flawed because, for each means-plus-function clause, they do not specifically identify the function. They also do not clearly identify the structure corresponding to the function.

[21] DDB reserves the right to assert claims 17-19 after the Court's claim construction and after DDB has been provided with the discovery that it has requested and has yet to receive from MLBAM.

### E.     Database File

MLBAM's complaint that DDB's proposed construction is too broad has no merit. Claim terms have to be read in light of the claims in which they appear. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1201-1202 (Fed. Cir. 2002). The claims of the patents-in-suit are written in the context of computers, including storage of information on computers. In the context of the claims, DDB's proposed construction of "a repository containing data" would obviously be limited to an electronic repository containing data. It would not therefore read on a book, a piece of paper, a human brain, or a courtroom, as MLBAM claims.

The fundamental flaw in MLBAM's construction is that it requires no less than *18 words* to define "database file." These 18 words just add confusion rather than clarity. What is a "nonredundant collection of relational, interrelated data items?" MLBAM's proposed construction *itself* requires construction. Moreover, it makes no sense to require a "database file" to have data items that "be shared and used by several different subsystems." There is simply no reason to read these limitations into "database file."

Even the dictionary definition relied upon by MLBAM does not support MLBAM's construction. For instance, there is no mention in this definition of a "nonredundant collection of relational, interrelated data items." Moreover, the definition provided by MLBAM actually defines the word database, not a "database *file*." Thus, the definition is not even relevant to the inquiry. In short, MLBAM's construction should be rejected.

**F.    Symbolic Description**

MLBAM's construction is unduly narrow because it improperly imports into the claim term "a sub-event code entered by the observer."  The claim term "symbolic description" itself has nothing whatsoever to do with the "entering" of information, or *who* (such as an observer) is doing the entering, for that matter.  As DDB demonstrated in its opening brief, certain claims of the Simulation Patents that have the "symbolic description" limitation refer to an observer computer, while other claims that have the "symbolic description" limitation specifically omit the reference to an observer computer. It is therefore improper for MLBAM to import the "sub-event code entered by the observer" limitation into the meaning of the term "symbolic description."  Accordingly, DDB's proposed construction should be adopted, and MLBAM's proposed construction should be rejected.

**G.    Useful In A Computer Simulation**

DDB and MLBAM have each submitted a proposed definition for the term "computer simulation."  Remarkably, MLBAM states that the words "useful in a" also require construction.  DDB disagrees.

The words "useful in a" are common everyday terms that do not require any construction.  However, if the Court does construe this phrase, then DDB submits that the phrase should be construed to simply mean "capable of being put to use in a."

MLBAM's construction, on the other hand, construes "useful in a" as "having practicable utility as input to a."  DDB submits that the phrase "capable of being put to use in a" is more readily understood than the phrase "practicable utility."  Additionally, if one were to resort to the dictionary to more readily understand the term "practicable,"

one would find that the dictionary defines "practicable" simply as "2: capable of being used" (Ex. S), which is precisely the definition provided by DDB.  In view of the above, DDB's construction should be adopted.

### H.    Symbol/Code

DDB believes that these terms are self-evident and do not require any construction.  A symbol is simply a representation of something (e.g., a representation of an action).  DDB believes that a "code" is also self-evident.  A "code" refers simply to symbols (e.g., letters, numbers, or words) used to represent information.

MLBAM argues that DDB's construction is flawed because "symbols or code must represent something other than themselves." (MLBAM's Brief, p. 48).  MLBAM provides the following example in an attempt to illustrate its point: "the word 'hit' is not a symbol or code for the word 'hit.'" (Id.).  MLBAM is missing the point entirely.

DDB's construction does not contemplate that a word such as "hit" is a symbol for the *word* "hit."  Rather, DDB's construction contemplates that the word "hit" can be used as a symbol to *represent a hit (i.e., an action) on the field*.  In this scenario, the word "hit" *is* a symbol because it is a representation of something (i.e., an action).  Accordingly, DDB's proposed definition should be adopted.

### I.    Separating

MLBAM once again ignores clear intrinsic evidence in the patents when it construes the meaning of "separating."  Rather than rely upon the meaning set forth by the patentee, MLBAM directs the Court to extrinsic evidence such as that found in a dictionary.

As DDB has asserted, the Court need look no farther than the claims themselves to find the plain meaning of "separating."  Claim 1 of the `630 patent recites in part:

> *producing* a broadcast signal by *combining*[22] said first and second second information signals;
>
> *transmitting* said broadcast signal from a first location;
>
> *receiving* said broadcast signal at a second location;
>
> *separating* said broadcast signal into said first and second information signals;

(Ex. G, col. 26, ll. 3-9, emphasis added).  It is clear from Claim 1 that "separating" simply means to separate.  In this case, it means to separate the broadcast signal into first and second information signals.  Further limitations to the term would be improper.[23]  Accordingly, DDB`s construction should be adopted.

## J.    Automatically Transmitted

While DDB's and MLBAM`s definitions for "automatically transmitting" look similar at first glance, upon a more careful review, it is clear that MLBAM attempts to once again import improper limitations into its construction.  Specifically, MLBAM proposes that "automatically transmitting" be construed so as to include the terms "one computer" and "another computer."  However, such a construction is not consistent with

---

[22] MLBAM argues--again--that DDB`s construction for "combining" is somehow meaningless, and therefore "separating" is also meaningless.  However, as can be seen in Claim 1, combining occurs *prior* to the transmission of the broadcast signal, and separating occurs *after* the broadcast signal has been received.  MLBAM`s references to radio signals are therefore irrelevant.  Whether radio signals can be combined as they pass each other in the air has nothing to do with "combining" as it is used in the claims.

[23] DDB notes that MLBAM cannot turn to the specification or prosecution history to further limit the term, either.  This is because the intrinsic evidence supports the plain meaning: to separate.

the plain meaning[24] of "automatically transmitting," and is in fact inconsistent with the intrinsic evidence.

The intrinsic evidence, and particularly the claims, illustrate that it would be improper to limit "automatically transmitting" to transmissions occurring only between computers, as MLBAM proposes. In fact, certain claims specifically recite structure other than computers. For example, Claims 4 and 6 of the '479 patent[25] require automatically transmitting from a first location to a database file. (Ex. D, col. 17, ll. 3-8, 14-19). Claim 13 of the '479 patent recites that the transmission is *received from* the database file (Ex. D, col. 18, ll. 7-9). Still other claims, including Claim 17 of the '479 Patent, (Ex. D, col. 18, ll. 50-54) Claim 15 of the '347 Patent, (Ex. E, col. 18, ll. 25-28) and Claim 12 of the '862 Patent, (Ex. F, col. 18, ll. 25-29) don't even require a structure, but instead relate to automatically transmitting over a multiplexed communication channel. Therefore, it would be improper to limit the transmissions to those between computers. Accordingly, MLBAM's proposed construction fails, and DDB's construction should be adopted.[26]

**K.    Status/State[27]**

DDB believes that these terms are self-evident and do not require any construction. "Status" simply means information about the state of an event. "State"

---

[24] DDB notes that MLBAM relies on a dictionary for support in its construction of "automatically transmitting." However, even MLBAM's selected definition does not support limiting the term with "one computer" and "another computer."

[25] DDB notes that the '347 patent and the '862 patent have similar claims.

[26] DDB notes that MLBAM reiterates its argument that "automatically transmitting" relates to *how* the transmission occurs rather than whether it is a one-way transmission. DDB addresses this argument in its discussion of "broadcasting" set forth above.

[27] MLBAM sets forth this term in a table in which the first column is labeled "means-plus-function phrase." Contrary to MLBAM's representation, this term is not a means-plus-function term.

modifies the word "variables" in the claims.  Thus, the proper term to construe is "state

variables," which simply means information about the state of the event.

### L.      Selectively Producing[28]

DDB believes that this term is self-evident and does not require any construction.

"Selectively producing" simply means to produce a selected portion.

### M.      Searching The Stored Signals To Detect A Match Between A Stored Symbolic Representation And A Symbolic Representation Of Subevents And Status Information Of Interest[29]

DDB believes that the term "searching" in this phrase is self-evident and does not

require any construction.  It simply means looking for something.

### N.      Viewer Event File[30]

DDB believes that the term "viewer event file" is self-evident and does not require

any construction.   It simply means a repository containing data for the viewer about an

event.

### O.      Each Symbol is Representative Of An Action Involving Physical Exertion And Skill[31]

DDB believes that the term "physical exertion and skill" is self-evident and does

not require any construction.  It simply means physical exertion and skill.

---

[28] MLBAM sets forth this term in a table in which the first column is labeled "means-plus-function phrase."  Contrary to MLBAM's representation, this term is not a means-plus-function term.

[29] MLBAM sets forth this term in a table in which the first column is labeled "means-plus-function phrase."  Contrary to MLBAM's representation, this term is not a means-plus-function term.

[30] MLBAM sets forth this term in a table in which the first column is labeled "means-plus-function phrase."  Contrary to MLBAM's representation, this term is not a means-plus-function term.

[31] MLBAM sets forth this term in a table in which the first column is labeled "means-plus-function phrase."  Contrary to MLBAM's representation, this term is not a means-plus-function term.

## IV.    CONCLUSION

For the reasons set forth by DDB, this Court need not construe all of the claims that MLBAM asserts should be construed.  Such an exercise would be a waste of time and judicial resources.  Rather, the Court should focus on the claim terms that the parties mutually agree are truly at issue, including "broadcasting" and "computer simulation." For the reasons set forth in DDB's opening brief and this reply brief, the Court should adopt DDB's definitions for these terms.

To the extent the Court deems it necessary to construe the other terms, the Court should adopt DDB's plain meaning constructions for those terms, because such constructions are consistent with the intrinsic evidence.   MLBAM's proposed constructions, which improperly import limitations into the claims, should be rejected.

Respectfully submitted,

DDB Technologies, L.L.C.,

Date: May 9, 2005

*Michael Adams*

Michael H. Baniak
Michael D. Gannon
Christina L. Brown
Christopher E. Haigh
BANIAK PINE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois  60606
(312) 673-0360
(312) 673-0361  Facsimile

and

Ross Spencer Garsson
Texas State Bar Number 00784112
Michael P. Adams
Texas State Bar Number 00872050
WINSTEAD SECHREST & MINICK P.C.
401 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 474-4330
(512) 370-2850  Facsimile

Attorneys for Plaintiff DDB Technologies, L.L.C.

## CERTIFICATE OF SERVICE

The   undersigned   hereby   certifies   that   true   and   correct   copies   of   DDB

TECHNOLOGIES, L.L.C.'S *MARKMAN* REPLY BRIEF was served upon:

Hal L. Sanders
Witcher F. McCullough III
HAYNES AND BOONE LLP
600 Congress Ave., Suite 1300
Austin, Texas 78701-3236
(512) 867-8400
(512) 867-8470 Facsimile
*via hand delivery*

Sharon R. Barner
Anat Hakim
James T. McKeown
FOLEY & LARDNER LLP
321 North Clark
Suite 2800
Chicago, Illinois 60610-4764
(312) 832-4500
(312) 832-4700 Facsimile
*via federal express*

this 9th day of May, 2005.

Michael P. Adams

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DDB Technologies, L.L.C.,

               Plaintiff,

    v.

MLB Advanced Media, L.P.,

               Defendant.

Civil Action No. A04CA352 LY

Judge Lee Yeakel

**DECLARATION OF CHRISTOPHER E. HAIGH IN SUPPORT OF
DDB'S *MARKMAN* REPLY BRIEF**

I, Christopher E. Haigh, hereby declare as follows:

    1.    I am an attorney with Baniak Pine and Gannon, counsel for the Plaintiff, DDB Technologies, L.L.C. ("DDB") in the above-captioned case.

    2.    I make this Declaration on the basis of my own personal knowledge and if I were called as a witness, I could and would testify competently to the following facts.

    3.    Attached to this Declaration as Exhibit P is a true and correct copy of the Declaration of Dr. Dewayne E Perry Concerning the Meaning of Certain Terms Found in the Claims of the Patents-in-Suit, dated May 6, 2005.

    4.    Attached to this Declaration as Exhibit Q is a true and correct copy of excerpts from U.S. Patent Application Serial No. 07/920,355, filed July 29, 1992, which resulted in U.S. Patent No. 5,526,479.

5.    Attached to this Declaration as Exhibit R is a true and correct copy of Exhibit 11 from the Declaration of Christopher Schmandt in Support of MLBAM's Motion for Summary Judgment of Non-Infringement.

6.    Attached to this Declaration as Exhibit S is a true and correct copy of the definition of "practicable" from WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991).

7.    Attached to this Declaration as Exhibit T is a true and correct copy of U.S. Patent Application Serial No. 07/542,990, filed June 25, 1990.


I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

May 7, 2005                          _____
                                     Christopher E. Haigh

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of DECLARATION OF CHRISTOPHER

E. HAIGH IN SUPPORT OF DDB'S MARKMAN REPLY BRIEF was served upon:

> Hal L. Sanders
> Witcher F. McCullough III
> HAYNES AND BOONE LLP
> 600 Congress Ave., Suite 1300
> Austin, Texas 78701-3236
> (512) 867-8400
> (512) 867-8470 Facsimile
> *via hand delivery*
>
> Sharon R. Barner
> Anat Hakim
> James T. McKeown
> FOLEY & LARDNER LLP
> 321 North Clark
> Suite 2800
> Chicago, Illinois 60610-4764
> (312) 832-4500
> (312) 832-4700 Facsimile
> *via federal express*

this _9_ day of _May_____, 2005.

_____
Michael Adams

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

## Notice of Document/Attachment(s) Not Imaged but Stored with Document in Case File

### See Original File to View/Copy Document/Attachment(s)

Civil Case No.          A-04-CA-352 LY

DDB TECHNOLOGIES

VS.

MLB ADVANCED MEDIA

Attachments to
Document #:             64

Description:            DDB Technologies, L.L.C.'s Markman
                        Reply Brief

File Date:              5/9/05

Prepared by:            MLC

### This sheet to be imaged as the last page.