FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2006 SEP 26  PM 3: 48

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
                    DEPUTY

| | | |
|---|---|---|
| DDB TECHNOLOGIES, L.L.C., | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. A-04-CA-352-LY |
| | § | |
| MLB ADVANCED MEDIA, L.P., | § | |
| | § | |
| DEFENDANT. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motion and Brief in Support of Defendant MLB Advanced Media, L.P.'s Motion to Dismiss and Request for Oral Argument filed May 1, 2006 (Doc. #214); DDB's Opposition to MLBAM's Motion to Dismiss filed May 31, 2006 (Doc. #221); and Defendant MLB Advanced Media, L.P.'s Reply Brief in Support of Its Motion to Dismiss and Request for Oral Argument filed June 5, 2006 (Doc. #227). On June 8, 2006, the Court conducted a hearing on the motion to dismiss. Having considered the motion, response, and reply, as well as the applicable law and evidence and argument of counsel, the Court renders the following order.

### I. Introduction

This is a patent-infringement suit brought by Plaintiff DDB Technologies, L.L.C. ("DDB") against Defendant MLB Advanced Media, L.P. ("MLB"). Four patents are at issue: (1) U.S. Patent No. 5,189,630 (filed Jan. 15, 1991) (issued Feb. 23, 1993), entitled "Method for Encoding and Broadcasting Information About Live Events Using Computer Pattern Matching Technique" (the "'630 Patent"); (2) U.S. Patent No. 5,526,479 (filed Jul. 29, 1992) (issued June 11, 1996), entitled "Method and Apparatus for Broadcasting Live Events to Another Location and Producing a Computer Simulation of the Events at that Location" (the "'479 Patent"); (3) U.S. Patent 5,671,347

(filed June 10, 1996) (issued Sep. 23, 1997), entitled "Method and Apparatus for Broadcasting Live Events to Another Location and Producing a Computer Simulation of the Events at that Location" (the "'347 Patent"); and (4) U.S. Patent No. 6,204,862 (filed June 9, 1997) (issued March 20, 2001), entitled "Method and Apparatus for Broadcasting Live Events to Another Location and Producing a Computer Simulation of the Events at that Location" (the "'862 Patent").[1]

DDB refers to the '479, '347, and '862 Patents as the "Computer Simulation Patents." The specifications of these patents are identical. Generally, the Computer Simulation Patents relate to a method for generating a computer simulation of a live event for display on a viewer's computer. The '630 Patent is referred to as the "Pattern-Matching Patent." This patent relates generally to a method that allows a viewer to search for certain information concerning a live event. Similar to the Computer Simulation Patents, an observer watches a live event and enters data representative of that event. The data is transmitted to a database, and, after a viewer requests information, a pattern-matching technique is utilized in order to match the viewer's information request with the information from the live event.

All four patents-in-suit were issued in the names of David R. Barstow and Daniel W. Barstow, brothers.[2] They, in turn, purported to assign their rights to the patents-in-suit to DDB, a company they jointly own. The Barstows executed assignment documents to DDB in 1998 for the '479 and '630 Patents, in 1999 for the '347 Patent, and in 2001 for the '862 Patent.

---

[1] For convenience, the Court will refer to them collectively as "the patents-in-suit."

[2] The Court will refer to David R. Barstow as "Barstow." Daniel W. Barstow will be specifically referred to as necessary.

2

Barstow, however, had executed on May 27, 1980, an employment agreement, entitled "Patent and Confidential Information Agreement," with Schlumberger Technology Corporation, acting through its Schlumberger-Doll Research Center Division ("Schlumberger").[3]   In the employment agreement, Barstow agreed that:

> 3.   Employee shall promptly furnish to Company a complete record of any and all technological ideas, inventions and improvements, whether patentable or not, which he, solely or jointly, may conceive, make or first disclose during the period of his employment with Company.
>
> 4.   Employee agrees to and does hereby grant and assign to Company or its nominee his entire right, title and interest in and to ideas, inventions and improvements coming within the scope of Paragraph 3:
>    a)   which relate in any way to the business or activities of Company, or
>    b)   which are suggested by or result from any task or work of Employee for Company, or
>    c)   which related in any way to the business or activities of Affiliates of Company,
> together with any and all domestic and foreign patent rights in such ideas, inventions and improvements.   Employee agrees to execute specific assignments and do anything else properly requested by Company, at any time during or after employment with Company, to secure such rights.

Barstow was employed with Schlumberger from May 1980 until November 1994.  On June 25, 1990, during his employment with Schlumberger, Barstow submitted to the United States Patent and Trademark Office ("PTO") patent application number 07/542,990 ("the '990 application").  The '990 application, entitled "A Method for Broadcasting Live Events Using Computer Simulation Techniques," disclosed the use of symbols to describe an event, and the broadcast of the information to a computer where the event would then be simulated.  The '990 application was abandoned in

---

[3] No party challenges the validity or enforceability of the employment agreement.

favor of a continuation-in-part application filed July 29, 1992, which ultimately issued as the '479

Patent. The '347 Patent is a continuation of the '479 Patent, and the '862 Patent is a continuation

of the '347 Patent.

Barstow submitted the application for the fourth patent-in-suit, the '630 Patent, to the PTO

on January 15, 1991, also during his employment with Schlumberger. The '630 Patent includes the

specification from the '990 application and discloses a method of notifying users of a match between

symbolic descriptions and specified actions of interest, as well as producing an audio or video

representation of the action. The '630 Patent issued on February 23, 1993, while Barstow was

employed with Schlumberger.

With its current motion, MLB challenges the Court's subject-matter jurisdiction to hear this

action. *See* FED. R. CIV. P. 12(b)(1). MLB argues that Schlumberger, not Barstow, owns Barstow's

rights in the patents-in-suit by virtue of the employment agreement. MLB contends that the patents-

in-suit can be traced back to the '990 application, the '479 Patent, or the '630 Patent, all of which

MLB claims were developed and filed while Barstow worked for Schlumberger. MLB further argues

that the patents-in-suit fall within the scope of the employment agreement, because they were either

suggested by or resulted from Barstow's work with Schlumberger, or were related to Schlumberger's

business or activities. Thus, MLB argues that Barstow's right, title, and interest in and to the

patents-in-suit were automatically assigned to Schlumberger under the employment agreement.

Because DDB failed to include co-owner Schlumberger as a plaintiff in this action at the time

it initially filed suit, MLB contends that DDB lacks standing under *Ethicon, Inc. v. United States*

*Surgical Corporation*, 135 F.3d 1456 (Fed. Cir. 1998). Moreover, on April 7, 2006, Schlumberger

assigned all of its right, title, and interest in the patents-in-suit to MLB, including a retroactive

4

license to practice the patents-in-suit from the date of their issuance, thereby preventing DDB from possibly curing any standing defect by joining Schlumberger as a plaintiff.

DDB responds that Schlumberger does not own the rights in the patents-in-suit, contending the patents-in-suit do not fall within the scope of the employment agreement and that there was no "automatic" assignment of Barstow's rights to Schlumberger under the employment agreement. Additionally, DDB advances numerous equitable arguments opposing Schlumberger's, and therefore MLB's, ownership rights in the patents-in-suit. Finally, DDB claims that MLB's "payment scheme" to Schlumberger for the assignment of the patents-in-suit is "highly suspect" and should be considered in determining the credibility of the assignment.

## II. Applicable Law

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject-matter jurisdiction of the district court to hear a case. *See* FED. R. CIV. P. 12(b)(1). Lack of subject-matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *See Ramming*, 281 F.3d at 161. Accordingly, DDB bears the burden of proof that jurisdiction does in fact exist.

In examining a Rule 12(b)(1) motion, the Court is empowered to consider matters of fact which may be in dispute. *See Ramming*, 281 F.3d at 161; *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). A motion to dismiss for lack of subject-matter jurisdiction should be granted only

if it appears certain that the plaintiff cannot prove any set of facts in support of its claim that would entitle plaintiff to relief. *See Ramming*, 281 F.3d at 161.

The question of standing to sue for patent infringement is a jurisdictional one. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995). Whether a party has standing to sue in federal court is a question of federal law. *See Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003) (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962)). To bring a patent infringement suit, a plaintiff must have legal title to the patent. *See* 35 U.S.C. § 281; *see also Rite-Hite*, 56 F.3d at 1551. However, when there is more than one patent owner, all co-owners must be joined as plaintiffs in the patent-infringement action. *See Ethicon*, 135 F.3d at 1467 (citing *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891)). Further, all co-owners must, ordinarily, consent to join as plaintiffs in an infringement suit. *See id.* at 1468. By refusing to voluntarily join in an infringement suit, "one co-owner has the right to impede the other co-owner's ability to sue infringers." *See id.* at 1468 (citing *Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 345 (Fed. Cir. 1997)). Without all co-owners, the suit must be dismissed. *See id.* (dismissing infringement suit where co-owner failed to participate).

### III. Analysis

In determining whether Schlumberger has ownership rights in the patents-in-suit, the Court is concerned with two questions: (1) are the patents-in-suit subject to the assignment provision of the employment agreement; and (2) if so, were Barstow's rights in the patents-in-suit "automatically" assigned to Schlumberger under the employment agreement. For the patents-in-suit to be subject to the assignment provision, Barstow must have conceived, made, or first disclosed the patents-in-suit during his employment with Schlumberger, *and* they must relate, in any way, to the business or

6

activities of Schlumberger, *or* have been suggested by, or resulted from, any of Barstow's tasks or work for Schlumberger or any affiliate of Schlumberger.

Whether Barstow conceived, made, or first disclosed the patents-in-suit during his employment with Schlumberger does not appear to be a point of contention. As explained previously, the '479 Patent is a continuation-in-part of the '990 application, which was filed while Barstow was employed by Schlumberger. The '347 Patent is a continuation of the '479 Patent, and the '862 Patent is a continuation of the '347 Patent. The application for the '630 Patent was filed and the '630 Patent actually issued during Barstow's employment with Schlumberger. Further, DDB responded to MLB's interrogatory regarding conception of the patents-in-suit by stating that "David Barstow first conceived of the basic concept of the inventions described and claimed in the patents-in-suit at least as early as 1988, when pondering what could be done with detailed information about each play in a baseball game." Barstow was employed with Schlumberger from May 1980 to November 1994. Thus, the Court concludes that, at the very least, Barstow conceived of the patents-in-suit during his period of employment with Schlumberger.

However, whether the patents-in-suit were suggested by, or resulted from, Barstow's work, or were related to Schlumberger's business are vigorously debated questions. MLB argues both that the patents-in-suit were suggested by, or resulted from, Barstow's work for Schlumberger and are related to Schlumberger's business. DDB responds that the patents-in-suit were neither suggested by, or resulted from, Barstow's work for Schlumberger, and are not related to Schlumberger's business.

As support for its position, MLB directs the Court to two prior patents issued to Schlumberger during Barstow's employment that name Barstow as the inventor: U.S. Patent No. 4,827,404 (filed April 14, 1986) (issued May 2, 1989) (the "'404 Patent"); and U.S. Patent No. 5,204,965 (filed Sep. 19, 1989) (issued April 20, 1993) (the "'965 Patent"). Specifically, MLB contends that the '404 Patent teaches or suggests two key features of the patents-in-suit: the use of symbols and symbolic data for computer programming; and simulation techniques, including animated displays. MLB also points out that the '404 Patent was listed as prior art by the PTO examiners of the patents-in-suit and is listed on the face of the '479, '347, and '862 Patents. MLB contends that Barstow disclosed with the '965 Patent a method for acquiring and processing data from an event in real-time involving parallel processing. MLB claims that one of the advantages of the '630 Patent is the ability to capture and process data from multiple events simultaneously, which MLB characterizes as parallel processing, before sending it to an end user.

Contending that a "common thread" of Schlumberger's business is the collection, processing, storage, transmission, and presentation of data in the form of a simulation or graphically animated display, MLB further argues that patents-in-suit relate to the business or activities of Schlumberger, because these same steps underlie the patents-in-suit. MLB claims that the PTO independently verified the connection between the patents-in-suit and the Schlumberger business, when the PTO examiner cited the '404 Patent, as well as U.S. Patent No. 4,794,534 (filed Aug. 8, 1985) (issued Dec. 27, 1988) (the "'534 Patent"), as prior art during the examination of the '479 Patent. MLB claims that the PTO examiner found the '404 Patent germane to the '479 application, because it taught programming methodology for simulation. The '534 Patent, issued to Keith Millheim and the Amoco Corporation in December 1988, related to the real-time data collection from, and

8

simulation of, oil-well drilling.  MLB argues the '534 Patent was so relevant to the '479 Patent, that

the examiner used it to initially reject as invalid many of the claims in the '479 application.

Lastly, MLB claims that a letter Barstow wrote to his brother in 1992 further reflects the

connection between the patents-in-suit and the business of Schlumberger.  MLB directs the Court

to the portion of the letter in which Barstow wrote:

> It's curious how BBL and my Schlumberger work go hand-in hand;
> the work I did on BBL last summer helped me get ready for my card
> payment work, and the work I did on that helped me get ready for the
> next piece of BBL.

MLB explains that "BBL" refers to an early embodiment of the patents-in-suit and the "card payment

work" refers to one of Barstow's Schlumberger projects.[4]

Relying heavily on the declaration of Barstow, DDB argues that Barstow's work at

Schlumberger from 1980 through 1988 was related to logging oil wells and writing computer

software used to control and record data from the physical sensors used in the logging.  DDB argues

there is no link between the '404 and '965 Patents and the patents-in-suit, because the work that

resulted in the '404 and '965 Patents related to software for controlling and recording data from

physical sensors.  DDB argues that the same sequence of steps that MLB claims link the patents-in-

suit to the '404 and '965 Patents is extremely common in many computer applications and provides

no basis for any kind of connection.  Further, DDB claims that Barstow did not invent any of the

features of the '404 Patent that MLB argues are included in the patents-in-suit.  DDB also states that

the '404 Patent deals with the application of the simulation techniques in software to control and

record data from physical sensors in an oil well, whereas the patents-in-suit deal with the application

---

[4] MLB also directs the Court to Schlumberger's 2005 Annual Report.  The Court, however,
will not consider this document in its analysis, because Barstow left Schlumberger in 1994.

of these techniques to broadcast information about a live event and produce a computer simulation of that live event. DDB distinguishes MLB's claimed "parallelism" in the '965 Patent, contending that it was specifically designed for controlling and recording data from physical sensors, and noting that the patents-in-suit do not involve the use of physical sensors, as the data about the live event is recorded by an observer at the site of the live event.

DDB further claims that Schlumberger's primary area of business involves providing services to companies in the exploration for oil and the retrieval of oil from oil fields, although Schlumberger has been involved in other businesses, such as electricity and gas meters, gas-station control systems, smart cards, and parking meters. DDB argues that the patents-in-suit have nothing to do with Schlumberger's business, because the patents-in-suit relate to broadcasting information about live events to viewers so that viewers can see a computer simulation of the live event. DDB distinguishes the '543 Patent on the basis that it teaches the use of simulation to predict the future, rather than to show a live event as it is occurring. DDB argues that the 1992 letter does not suggest a relationship between Barstow's work and the patents-in-suit, because Barstow was only referring to the fact the same programming language was common to both projects.

The Court notes that, in its briefing, DDB concedes that the '404 and '965 Patents resulted from Barstow's work at Schlumberger. After reviewing these patents, the Court finds a sufficient connection between these earlier patents and the patents-in-suit to establish that the patents-in-suit were at least "suggested by" Barstow's work for Schlumberger. In reaching this conclusion, the Court is focused on the term "suggested by" in paragraph 4(b) of the employment agreement. Despite DDB's urging to the contrary, the Court construes the term "suggested by" broadly. The Court does not interpret the employment agreement to require Barstow to have invented a feature

of the '404 or '965 Patent and imported that invented feature into a patent-in-suit for that patent to

be "suggested by" Barstow's work for Schlumberger.  Nor does the Court read the '404 and '965

Patents as narrowly as DDB.  Although DDB characterizes these patents as related to software to

control and record data from physical sensors, these patents have broader applications.[5]  Further, the

Court does not interpret the employment requirement to require the patents-in-suit to be identical to

all of Barstow's work on the '404 and '965 Patents; the patents-in-suit only need to be "suggested

by" any task or work of Barstow's on these earlier patents.

Initially, the Court finds that a comparison of the '404 and '965 Patents to the patents-in-suit

reflects that the patents-in-suit have numerous connections with, and share many similar features of,

the earlier patents, including the use of symbolic representations, animated displays, storing,

retrieving, and requesting data, live data transmission, and the processing of data from a plurality of

events.  For example, three of the patents-in-suit, the '479, '347, and '862 Patents, disclose

> . . . an event, [that] is characterized as a sequence of sub-events
> constituted by a discrete number of actions selected from a finite set
> of action types which define the nature of the event. . . .  The event
> may be observed by an observer who attends or watches the event and
> monitors each of the actions which occurs in the course of the event.
> The observer enters associated parameters for each action which takes
> place during the event.  The event is thus represented by a sequence
> of sub-events each described by a sequence of characterizations of a
> plurality of actions in terms of parameters which are entered into an
> event file of a centralized data base computer which is accessible by
> the observer. . . . [T]he observer, having access to a computer,
> encodes the event as a series of actions having associated therewith
> various parameters which define the actions that have taken place.
> Once the encoded description is transferred to an event file of the
> centralized data base computer, it is accessible by a viewer.  Once
> accessed by a viewer these encoded descriptions of the actions of the

---

[5] For example, the '965 Patent expressly states that it does not exclusively relate to systems
and methods for processing data obtained during logging operations.

event will then be utilized by the viewer's computer to reconstruct the actions of each sub-event of the selected event by using the parameter information associated with each action.   The actions can be represented to the viewer either with visual images, audio images, or text, or some combination thereof.

. . . . [T]he viewer will be able to replay any portion of the event as already stored in an event file of a viewer data base at the viewer's computer. Furthermore, the viewer will be able to update the viewer computer data base with event information from the centralized data base computer at any time.  In addition, the viewer's computer will be able to access the action information of a plurality of events from the centralized data base computer and store such information in a viewer file, permitting the viewer to select from any one of the plurality of events for view.

'479 Patent, col.2 l.8-21, 25-36, 39-49; '347 Patent, col.2 l.7-21, 25-36, 39-49; '862 Patent, col.2 l.10-24, 28-39, 42-52.

The fourth patent-in-suit, the '630 Patent, discloses much the same invention, with the inclusion of the viewer's ability to "search only for the occurrence of subevents of interest based on the encoded description information and then replay only those subevents." '630 Patent, col.2 l.61-63.  The viewer may also "update the viewer computer data base with event information from the centralized data base computer at any time." '630 Patent, col.2, l.64-66.  Furthermore, "the viewer's computer will be able to access the action information of a plurality of events from the centralized data base computer and store such information in a viewer file, permitting the viewer to select from any one of the plurality of events for view." '630 Patent, col.2 l.67-col.3 l.3.

By comparison, the '965 Patent is described in the Abstract as a

system and method for data processing in which data processing tasks are arranged as separate processes, each of which can be executed by a dedicated central processing unit or by one or more shared processing units.  All communication between processes takes place via streams of data items. . . . A *data item can be requested* with a limit on the time that elapses before the attempt is aborted; also *a*

12

> *request can be made* before the data item most recently appended to
> a stream instead of in terms of a specific index value.   This
> architecture facilities data processing *involving both time-independent
> and time-dependent processes.*

(Emphasis added.)   An object of the '965 invention is "to provide a system and method for

processing data which facilitate[s] implementation of time-independent and time-dependent

operations jointly." '965 col.3 l.22-25.   Another object is "to provide a system and method which

facilitates processing of data by means of a plurality of concurrently executing processes." '965

col.3 l.26-29. A third object of the invention is "to provide a system and method for processing data

using a plurality of data processors." '965 col.3 l.30-32.   Additionally, an aspect of the '965

invention is described as a data processing system comprising

> input means for receiving sequentially occurring data items to be
> processed by said system; processor means for concurrently executing
> a plurality of processes to generate additional sequentially occurring
> data items; means for associating data items with respective unique
> index values according to the source of each said item and its
> sequential position relative other items received from the same
> source; *data storage means for storing said data items; means for
> supplying any selected data item from said storage means to aid said
> processing means for use in execution of a process, said data item
> being selected in accordance with the associated index value
> determined during execution of that process; and output means for
> supplying data items resulting from execution of said processes.*

'965 col.3 l.36-51 (emphasis added).

The '404 Patent is described in the Abstract as a method and system for computer

programming that

> provides a graphical editor function for creation and editing of a
> computer program by manipulation of graphical images . . . . The
> graphical display of the program is animated during the execution so
> that the user can observe and check the program's operation.   When
> the simulated execution is satisfactory the definition-language version
> of the program is translated into the language executable in the target

13

processor.

An object of the invention of the '404 Patent is "to provide a system and method for programming which can be used to aid the preparation of programs intended to perform *real-time tasks*." '404 Patent, col.2 l.61-64 (emphasis added). The invention "facilitates programming by providing *rapid feedback* to the operator on the behavior of a program under development . . . ." '404 Patent, col.3 l.46-48 (emphasis added). Further, the system disclosed in the '404 Patent "is optimized for efficient programming and to this end includes input means and graphical display means for displaying graphical images in accordance with *interactive input by an operator*." '404 Patent, col.3 l.1-5 (emphasis added). The '404 Patent also includes a "storage means for storing representation of a program for the target processor" and allows the operator to edit "the program representation by interactive manipulation . . . of the graphically displayed graphical images." '404 Patent, col.3 l.5-7, 14-16.

The above-cited passages are merely illustrative, rather than exhaustive, of what the Court considers general connections between, and similar features of, the '404 and '965 Patents and the patents-in-suit.

In addition, the Court cannot ignore the fact that the '404 Patent is listed under the "References Cited" column of the '479, '347, and '842 Patents. DDB attempts to explain away this fact by claiming that "[i]t is common practice for examiners, as part of their search, to see what the inventor has done in the past." The Court rejects this explanation, noting that the '404 Patent was not listed under the "References Cited" column of the subsequently-issued '630 Patent.

Nor can the Court ignore the fact that the PTO examiner initially rejected all claims in the '479 Patent, in part, because of the '404 Patent. The PTO examiner noted that the '404 Patent

"show[ed] programming methodology for simulation." The PTO examiner considered the '404 Patent to be part of "the prior art made of record and not relied upon" that was, nevertheless, "pertinent to applicant's disclosure."

Lastly, in the Summary of the Invention section of the '404 Patent, Barstow states that "[i]t is an object of this invention to provide a system and method for programming which provides an optimum programming environment for developing and testing a program . . . ." and "[t]he program can then be tested with the aid of means for providing a simulation of an external environment of the target processor, and for simulating execution of the program by the target processor . . . ." '404 Patent, col.2 l.51-55; col.3 l.15-17. The Related Art section of the Background of the Invention section of each patent-in-suit states:

> It is also well known to utilize computers to simulate activities. *In particular, computer simulation techniques to represent the testing of the operation of devices are well known.* Thus, computer programmers familiar with simulation techniques are familiar with programs required for simulating activities on a computer.

'630 Patent, col.1 l.39-44; '479 Patent, col.1 l.41-46; '347 Patent, col.1 l.40-45; '862 Patent, col.1 l.43-48 (emphasis added).

In light of the foregoing—the connections and similar features, the prior art history, the related references, and the related art—the Court finds that the patents-in-suit were "suggested by" Barstow's work for Schlumberger that culminated in the '404 and '965 Patents. Thus, the Court concludes that the patents-in-suit were "suggested by" Barstow's work for Schlumberger pursuant to paragraph 4(b) of the employment agreement.

The Court further concludes that the patents-in-suit are related to Schlumberger's business as it existed during Barstow's employment. No party disputes that at least one major aspect of

15

Schlumberger's business involves the oil industry. Both the '404 and '965 Patents have applications in the oil industry, although neither is limited exclusively to the oil industry. For example, the '404 Patent includes a schematic of a borehole logging operation using a data processor, the programming of which can be accomplished with the aid of the invention described in the '404 Patent. *See* '404 Patent fig.2. The '965 Patent relates to "systems and methods for processing data obtained during logging operations to investigate earth formations traversed by a borehole." '965 Patent, col.1 l.13-15. Given that the Court has concluded that the patents-in-suit were suggested by Barstow's work on the '404 and '965 Patents, the Court finds that these patents also provide some evidence that the patents-in-suit are related to Schlumberger's oil business. DDB has always maintained that the patents-in-suit have broader application than simply to baseball or sports. In fact, each patent-in-suit states that "[i]t is also possible to utilize this system with such events as the activities involving a stock market, an election, an auction and any other event where a finite set of possible action types can be defined prior to the beginning of the event." '630 Patent, col.3 l.9-13; '479 Patent, col.2 l.55-59; '347 Patent, col.2 l.55-59; '862 Patent, col. 2 l.58-62.

The Court additionally finds that the examiner's reliance on the '534 Patent, which is directed to the oil industry, in examining and rejecting the '479 Patent application is some evidence of a link between Schlumberger's oil industry business and the patents-in-suit. The PTO examiner specifically noted that "Millheim shows generating [computer] simulation of the discrete sub-event of the live event using symbolic description in an analogous art for the purpose of simulating the live event" and Millheim "taught advantages of live event simulation."

The Court also finds persuasive Barstow's own admission of the connection between his work for Schlumberger and the patents-in-suit. Barstow conceded in the 1992 letter that his work

on a Schlumberger project and an earlier version of the patents-in-suit "go hand-in-hand." With this comment, DDB argues that Barstow was only referring to the fact that both the Schlumberger project and the earlier version of the patents-in-suit were written in the same programming language. Regardless, the employment agreement only requires that the patents-in-suit "relate in any way to the business or activities" of Schlumberger.

In sum, the Court concludes that the patents-in-suit are subject to the assignment provision of the employment agreement, because they were suggested by Barstow's work for Schlumberger and because they relate to the business of Schlumberger. The Court turns next to whether Barstow's rights in the patents-in-suit were "automatically" assigned to Schlumberger by virtue of the employment agreement.

Under the employment agreement, Barstow "agrees to and does hereby grant and assign to Company or its nominee his entire right, title and interest in and to ideas, inventions and improvements." The Federal Circuit has clearly written that agreements like Barstow's are to be enforced. *See Imatec, LTD. v. Apple Computer, Inc.,* 15 Fed. Appx. 887, 893 (Fed. Cir. 2001); *Speedplay, Inc. v. Bebop, Inc.,* 211 F.3d 1245, 1253 (Fed. Cir. 2000); *FilmTec Corp. v. Allied-Signal, Inc.,* 939 F.2d 1568, 1572-73 (Fed. Cir. 1991). For instance, in *Filmtec,* the company agreed

> to grant and does hereby grant to the Government the full and entire domestic right, title and interest in [any invention, discovery, improvement or development (whether or not patentable) made in the course of or under this contract or any subcontracts (of any tier) thereunder].

*See Filmtec,* 939 F.2d at 1570. The Federal Circuit determined that this provision "did not merely obligate [the company] to grant future rights, but expressly granted to the Government [the company's] rights in any future invention." *Id.* at 1573. No further act was required once the invention came into being, because "the transfer of title would occur by operation of law." *Id.*

17

The agreement at issue in *Speedplay* provided that all inventions covered by it "'shall belong exclusively'" to Speedplay and the employee "'hereby conveys, transfers and assigns to [Speedplay] . . . all right, title and interest in and to Inventions." *Speedplay*, 211 F.3d at 1253. Relying on *Filmtec*, the Federal Circuit reiterated its position that where such a present assignment of a future interest existed, "'no further act would be required once an invention came into being; the transfer of title would occur by operation of law.'" *Id.* (citing *Filmtec*, 939 F.2d at 1573).

In *Imatec*, the employee "agree[s] to assign, and hereby does assign . . . all my rights to inventions which i have made or conceived or which i may hereafter make or conceive . . . in the course of such employment." *Imatec*, 15 Fed. Appx. at 893. Based on this assignment provision, the Federal Circuit explained that the employee "expressly granted to [the company] his rights in any invention he had already created and in any invention he developed while an employee of [the company]. No further act would be required. Once an invention came into being, the transfer of title would occur by operation of law." *Id.* (citing *Filmtec*, 939 F.2d at 1573).

The Court has also reviewed the Federal Circuit's opinion in *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574 (Fed. Cir. 1991), and finds it distinguishable. The *Arachnid* assignment provision stated that "'[a]ny inventions conceived by [a consulting service] or its employees . . . in the course of the project covered by the agreement, shall be the property of [Arachnid], and all rights thereto will be assigned by [the consulting service] to [Arachnid].'" *Arachnid*, 939 F.2d at 1576. The Federal Circuit considered this assignment provision to be "an agreement to assign, not an assignment." *Id.* at 1580. The "will be assigned" provision did not rise to the level of a present assignment of an existing invention or of an expectant interest. *Id.* at 1580-81. This is not the case, however, with Barstow's employment agreement. In accordance with the

18

language of the assignment provision in Barstow's employment agreement—"agrees to and does hereby grant and assign to"—Barstow made a present assignment of future interests. Thus, the *Filmtec* line of cases controls.

Accordingly, the Court concludes that Barstow's rights in the patents-in-suit vested in Schlumberger by operation of law when they came into existence. No further action was necessary to transfer title to Schlumberger. *See Imatec,* 15 Fed. Appx. at 893; *Speedplay*, 211 F.3d at 1253; *FilmTec*, 939 F.2d at 1573.

The Court has concluded that the patents-in-suit were subject to the assignment provision of the employment agreement and that Barstow's rights in them were automatically assigned to Schlumberger. The Court now considers DDB's equitable defenses to MLB's claim of ownership in the patents-in-suit through Schlumberger. Because this issue is one of contract law, namely defenses in avoidance of a valid contract, state law governs. *See Regents of the Univ. of N. M. v. Knight,* 321 F.3d 1111, 1118 (Fed. Cir. 2003) ("State law governs contractual obligations and transfers of property rights, including those relating to patents."); *Imatec*, 15 Fed. Appx. at 892 (construction of agreement is matter of state contract law). The Court will apply Texas law, in light of paragraph 8 of the employment agreement which states that the agreement "shall be interpreted and construed in accordance with the laws of that jurisdiction in which enforcement in sought."

DDB asserts that Schlumberger's, and therefore MLB's, ownership rights in the patents-in-suit are barred by statute of limitations, waiver, various forms of estoppel, and laches. However, the Court finds that these equitable defenses are unavailable to DDB based on Texas law and the existing facts. Pursuant to the employment agreement, Barstow assigned his rights to the patents-in-suit to Schlumberger, and those rights were transferred by operation of law, once the patents-in-suit

19

came into existence. Under Texas law, after such an unqualified assignment, an assignor generally

loses all control over the transferred rights or interest and "can do nothing to defeat the rights of the

assignee." *See Johnson v. Structured Asset Servs., Inc.*, 148 S.W.3d 711, 722 (Tex. App.–Dallas

2004, no writ);  *University of Tex. Med. Branch v. Allan*, 777 S.W.2d 450, 453 (Tex. App.–Hous.

[14th Dist.] 1989, no writ).  After making a valid assignment, an assignor cannot urge estoppel or

waiver against his assignee.  *See Johnson*, 148 S.W.3d at 722; *Allan*, 777 S.W.2d at 453.   If an

assignor cannot urge estoppel or waiver against his assignee, the Court reasons that an assignor

likewise should not be able to assert statute of limitations or laches against his assignee.

In addition, paragraph 3 of the employment agreement obligated Barstow, as the employee,

to provide Schlumberger a "complete record of any and all technological ideas, inventions and

improvements, whether patentable or not, which he, solely or jointly, may conceive, make or first

disclose during the period of his employment" with Schlumberger.  The parties acknowledged at the

hearing that a 1992 e-mail to Barstow's supervisor was the only written record related to the patents-

in-suit that Barstow provided Schlumberger.  The e-mail does not, however, satisfy Barstow's

obligations under paragraph 3 of the employment agreement.

For example, in the e-mail, Barstow referred to "that project of my brother's that I told you

about a couple of years before" and limited his role as helping his brother "define the symbolic

representation for baseball games." Barstow did not request in the e-mail a waiver or release of any

rights that Schlumberger might have had in this "project," even though he mentioned that "some

patents may issue this year, in both of our [Barstow and his brother's] names." Nor did Barstow

provide Schlumberger with the '603 Patent when it issued in February 1993, despite the fact that

Barstow was still employed with Schlumberger at that time and Barstow represented in the e-mail

that he would "let [his supervisor] know if it actually happens." In the e-mail, Barstow sought permission only to include a biographical paragraph in the project description. Thus, the Court considers this an inadequate disclosure of the patents-in-suit under paragraph 3 of the employment agreement. On this record, DDB cannot claim that Schlumberger is estopped, has intentionally waived, or was barred by laches or the statute of limitations from asserting its rights in the patents-in-suit and assigning those rights to MLB.

Lastly, DDB claims that MLB's "payment scheme" to Schlumberger for the assignment of the patents-in-suit is "highly suspect" and should be considered in determining the credibility of the assignment. DDB does not, however, appear to challenge the assignment document between Schlumberger and MLB on any other grounds. After reviewing the "Assignment and License Agreement" between Schlumberger and MLB, the Court finds it to be a valid assignment of Schlumberger's interests in the patents-in-suit to MLB. Pursuant to this assignment document, the Court considers MLB the current owner of Schlumberger's prior rights to the patents-in-suit.

## IV. Conclusion

Pursuant to the employment agreement, Barstow's rights in the patents-in-suit were assigned to Schlumberger by operation of law, once the patents-in-suit came into being. Schlumberger subsequently assigned its rights in the patents-in-suit to MLB. DDB's equitable arguments cannot, and do not, defeat the otherwise valid assignments of the rights to the patents-in-suit from Barstow to Schlumberger, and then from Schlumberger to MLB. Because DDB failed to join Schlumberger, a co-owner of the patents-in-suit at the time this action was filed, and cannot now, for obvious reasons, join MLB, the current owner of Schlumberger's interest in the patents-in-suit, the suit must be dismissed.

**IT IS THEREFORE ORDERED** that the Motion of Defendant MLB Advanced Media,

L.P.'s Motion to Dismiss (Doc. #214) is **GRANTED**.

**SIGNED** this _26th_ day of September, 2006.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE