IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2009 AUG 18   AM 10: 52

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | | |
|---|---|---|
| DDB TECHNOLOGIES, L.L.C., | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. A-04-CA-352-LY |
| | § | |
| MLB ADVANCED MEDIA, L.P., | § | |
| DEFENDANT. | § | |

## MEMORANDUM OPINION AND ORDER FOLLOWING REMAND
## ON MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

The above styled and numbered cause, a patent-infringement action, is before the Court on

remand from the United States Court of Appeals for the Federal Circuit, which held that this Court

erred in failing to allow limited jurisdictional discovery and dismissing the action for lack of subject-

matter jurisdiction. *See DDB Techs., L.L.C. v. MLB Adv. Media, L.P.*, 517 F.3d 1284, 1286 (Fed.

Cir. 2008).[1]  The Court, after allowing the parties a period of several months for jurisdictional

discovery, proceeds to reconsider subject-matter jurisdiction in this action and Defendant MLB

Advanced Media, L.P.'s ("MLBAM") Supplemental Brief In Support Of Its Motion To Dismiss

(Clerk's Document No. 318), Plaintiff DDB Technologies, LLC's ("DDB") response brief (Clerk's

Document No. 322), MLBAM's reply (Clerk's Document No. 327), and the parties' exhibits.  On

January 9, 2009, in light of the Federal Circuit's opinion and holdings and the parties' supplemental

briefing and exhibits related to jurisdiction, the Court convened a hearing on MLBAM's motion to

dismiss for lack of subject-matter jurisdiction.  Having considered the Federal Circuit's opinion, the

---

[1] A three-judge panel of the Federal Circuit affirmed in part and vacated in part this Court's
judgment, remanded the cause, and ordered that this Court allow jurisdictional discovery and
reconsider subject-matter jurisdiction in light of the additional discovery.  One member of the panel
concurred in the majority's remand for additional discovery, but dissented from the majority's other
"pronouncements of law, fact, and procedure." *DDB Techs., L.L.C. v. MLB Adv. Media, L.P.*, 517
F.3d 1284, 1286 (Fed. Cir. 2008) (Newman, J., concurring in part and dissenting in part).

parties' additional briefing, exhibits, and arguments, the pleadings, the case file, and the applicable law, the Court finds and concludes that DDB is the only entity that holds legal title to the four patents-in-suit. The Court, therefore, has subject-matter jurisdiction over the action, and will deny MLBAM's motion to dismiss.

## Background

Dr. David Barstow, a computer scientist, was employed with Schlumberger Technology Corporation's Schlumberger-Doll Research Center Division ("Schlumberger") from May 1980 until November 1994, at the Schlumberger Laboratory for Computer Science ("Schlumberger Laboratory"). On May 27, 1980, Barstow executed an employment agreement with Schlumberger, a "Patent and Confidential Information Agreement" ("Agreement"), which provides in pertinent part:

> 3. Employee shall promptly furnish to Company a complete record of any and all technological ideas, inventions and improvements, whether patentable or not, which he, solely or jointly, may conceive, make or first disclose during the period of his employment with Company.
>
> 4. Employee agrees to and does hereby grant and assign to Company or its nominee his entire right, title and interest in and to ideas, inventions and improvements coming within the scope of Paragraph 3:
>
> > (a) which relate in any way to the business or activities of Company, or
> >
> > (b) which are suggested by or result from any task or work of Employee for Company, or
> >
> > (c) which related in any way to the business or activities of Affiliates of Company,
>
> together with any and all domestic and foreign patent rights in such ideas, inventions and improvements. Employee agrees to execute specific assignments and do anything else properly requested by

2

Company, at any time during or after employment with Company, to secure such rights.

During his employment with Schlumberger, Barstow and his brother Daniel Barstow submitted applications for and were issued the four patents-in-suit.[2]  The Barstows each executed Patent Assignments by which the Barstows assigned the entire right, title, and interest in and to each of the patents-in-suit to DDB, a company the Barstows jointly own, which they formed to commercialize and further develop their inventions.  The Barstows executed patent assignments to DDB in 1998 for the '479 and '630 patents, in 1999 for the '347 patent, and in 2001 for the '862 patent.

In June 2004, DDB commenced this action alleging that MLBAM was infringing DDB's four patents-in-suit.  In September 2004, MLBAM answered, counterclaimed that DDB's patents-in-suit were invalid, and asked the Court to declare that MLBAM had not infringed any valid or enforceable

---

[2] The Court refers to David Barstow as "Barstow" and to Daniel Barstow specifically.  The Court discussed the four patents-in-suit in detail in a prior order, and therefore here only summarily identifies them.  *See DDB Techs., LLC. v. MLB Advanced Media, LP*, 465 F.Supp.2d 657, 662-67 (W.D. Tex. 2006).

The four patents-in-suit are three "Computer Simulation Patents," U.S. Patent Nos. 5,526,479 titled "Method and Apparatus for Broadcasting Live Events to Another Location and Producing a Computer Simulation of the Events at that Location" (filed July 29, 1992 and issued 1996) ("'479 patent"), 5,671,347 titled "Method and Apparatus for Broadcasting Live Events to Another Location and Producing a Computer Simulation of the Events at that Location"(filed June 10, 1996 and issued September 23, 1997) ("'347 patent"), and 6,204,862 titled "Method and Apparatus for Broadcasting Live Events to Another Location and Producing a Computer Simulation of the Events at that Location" (filed June 9, 1997 and issued March 20, 2001) ("'862 patent"), which all relate to a method for generating a computer simulation of a live event for display on a viewer's computer, and one "Pattern Matching Patent," U.S. Patent No. 5,189,630 titled "Method for Encoding and Broadcasting Information About Live Events Using Computer Pattern Matching Technique" (filed January 15, 1991 and issued February 23, 1993) ("'630 patent"), relating to a method allowing a viewer to search for certain information about a live event.  Additionally, on June 25, 1990, the Barstows submitted to the United States Patent and Trademark Office patent application 07/542,990 ("the '990 application"), which disclosed the use of symbols to describe an event and the broadcast of the information to a computer where the event would then be simulated.  The '990 application was abandoned in favor of a continuation-in-part application, which ultimately issued as the '479 patent.

claims of the patents-in-suit (Clerk's Document No. 5). The parties proceeded with discovery. On April 7, 2006, Schlumberger, not a party to this action, executed an Assignment and License Agreeement by which Schlumberger assigned all of its rights, title, and interest, if any, in the patents-in-suit to MLBAM, including a retroactive license to practice the patents-in-suit from the date of their issuance.

In May 2006, MLBAM challenged the Court's subject-matter jurisdiction of the case contending first that Schlumberger and now, following the April 2006 assignment, MLBAM owned the patents-in-suit, not DDB. Specifically, MLBAM claimed that all of the patents-in-suit trace back to the '990 application, the '479 patent, or the '630 patent, which were all developed and filed during Barstow's employment with Schlumberger. MLBAM argued that the patents-in-suit fall within the scope of the Agreement and under the Agreement, Barstow's right, title, and interest in and to the patents-in-suit were automatically assigned to Schlumberger because the patents-in-suit were either suggested by or resulted from Barstow's work with Schlumberger or were related to Schlumberger's business or activities. MLBAM continued its argument claiming that because at the time DDB filed this action, DDB failed to include Schlumberger, who at the time DDB filed this action contends MLBAM was a co-owner of the patents-in-suit, as a plaintiff, DDB lacks standing to proceed with the action, and thus, this Court lacks subject-matter jurisdiction over DDB's claims (Clerk's Document No. 214). *See Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998). Finally, MLBAM contended that by virtue of MLBAM and Schlumberger's April 2006 assignment and license agreement, currently it is impossible for DDB to join MLBAM as a plaintiff and cure DDB's standing defect. MLBAM asserts that DDB's claims should be dismissed for lack of subject-matter jurisdiction.

DDB responded that the patents-in-suit fail to fall within the scope of the Agreement, therefore, Schlumberger never obtained any title or rights to the patents-in-suit (Clerk's Document No. 221). Further, DDB contended that even if the patents-in-suit were within the scope of the Agreement, lacking is any provision in the Agreement that automatically assigned Barstow's rights to Schlumberger. Consequently, argued DDB, nothing was conveyed by the 2006 assignment and license agreement between Schlumberger and MLBAM. Additionally, DDB raised several equitable arguments in opposition to MLBAM's allegation that the Court lacks subject-matter jurisdiction.

DDB moved the Court to suspend the briefing schedule on MLBAM's motion to dismiss and requested that the Court allow DDB to obtain limited expedited discovery, including depositions, on the issues raised by MLBAM's motion to dismiss (Clerk's Document No. 217). This Court denied DDB's requests and proceeded to a hearing on MLBAM's motion to dismiss (Clerk's Document No. 218).

After considering MLBAM's motion, DDB's response, testimony presented at the hearing, and the applicable law, the Court granted MLBAM's motion and dismissed the action (Clerk's Document Nos. 236 & 237). Specifically, the Court held that the patents-in-suit were within the Agreement and, pursuant to the Agreement, Barstow's interests in the patents-in-suit were, upon issuance of the patents, automatically assigned to Schlumberger. Further the Court found that DDB's equitable arguments did not defeat the valid assignment, under the Agreement, of Barstow's interests in the patents-in-suit from Barstow to Schlumberger, and later, from Schlumberger to MLBAM. Because this Court held that Schlumberger had owned the patents-in-suit and assigned them to MLBAM, the Court lacked jurisdiction over DDB's claims and dismissed them.

***Federal-Circuit Opinion***

DDB appealed this Court's dismissal.  The Federal Circuit rendered several holdings that affect proceedings on remand.  First, the circuit held that DDB is not entitled to a jury trial on the question of whether the Agreement provides for immediate assignment of interests to the patents-in-suit, because the only issue before the Court is jurisdiction, which is a matter of law to be decided by the Court.[3]  *DDB Techs.*, 517 F.3d at 1290-91.

Second, establishing the law of the case, the circuit held that the Agreement contains an "express assignment of rights in future inventions" and that this Court correctly determined that "if the patents in suit were within the scope of the [assignment provision in the Agreement], they would have been automatically assigned to Schlumberger by operation of law with no further act required" by the parties.  *Id.* at 1290.

Third, the circuit held as a matter of law that the Agreement's paragraph three is ambiguous with regard to the phrases "related in any way to the business or activities of [Schlumberger]" or "suggested by or result from any task or work of [Barstow] for [Schlumberger]" because "resort to extrinsic evidence, for example, as to the nature of Schlumberger's business or to that of Barstow's work, is necessary to determine whether the [Agreement] applies." *Id.* at 1292.  The circuit noted, "Under both Texas contract law and general contract law, when a contract is ambiguous, '[c]onduct of the parties which indicates the construction that the parties themselves placed on the contract may . . . be considered in determining the parties' true intent." *Id.* at 1292 (quoting *Consolidated Eng'g Co. v. Southern Steel Co.*, 699 S.W.2d 188, 192-93 (Tex. 1985)).  The circuit also noted, "[T]he

---

[3]  Although DDB has no right to a jury trial on the issue of standing, the Federal Circuit recognized that there remains the right to jury trial on other appropriate issues in the case.  *See DDB Techs.*, 517 F.3d at 1291-92.

parties' own practical interpretation of the contract—how they actually acted, thereby giving meaning to their contract during the course of performing it can be an important aid to the court." *DDB Techs.*, 517 F.3d at 1292 (quoting 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 32:14 (4th ed. 1993)). "Here, evidence that the parties during performance agreed that Barstow's work leading to the patents-in-suit was not covered by the Agreement would be highly relevant, if not dispositive." *DDB Techs.*, 517 F.3d at 1292.

The circuit reviewed the evidence before this Court, noting particularly that, "DDB presented witness testimony suggesting that Schlumberger knew about Barstow's work on the project leading to the patents-in-suit, considered whether it fell within the scope of the [A]greement, and concluded that it did not." *Id.* Additionally, the circuit noted testimony of Dr. Reid Smith, the director of Schlumberger Laboratory where Barstow worked and Barstow's direct supervisor, that Smith believed that Barstow's personal project, referred to as Barstow's baseball project, did not apply to Schlumberger's business. The circuit also observed that "during the period from 1994 when Barstow left Schlumberger, until September 2005, when MLBAM contacted [Schlumberger] to initiate negotiations for an assignment of rights, Schlumberger did nothing to indicate that it believed it had an ownership interest in the patents in suit." *Id.* at 1292-93. The circuit continued its analysis,

> Schlumberger's view that the [A]greement did not apply (and its silence) would only be significant if Schlumberger had been aware of the nature of Barstow's project. The crucial question thus was the extent of Schlumberger's knowledge of the project at the time [Schlumberger's] officers concluded that the project was not within the scope of the [A]greement. The problem is that DDB was denied discovery on this central issue.

*Id.* at 1293.

DDB's discovery requests could have led to the production of documents (if they existed) such as copies of the applications for the patents in suit in Schlumberger's files, notes of conversations by Schlumberger employees demonstrating the extent of the company's knowledge of the inventions, further communications between Barstow and Schlumberger regarding the inventions, or communications as to whether Schlumberger's officers or employees believed that Schlumberger had an ownership interest in those inventions.

*Id.*

Fourth, the circuit also held that this Court determined correctly that DDB's statute of limitations and equitable defenses were without merit and that no jury trial was required on the issue of standing. *Id.* at 1290-91.

Finally, the circuit held that this Court erred in denying DDB's request for limited expedited discovery regarding MLBAM's newly raised jurisdictional issue and remanded the cause to this Court. *Id.* at 1294. The circuit instructed, "On remand, the district court should allow DDB to conduct reasonable discovery relevant to the issue of whether the patents-in-suit fall within the scope of Barstow's [A]greement with Schlumberger." *Id.* The circuit allowed this Court discretion to determine the range of discovery. *Id.*

### On remand

On remand, this Court allowed the parties to engage in additional discovery relevant only to the issue of whether the patents-in-suit fall within the scope of the assignment provision of the Agreement. The Court placed no limits on the number of third parties from whom DDB and MLBAM could seek additional discovery. At the conclusion of a four-month period, the parties had

conducted six depositions.[4]   Additionally the parties made several document requests of Schlumberger employees, who produced documents. At the conclusion of the discovery period, the parties submitted supplemental briefing and the Court proceeded with the January 9 hearing.

The posture of the case remains the same as existed before the Court granted MLBAM's motion to dismiss to the extent that MLBAM contends that this Court should dismiss the action for lack of jurisdiction as all co-owners of the patents-in-suit were not joined as plaintiffs at the commencement of the action, and further, as MLBAM now retroactively owns the patents-in-suit, it is impossible for DDB to maintain its claims. *Ethicon*, 135 F.3d at 1468. As DDB is the party asserting that this Court has jurisdiction, the burden of proof remains with DDB.

### *Arguments of the parties*

MLBAM argues that the additional discovery confirms this Court's previous holding that the patents-in-suit were suggested by Barstow's work for Schlumberger and are related to Schlumberger's business. MLBAM contends that because the ambiguity may be resolved on undisputed evidence describing Barstow's work for Schlumberger as well as undisputed evidence regarding the scope of Schlumberger's business during Barstow's employment, the Court need go no further in its analysis, that is, it is unnecessary for the Court to inquire and review evidence produced about (1) Barstow and Schlumberger's interactions between or representations made to each other; (2) what Barstow disclosed to Schlumberger; or (3) what Schlumberger's subjective

---

[4]  The parties deposed David Barstow, Daniel Barstow, Chad Huston, Schlumberger's in-house counsel for intellectual property and software matters from 1990 to 1995, Reid Smith, formerly a vice president and the director of Schlumberger Laboratory during Barstow's employment with Schlumberger, Darryl Cornish, who lead Schlumberger's new business development group, and Schlumberger's corporate representative, Dale Guardier, an attorney with Schlumberger since 1979 and currently is Schlumberger's Deputy General Counsel, Intellectual Property.

belief was during Barstow's employment regarding Schlumberger's rights to Barstow's baseball project and the patents-in-suit.

MLBAM argues that upon the Court finding that the patents-in-suit were suggested by Barstow's work for Schlumberger or are related to Schlumberger's business, the circuit's holding that the inventions were automatically assigned to Schlumberger as of the moment Barstow conceived them applies. MLBAM contends no oral statements by any Schlumberger employee can reassign back to Barstow the rights to the patents-in-suit which Schlumberger automatically acquired under the Agreement, and the jurisdictional issue is thereby resolved in favor of MLBAM. Additionally, as an alternative argument, MLBAM contends that additional discovery confirms that Barstow failed to comply with the Agreement's requirement that he "promptly furnish a complete record of the invention" to Schlumberger, thereby violating the Agreement.

DDB argues on remand that Barstow and Schlumberger's conduct and representations each made to the other are critical and must be considered by this Court. DDB contends that upon considering the actions of Barstow and Schlumberger, this Court will conclude that Schlumberger exhibited and represented to Barstow that Schlumberger lacked interest in Barstow's personal baseball project and declined the patents-in-suit. DDB notes the portion of the circuit's opinion that provides the parties' conduct is "highly relevant, if not dispositive" in determining whether Barstow's baseball project fell within the scope of the Agreement. DDB contends that as a result of the circuit's holding that the Agreement's phrases "relate in any way to the business activities of [Schlumberger]" and "suggested by or result from any task or work of [Barstow]" are ambiguous, this Court is to review Barstow's and Schlumberger employees' conduct to determine the construction and interpretation they attributed to these ambiguous portions of the Agreement. DDB

10

argues that the additional discovery shows that Schlumberger was fully aware of Barstow's personal baseball project, believed Barstow's project was not covered by the Agreement, and that Schlumberger conveyed such belief to Barstow.  Further, DDB contends that Barstow did everything required of him with regard to disclosing his invention to Schlumberger, which included fully apprising Schlumberger through Huston, Cornish, and Smith about his personal baseball project.

In summary, the parties present the Court different approaches to resolving the jurisdictional issue.  MLBAM would have the Court review the additional discovery and determine only whether the evidence supports a finding that the patents-in-suit "relate in any way to the business" of Schlumberger or "are suggested by or result from any task or work of [Barstow]" such that the patents-in-suit are or are not within the Agreement and thus, by the Agreement, Barstow's portion of the patents-in-suit either were or were not directly assigned to Schlumberger.  DDB would have the Court review the additional discovery with regard to Barstow's and Schlumberger employees' conduct only, because the law of the case established by the circuit's opinion is that the Agreement is ambiguous, so no further analysis or interpretation need be given to the language of the Agreement.

The Federal Circuit established as the law of the case that the portions of the Agreement focusing on whether Barstow's personal baseball project and particularly the patents-in-suit were related to Schlumberger's business or were suggested by or resulted from Barstow's work for Schlumberger are ambiguous.  Therefore, this Court, in seeking to determine the true intent and interpretation of the Agreement, reviews the evidence developed during the period of additional jurisdictional discovery regarding Barstow's and Schlumberger employees' practical interpretation of the ambiguous portion of the Agreement.

11

*Additional discovery*

### Nature of Schlumberger's business

During the after-remand discovery period, Schlumberger produced its 1992 Annual Report which reflects the variety of business in which Schlumberger is engaged. The report reflects that Schlumberger's business includes activities such as (1) "Wireline and Testing", which is the "measurement of physical properties of underground formations to help locate, define and produce oil and gas reservoirs"; also "well testing, pressure measurements; perforating, completion and workover services; through-casing reservoir evaluation and production monitoring services"; (2) "Anadrill", which are "drilling services that integrate realtime, surface and downhole measurements with geological data to optimize the drilling process; Measurement-While-Drilling; Directional Drilling"; (3) "GeoQuest", which is a "software and services, on mainframe computers and workstation systems, located in customer offices and data services centers, to process and interpret exploration and production data"; (4) seismic services, Geco-Prakla, which does "[a]cquisition, processing, and interpretation of seismic data to define subsurface structures where oil and gas may be trapped"; (5) "Electricity Management: Electricity meters, load and rate management and automatic meter reading and billing systems"; (6) Water and Gas meters for measuring water, gas, thermal energy and industrial fluids consumption; gas regulation systems; automatic meter reading and billng systems"; (7) Defense systems, "civil and military mass storage, telemetry and signal processing systems"; (8) Applicon, which is a "computer-based solutions for mechanical engineering design and manufacturing processes"; and (9) Test and Transactions, which include "test equipment for telecommunications and mechanical vibration analysis; functional and in-circuit testing of printed

circuit boards; cards, terminals, systems and service to automate point-of-sale payments; parking management systems; public pay phones and smart cards".

Chad Huston was Schlumberger's in-house counsel for intellectual property and software matters and all parties agree he was, pursuant to the Agreement, the legal department at Schlumberger Laboratory and the person with whom Barstow was obligated to discuss the details of his personal baseball project during Barstow's employment at Schlumberger. Huston identified Schlumberger's main business activities for the time he was at Schlumberger from 1990 to 1995 as oilfield services, water and electricity metering, gas pumps, CAD/CAM software, automated test equipment, and smart card services. Huston also explained that Schlumberger's activities included realtime transmission of data, similar to what is accomplished by the patents-in-suit.

Reid Smith, Barstow's supervisor, Schlumberger vice-president, and director of Schlumberger Laboratory during Barstow's employment, stated that Schlumberger's information technology business alone ranged from oil well services to government businesses and telecommunications.

Dale Gaudier, who is currently Schlumberger's Deputy General Counsel, Intellectual Property, and has been an attorney with Schlumberger since 1979, expressed his belief that, after reviewing the four patents-in-suit, particularly the subject matter, the summary of the invention, the description, and the claims of all four patents, and based on his personal knowledge of and having considered Schlumberger's annual reports, based upon the breadth and lack of limitations in the claims of the patents-in-suit, the four patents fell within the scope of Schlumberger's business during the relevant time period. In a 1993 email from Barstow to his supervisor, Barstow describes Schlumberger's interests in "special purpose customized telecommunications systems" and

13

Schlumberger's extensive experience in "various communication media" and transmitting "specialized representations of information." MLBAM argues that these activities are closely related to the patents-in-suit, which also use telecommunications systems to broadcast symbolic descriptions of live events and, therefore, demonstrate the direct relationship of the patents-in-suit to Schlumberger's business.

As noted in this Court's previous opinion, two patents issued to Schlumberger during Barstow's employment that name Barstow as the inventor: (1) U.S. Patent No. 4,827,404 (the "'404 patent') and (2) U.S. Patent No. 5,204,965 (the "'965 patent") suggest two features of the patents-in-suit, (A) the use of symbols and symbolic data for computer programming; and (B) simulation techniques, including animated displays. Additionally, the '404 patent was listed as prior art by the PTO examiners of the patents-in-suit and is listed on the face of the '479, '347, and '862 patents. Contending that a common thread of Schlumberger's business is the collection, processing, storage, transmission, and presentation of data in the form of a simulation or graphically animated display, MLBAM argues that the patents-in-suit relate to the business or activities of Schlumberger.

### Barstow's work at Schlumberger

The additional discovery reveals little new information about Barstow's work at Schlumberger. From 1980 through 1988 Barstow wrote computer software programs used to control and record data from sensors used in logging oil wells. MLBAM argues that the patents-in-suit were suggested by or resulted from Barstow's work particularly on these patents. During his employment at Schlumberger, Barstow also worked on card payment systems. MLBAM contends that an article written by Barstow in July 1991 demonstrates several similarities between the card payment systems Barstow developed at Schlumberger and the patents-in-suit, that is that individuals use remote

terminals to input sub-events occurring at their location to be transmitted in realtime to a central location for further processing and simulation. Further, in support of its argument that Barstow's Schlumberger work went hand-in-hand with his personal baseball project, MLBAM directs the Court to a letter dated November 24, 1992, from David Barstow to his brother Daniel, in which David Barstow states, "It's curious how [the personal baseball project] and my Schlumberger work go hand-in-hand: the work I did on [the personal baseball project] helped get me ready for my card payment work, and the work I did on that helped get me ready for the next piece of [the personal baseball project]."

Despite all of this, Huston and Darryl Cornish, who lead Schlumberger's new business development group, each stated that they were aware of Barstow's card-payment systems work and his personal baseball project, and neither Huston nor Cornish, thought the card-payment systems work and Barstow's personal invention were related. Huston was asked if Barstow's invention had been written in "C++"[5], would Schlumberger have asserted ownership rights in the project. Indicating no, Huston responded, "That's like saying you would assert an ownership right because the document was in English, I mean, or Spanish. I mean, it's just a language you could have put [it in] and certainly not proprietary to Schlumberger."

### Schlumberger's written policies and practices regarding employee personal inventions

During the additional discovery period, evidence was produced regarding Schlumberger's company policies and practices with regard to employee personal inventions. Specifically detailed

---

[5] C++ is a widely used computer programing language, which is object oriented and is considered a high level language. *See* BJARNE STROUSTRUP, PROGRAMMING PRINCIPLES AND PRACTICE USING C++, at xxiii-xxv (2008). Barstow used the C++ programming language on several projects he developed for Schlumberger.

is what occurred with regard to Barstow's baseball project and what Schlumberger knew about that project at the time Barstow was employed at Schlumberger. Schlumberger's employee handbook provides, "If, while working for Schlumberger, you develop a device, technique, or process that is related to our business, the invention will belong to Schlumberger." Schlumberger's 1988 employee handbook states, "All inventions by employees must be brought to the attention of the Legal Department."

The uncontroverted evidence is that for Barstow's personal baseball project, "the Legal Department" was Chad Huston. Although, according to the Agreement and Schlumberger's employee handbook, an employee is required to "promptly furnish to [Schlumberger] a complete record" of an invention, no guidance is provided about what constitutes a complete record, nor does any evidence presented to the Court further explain this requirement. Additionally, Huston confirmed that there was no written or unwritten policy at Schlumberger that describes particular documents or details employees were to disclose to Schlumberger regarding personal inventions.

When asked about Schlumberger's practice regarding employee inventions, Huston explained that his practice was to have a conversation with the employee about the personal invention and that Huston relied on the individual scientist to tell him about anything the employee had done or was doing that might present a conflict of interest with Schlumberger or if the invention was something that might be of interest to Schlumberger. Huston testified, "In most of those instances, I would simply ask them questions on how the technology at issue may relate to Schlumberger businesses." "If the subject matter didn't appear to have any relationship to Schlumberger's current businesses or prospective businesses, then the second issue would have been could the technology be employed in a Schlumberger business?" Typically, Huston explained that he would only discuss these issues

16

with the employee, as he did not have time to review the programming source code or the often many documents related to an employee's personal invention. Huston testified that there was no company requirement that employees provide him with any particular or specific written documentation about a personal invention. Although Schlumberger produced from its files a paper invention-disclosure form, Huston testified that the policy and practice at Schlumberger Laboratory was "not to do anything by paper." Huston explained that although Reid Smith tasked him with creating an electronic version of the invention-disclosure form, employees at Schlumberger Laboratory were not required to use either the paper or electronic form.

### Extent of Schlumberger's knowledge about Barstow's invention

The Federal Circuit's opinion provides that, "the extent of Huston and Smith's knowledge of Barstow's project is unclear from the record." MLBAM contends that the record is now clarified and shows that Schlumberger lacked sufficient information about Barstow's personal baseball project to have taken any effective action or have made any binding representations to Barstow regarding the project or, more specifically, the patents-in-suit. Conversely, DDB contends that deposition testimony elicited during the additional discovery period reveals that Schlumberger had extensive knowledge of Barstow's baseball project.

It is undisputed that Barstow and Huston discussed Barstow's personal baseball project. Huston recalled that Barstow had discussed the project with Barstow's supervisor, Smith, and that Smith sent Barstow to speak with Huston about the specifics of Barstow's project. Huston testified that he did not recall receiving a copy of Barstow's patent application for the invention but at the time was aware that Barstow had filed a patent application related to the baseball project. Huston explained that he and Barstow discussed fully the subject matter of Barstow's personal baseball

17

project and all of the nuances of the invention. Huston testified that Barstow answered all of Huston's questions and further Huston testified that if he had needed more information about Barstow's personal baseball project he would have asked Barstow for it. Huston explained that it was often his practice to consult with other scientists at Schlumberger Laboratory who might be more knowledgeable about a particular invention's technology. In Barstow's case, Huston spoke with Darryl Cornish about whether Barstow's personal project had a commercial application within Schlumberger. As for the extent of Cornish's knowledge about Barstow's invention, Cornish recalled, described, and accurately sketched Barstow's invention. Cornish specifically described Barstow's invention as

> a simulation system that took realtime events where you—where somebody would be keying in the event—basically keying in events and then potentially attaching parameters to those events, storing that information in a database or some kind of a taxonomic data structure, and then—that would allow you to replay those events in sort of a simulated mode or search those events to get replays.

Cornish communicated to Huston his conclusion that Barstow's personal baseball project had no commercial application for Schlumberger. Huston also stated that he concluded Barstow's baseball project had no relation to Schlumberger's current or future business interests. Huston testified that he also had a conversation with Smith, and that Smith wanted to know if Barstow's project might affect Schlumberger's business. According to Huston, he and Smith came to the conclusion that there was no way Barstow's baseball project related to Schlumberger's business. Huston testified that he could not recall if he or Smith communicated their conclusion to Barstow, but Huston believed that it was Smith who told Barstow that each of them believed Barstow's baseball project would not affect Schlumberger's business. Huston testified that with regard to communications

among him, Smith, Cornish, and Barstow about Barstow's invention, nothing was done in writing, although he excluded email communications.  When asked why he and Smith concluded that Barstow's invention did not relate to Schlumberger's business, Huston replied,

> we couldn't think of a possible use for that technology or how that would relate to Schlumberger's current or prospective business interests.  In fact, Schlumberger at the time, and still is, is trying to become more focused and not less focused and that was one of the drivers behind the new business initiative believe it or not.  It was to spinoff businesses away from Schlumberger that were not focused on its core businesses.

Huston testified, "What [Smith's] and my discussion was, is that we didn't see how [Barstow's personal baseball project] related to Schlumberger's business and we weren't going to assert Schlumberger an ownership interest in it."  And further Huston testified, that conclusion was communicated to Barstow.

The additional discovery reveals that Huston knew the details of Barstow's personal baseball project to the extent that he was able to discuss the invention with others at Schlumberger.  Further, following Huston's discussions with other Schlumberger employees, Huston determined that Barstow's personal baseball project did not relate to Schlumberger's business.  Further, Huston testified that Schlumberger was not going to assert an ownership interest in Barstow's invention and that position was communicated to Barstow.

### Schlumberger's document retention policy

Dale Guardier testified about Schlumberger's document retention policy and stated that any emails from the time frame at issue would have, by company policy and practice, been erased or destroyed.  Indeed, the only email exchange in the record was produced by DDB which was sent February 12, 1992, from Barstow to Smith and Huston.

19

*Analysis*

MLBAM moves to dismiss for lack of jurisdiction, therefore, at issue is whether DDB has standing to bring this patent infringement suit. *See* Fed. R. Civ. P. 12(b)(1); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551 (Fed Cir. 1995) (standing to sue for patent infringement is jurisdictional issue and party alleging infringement bears burden of proving standing). Given the state of the record, particularly given the relationships that existed at the time DDB filed the action and relationships that developed during the course of proceedings among Barstow, DDB, Schlumberger, and MLBAM, for DDB to proceed in this action, DDB must have been the sole holder of legal title to the patents-in-suit at the time suit was filed. *See* 35 U.S.C. § 281; *Israel Bio-Engineering Project v. Amgen Inc.,* 475 F.3d 1256, 1264-65 (Fed. Cir. 2007); *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998). DDB claims it has standing to proceed with this action because, by virtue of the Barstows' patent assignments executed for each of the patents-in-suit, at the time this action was filed, it was the sole owner of the patents-in-suit. *See* 35 U.S.C. § 261 ("Patents shall have the attributes of personal property. Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument of writing.")

MLBAM, conversely, claims that DDB lacks standing to maintain the action because by virtue of the Agreement, which Barstow executed at the commencement of his employment with Schlumberger in May 1980, Barstow assigned all of his right, title, and interest in the patents-in-suit to Schlumberger, thus, since the inception of each of the patents-in-suit Schlumberger has been a co-owner of each of the patents.

Based on the evidence produced during the post-remand discovery period, the Court finds that Barstow's and Schlumberger employees' interactions and representations reveal the meaning

they attributed to the Agreement. The Court finds that the patents-in-suit were covered by the Agreement. The Court finds that Barstow's personal baseball project and the related patents-in-suit were, at a minimum, suggested by Barstow's work at Schlumberger. The Court finds that Schlumberger's policies and practices required Barstow to disclose to Huston the details of his baseball project, which the Court finds Barstow did. Further, the Court finds that Huston well understood the details of Barstow's baseball project. The Court finds that Schlumberger had no written or unwritten policy that details or even suggests specific information that its employees must or should disclose about a personal invention. Specifically, nothing in the record indicates that Barstow was required and failed to disclose or reveal to Huston certain information about his personal baseball project or the patents-in-suit. The Court finds that Schlumberger's practice was that Schlumberger employees at Schlumberger Laboratory would converse with Huston about a personal invention, during which time Huston would ask the employee questions about the invention. Huston expected the inventing employee to be forthcoming about a personal invention. Huston's practice was that often he would discuss a personal invention with other Schlumberger employees who might have more familiarity with the technology at issue in an employee's personal invention. The Court finds that Barstow had such discussions with Huston about his personal baseball project. Huston included Darryl Cornish, the leader of Schlumberger's New Business Development Group, in discussions about Barstow's personal baseball project, as Cornish had detailed knowledge about the technologies and methods Barstow used in developing the baseball project. Although no written documents exist regarding the conversations among Huston, Cornish, and Barstow, the evidence reflects that pursuant to its record retention program, Schlumberger probably destroyed all email communications that might have related to Barstow's personal baseball project.

Further, testimony by Huston and Cornish reveals that each believed Schlumberger lacked interest in Barstow's invention. Although the testimony is unclear about who informed Barstow that Schlumberger was not interested in Barstow's personal baseball project, uncontroverted testimony from Huston was that either he or Smith informed Barstow that the baseball project did not relate to Schlumberger's business. Huston and Smith each concluded that they failed to see how Barstow's baseball project related to Schlumberger's business and that neither of them would assert an ownership interest in the invention. Additionally, the Court finds lacking from the evidence any action related to Barstow's personal baseball project or the patents-in-suit by Schlumberger between the time Barstow described his invention to Huston and the issuance of the patents-in-suit until 2006 when MLBAM approached Schlumberger about purchasing from Schlumberger the rights and interest, if any, Schlumberger had in the patents-in-suit.

In summary based on discovery developed following remand, the Court holds that the Agreement covers the patents-in-suit because their subject matter was suggested by Barstow's work at Schlumberger, but Barstow complied with Schlumberger's policies and practices for disclosure of a personal invention by a Schlumberger employee. After gaining extensive knowledge of Barstow's personal baseball project, and knowing that Barstow had filed patent applications related to that project, Schlumberger affirmatively declined Barstow's personal project and thereby the patents-in-suit. The Court holds that Barstow's personal baseball project, including the patents-in-suit, belong to Barstow and his successors in interest. The Court holds that at the time DDB filed

this action, DDB had legal title to the patents-in suit and consequently has standing to proceed with this action.

**IT IS ORDERED** that MLBAM's Motion To Dismiss is **DENIED**.

SIGNED this _**18th**_ day of August, 2009.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE