FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2009 DEC 30  PM 12: 56

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
                    DEPUTY

| | | |
|---|---|---|
| DDB TECHNOLOGIES, L.L.C., | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. A-04-CA-352-LY |
| | § | |
| MLB ADVANCED MEDIA, L.P., | § | |
| DEFENDANT. | § | |

## MEMORANDUM OPINION AND ORDER FOLLOWING REMAND ON MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

The above styled and numbered cause, a patent-infringement action, is before the Court on remand from the United States Court of Appeals for the Federal Circuit, which held that this Court erred in failing to allow limited jurisdictional discovery and dismissing the action for lack of subject-matter jurisdiction. *See DDB Techs., L.L.C. v. MLB Adv. Media, L.P.*, 517 F.3d 1284, 1286 (Fed. Cir. 2008).[1]

On August 18, 2009, this Court rendered its original Memorandum Opinion and Order Following Remand on Motion to Dismiss for Lack of Subject Matter Jurisdiction. *DDB Techs., L.L.C. v. MLB Adv. Media, L.P.*, No. A-04-CA-352-LY (W.D.Tex. Aug. 18, 2009). Thereafter, Defendant MLB Advanced Media, L.P. ("MLB") filed MLB Advanced Media, L.P.'s Motion for Reconsideration or, in the Alternative, Certification of Question for Interlocutory Appeal and Stay Pending Appeal (Clerk's Document No. 357). DDB Technologies, L.L.C. ("DDB") responded by filing DDB's Opposition to MLB[]'s Motion for Reconsideration or, in the Alternative, Certification

---

[1] A three-judge panel of the Federal Circuit affirmed in part and vacated in part this Court's judgment, remanded the cause, and ordered that this Court allow jurisdictional discovery and reconsider subject-matter jurisdiction in light of the additional discovery. One member of the panel concurred in the majority's remand for additional discovery, but dissented from the majority's other "pronouncements of law, fact, and procedure." *DDB Techs., L.L.C. v. MLB Adv. Media, L.P.*, 517 F.3d 1284, 1286 (Fed. Cir. 2008) (Newman, J., concurring in part and dissenting in part).

of Question for Interlocutory Appeal and Stay Pending Appeal (Clerk's Document No. 359). The

Court has also received and considered letters from both parties concerning the effect of *Board of*

*Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 583 F.3d. 832 (Fed.

Cir. 2009). After considering same, the Court withdraws its August 18, 2009 Memorandum Opinion

and Order Following Remand on Motion to Dismiss for Lack of Subject Matter Jurisdiction (Clerk's

Document No. 354) and renders the following.

***Background***

Dr. David Barstow, a computer scientist, was employed with Schlumberger Technology

Corporation's Schlumberger-Doll Research Center Division ("Schlumberger") from May 1980 until

November 1994, at the Schlumberger Laboratory for Computer Science ("Schlumberger

Laboratory"). On May 27, 1980, Barstow and Schlumberger executed a "Patent and Confidential

Information Agreement" ("Agreement"),which provides in pertinent part:

> 3. Employee shall promptly furnish to Company a complete record of
> any and all technological ideas, inventions and improvements,
> whether patentable or not, which he, solely or jointly, may conceive,
> make or first disclose during the period of his employment with
> Company.
>
> 4. Employee agrees to and does hereby grant and assign to Company
> or its nominee his entire right, title and interest in and to ideas,
> inventions and improvements coming within the scope of Paragraph 3:
>
> > (a) which relate in any way to the business or
> > activities of Company, or
> >
> > (b) which are suggested by or result from any task or
> > work of Employee for Company, or
> >
> > (c) which related in any way to the business or
> > activities of Affiliates of Company,

> together with any and all domestic and foreign patent rights in such ideas, inventions and improvements. Employee agrees to execute specific assignments and do anything else properly requested by Company, at any time during or after employment with Company, to secure such rights.

During his employment with Schlumberger, Barstow and his brother Daniel Barstow submitted applications for the four patents in suit.[2] The '630 patent was issued while Barstow was employed by Schlumberger. The remaining three patents were issued after he left Schlumberger's employ. The Barstows each executed patent assignments by which the Barstows assigned their entire right, title, and interest in and to each of the patents to DDB, a company the Barstows jointly own and which they formed to commercialize and further develop their inventions. The Barstows executed patent assignments to DDB in 1998 for the '479 and '630 patents, in 1999 for the '347 patent, and in 2001 for the '862 patent.

---

[2] The Court refers to David Barstow as "Barstow" and to Daniel Barstow by complete name. The Court discussed the four patents in suit in detail in a prior order, and therefore here only summarily identifies them. *See DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 465 F.Supp.2d 657, 662-67 (W.D. Tex. 2006).

The four patents in suit are three "Computer Simulation Patents," U.S. Patent Nos. 5,526,479 titled "Method and Apparatus for Broadcasting Live Events to Another Location and Producing a Computer Simulation of the Events at that Location" (filed July 29, 1992 and issued 1996) ("'479 patent"), 5,671,347 titled "Method and Apparatus for Broadcasting Live Events to Another Location and Producing a Computer Simulation of the Events at that Location" (filed June 10, 1996 and issued September 23, 1997) ("'347 patent"), and 6,204,862 titled "Method and Apparatus for Broadcasting Live Events to Another Location and Producing a Computer Simulation of the Events at that Location" (filed June 9, 1997 and issued March 20, 2001) ("'862 patent"), which all relate to a method for generating a computer simulation of a live event for display on a viewer's computer, and one "Pattern Matching Patent," U.S. Patent No. 5,189,630 titled "Method for Encoding and Broadcasting Information About Live Events Using Computer Pattern Matching Technique" (filed January 15, 1991 and issued February 23, 1993) ("'630 patent"), relating to a method allowing a viewer to search for certain information about a live event. Additionally, on June 25, 1990, the Barstows submitted to the United States Patent and Trademark Office patent application 07/542,990 ("the '990 application"), which disclosed the use of symbols to describe an event and the broadcast of the information to a computer where the event would then be simulated. The '990 application was abandoned in favor of a continuation-in-part application, which ultimately issued as the '479 patent.

3

In June 2004, DDB commenced this action, alleging that MLB was infringing the four patents in suit. In September 2004, MLB answered, counterclaimed that DDB's patents were invalid, and asked the Court to declare that MLB had not infringed any valid or enforceable claims of the patents. The parties proceeded with discovery. On April 7, 2006, Schlumberger, not a party to this action, executed an Assignment and License Agreement by which Schlumberger assigned all of its right, title, and interest, if any, in the patents to MLB, including a retroactive license to practice the patents from the dates of their issuance.

In May 2006, MLB challenged this Court's subject-matter jurisdiction, contending first that Schlumberger and now, following the April 2006 assignment, MLB owned the patents in suit. Specifically, MLB claimed that the patents trace back to the '990 application, the '479 patent, or the '630 patent, which were all developed and filed during Barstow's employment with Schlumberger. MLB argued that the patents fall within the scope of the Agreement and under the Agreement, Barstow's right, title, and interest in and to the patents were automatically assigned to Schlumberger, because the patents were either suggested by or resulted from Barstow's work at Schlumberger or were related to Schlumberger's business or activities. Further, because at the time DDB filed this action, DDB failed to include Schlumberger, a co-owner of the patents, as a plaintiff, DDB lacks standing to proceed with the action, and thus, this Court lacks subject-matter jurisdiction over DDB's claims. *See Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998). Finally, MLB contended that by virtue of MLB and Schlumberger's April 2006 assignment and license agreement, it is impossible for DDB to join MLB as a plaintiff and cure DDB's standing defect. MLB asserted that DDB's claims should be dismissed for lack of subject-matter jurisdiction.

4

DDB responded that the patents in suit fail to fall within the scope of the Agreement, therefore Schlumberger never obtained any title or rights to the patents in suit. Further, DDB contended that even if the patents were within the scope of the Agreement, lacking is any provision in the Agreement that automatically assigned Barstow's rights to Schlumberger. Consequently, argued DDB, nothing was conveyed by the 2006 agreement between Schlumberger and MLB. Additionally, DDB raised several equitable arguments in opposition to MLB's allegation that the Court lacked subject-matter jurisdiction.

DDB moved the Court to suspend the briefing schedule on MLB's motion to dismiss and requested that the Court allow DDB to obtain limited expedited discovery, including depositions, on the issues raised by MLB's motion to dismiss. This Court denied DDB's requests and proceeded to a hearing on MLB's motion to dismiss.

The Court granted MLB's motion and dismissed the action. Specifically, the Court held that the patents in suit were within the Agreement and, pursuant to the Agreement, Barstow's interests in the patents were, upon issuance of the patents, automatically assigned to Schlumberger. Further the Court found that DDB's equitable arguments did not defeat the Agreement's valid assignment of Barstow's interests in the patents from Barstow to Schlumberger and later from Schlumberger to MLB. Because this Court held that Schlumberger had owned the patents and assigned them to MLB, the Court lacked jurisdiction over DDB's claims and dismissed the suit. *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 465 F.Supp.2d 657, 670 (W.D. Tex. 2006).

***Federal-Circuit Opinion***

DDB appealed this Court's dismissal. The Federal Circuit rendered several holdings that affect proceedings on remand. First, the circuit held that DDB is not entitled to a jury trial on the

question of whether the Agreement provides for immediate assignment of the patents in suit, because the only issue before the Court is jurisdiction, which is a matter of law to be decided by the Court.[3] *DDB Techs.*, 517 F.3d at 1290-91.

Second, establishing the law of the case, the circuit held that the Agreement contains an "express assignment of rights in future inventions" and that this Court correctly determined that "if the patents in suit were within the scope of the [assignment provision in the Agreement], they would have been automatically assigned to Schlumberger by operation of law with no further act required" by the parties. *Id.* at 1290.

Third, the circuit held as a matter of law that the Agreement's paragraph three is ambiguous with regard to the phrases "related in any way to the business or activities of [Schlumberger]" or "suggested by or result from any task or work of [Barstow] for [Schlumberger]" because "resort to extrinsic evidence, for example, as to the nature of Schlumberger's business or to that of Barstow's work, is necessary to determine whether the [Agreement] applies." *Id.* at 1292. The circuit noted, "Under both Texas contract law and general contract law, when a contract is ambiguous, '[c]onduct of the parties which indicates the construction that the parties themselves placed on the contract may . . . be considered in determining the parties' true intent." *Id.* at 1292 (quoting *Consolidated Eng'g Co. v. Southern Steel Co.*, 699 S.W.2d 188, 192-93 (Tex. 1985)). The circuit also noted, "[T]he parties' own practical interpretation of the contract—how they actually acted, thereby giving meaning to their contract during the course of performing it can be an important aid to the court." *DDB Techs.*, 517 F.3d at 1292 (quoting 11 Samuel Williston & Richard A. Lord, *A Treatise on the*

---

[3] Although DDB has no right to a jury trial on the issue of standing, the Federal Circuit recognized that there remains the right to jury trial on other appropriate issues in the case. *See DDB Techs.*, 517 F.3d at 1291-92.

*Law of Contracts* § 32:14 (4th ed. 1993)). "Here, evidence that the parties during performance agreed that Barstow's work leading to the patents in suit was not covered by the Agreement would be highly relevant, if not dispositive." *DDB Techs.*, 517 F.3d at 1292.

The circuit reviewed the evidence before this Court, noting particularly that, "DDB presented witness testimony suggesting that Schlumberger knew about Barstow's work on the project leading to the patents in suit, considered whether it fell within the scope of the [A]greement, and concluded that it did not." *Id.* Additionally, the circuit noted testimony of Dr. Reid Smith, the director of Schlumberger Laboratory where Barstow worked and Barstow's direct supervisor, that Smith believed that Barstow's personal project, referred to as Barstow's "baseball project," did not apply to Schlumberger's business. The circuit also observed that "during the period from 1994 when Barstow left Schlumberger until September 2005, when MLB[] contacted [Schlumberger] to initiate negotiations for an assignment of rights, Schlumberger did nothing to indicate that it believed it had an ownership interest in the patents in suit." *Id.* at 1292-93. The circuit continued its analysis,

> Schlumberger's view that the [A]greement did not apply (and its silence) would only be significant if Schlumberger had been aware of the nature of Barstow's project. The crucial question thus was the extent of Schlumberger's knowledge of the project at the time [Schlumberger's] officers concluded that the project was not within the scope of the [A]greement. The problem is that DDB was denied discovery on this central issue.

*Id.* at 1293.

> DDB's discovery requests could have led to the production of documents (if they existed) such as copies of the applications for the patents in suit in Schlumberger's files, notes of conversations by Schlumberger employees demonstrating the extent of the company's knowledge of the inventions, further communications between Barstow and Schlumberger regarding the inventions, or communications as to whether Schlumberger's officers or employees

7

> believed that Schlumberger had an ownership interest in those inventions.

*Id.*

Fourth, the circuit held that this Court determined correctly that DDB's statute-of-limitations and equitable defenses were without merit, and that no jury trial was required on the issue of standing. *Id.* at 1290-91.

Finally, the circuit held that this Court erred in denying DDB's request for limited expedited discovery regarding MLB's newly raised jurisdictional issue and remanded the cause to this Court. *Id.* at 1294. The circuit instructed, "On remand, the district court should allow DDB to conduct reasonable discovery relevant to the issue of whether the patents in suit fall within the scope of Barstow's [A]greement with Schlumberger." *Id.* The circuit allowed this Court discretion to determine the range of discovery. *Id.*

The Court, after allowing the parties a period of several months for jurisdictional discovery, now proceeds to reconsider subject-matter jurisdiction. On January 9, 2009, in light of the Federal Circuit's opinion and holdings, Defendant MLB Advanced Media, L.P.'s Supplemental Brief In Support Of Its Motion To Dismiss, Plaintiff DDB Technologies, L.L.C.'s response brief, MLB's reply, and the parties' exhibits, the Court convened a hearing on MLB's motion to dismiss.

Having considered the Federal Circuit's opinion, the parties' additional briefing, exhibits, and arguments, the pleadings, the case file, and the applicable law, the Court finds and concludes that although Barstow's invention and hence the patents in suit appear to relate to or have been suggested by Barstow's work at Schlumberger, such an interpretation of the Agreement is foreclosed

by the Federal Circuit's holding of ambiguity when examined in the light of Barstow's and Schlumberger's contemporaneous construction of the Agreement.

**On remand**

On remand, this Court allowed the parties to engage in additional discovery relevant only to the issue of whether the patents in suit fall within the scope of the assignment provision of the Agreement. The Court placed no limits on the number of third parties from whom DDB and MLB could seek additional discovery. At the conclusion of a four-month period, the parties had conducted six depositions.[4]   Additionally the parties obtained documents from Schlumberger.   At the conclusion of the discovery period, the parties submitted supplemental briefing and the Court proceeded with the January 9 hearing.

The posture of the case remains the same as existed before the Court first granted MLB's motion to dismiss to the extent that MLB contends that this Court should dismiss the action for lack of jurisdiction as all co-owners of the patents in suit were not joined as plaintiffs at the commencement of the action, and further, as MLB now retroactively owns the patents, it is impossible for DDB to maintain its claims. *Ethicon*, 135 F.3d at 1468. As DDB is the party asserting that this Court has jurisdiction, the burden of proof remains with DDB.

---

[4] The parties deposed David Barstow, Daniel Barstow, Chad Huston, Schlumberger's in-house counsel for intellectual property and software matters from 1990 to 1995, Reid Smith, formerly a vice president and the director of Schlumberger Laboratory during Barstow's employment with Schlumberger, Darryl Cornish, who lead Schlumberger's new business development group, and Schlumberger's corporate representative, Dale Guardier, an attorney with Schlumberger since 1979 and currently is Schlumberger's Deputy General Counsel, Intellectual Property.

*Arguments of the parties*

MLB argues that the additional discovery confirms this Court's previous holding that the patents in suit were suggested by Barstow's work for Schlumberger and are related to Schlumberger's business. MLB contends that because the ambiguity may be resolved by undisputed evidence describing Barstow's work for Schlumberger as well as undisputed evidence regarding the scope of Schlumberger's business during Barstow's employment, the Court need go no further in its analysis; that is, it is unnecessary for the Court to inquire and review evidence produced concerning (1) Barstow and Schlumberger's interactions between or representations made to each other; (2) what Barstow disclosed to Schlumberger; or (3) what Schlumberger's subjective belief was during Barstow's employment regarding Schlumberger's rights to Barstow's baseball project and the patents in suit.

MLB further argues that upon the Court's finding that the patents in suit were suggested by Barstow's work for Schlumberger or are related to Schlumberger's business, the invention was automatically assigned to Schlumberger as of "the moment Barstow conceived of the invention and the related patents-in-suit." MLB contends no oral statements by any Schlumberger employee can reassign back to Barstow the rights to the patents, which Schlumberger automatically acquired under the Agreement, and the jurisdictional issue is thereby resolved in favor of MLB. Additionally, as an alternative argument, MLB contends that additional discovery confirms that Barstow failed to comply with the Agreement's requirement that he "promptly furnish a complete record of the invention" to Schlumberger, thereby violating the Agreement.

DDB responds that Barstow and Schlumberger's conduct and representations each made to the other are critical and must be considered by this Court. DDB contends that upon considering the

10

actions of Barstow and Schlumberger, this Court will conclude that Schlumberger exhibited and represented to Barstow that Schlumberger lacked interest in Barstow's personal baseball project and declined the patents in suit.  DDB notes the portion of the circuit's opinion that provides the parties' conduct is "highly relevant, if not dispositive" in determining whether Barstow's project fell within the scope of the Agreement.  DDB contends that as a result of the circuit's holding that the Agreement's phrases "relate in any way to the business activities of [Schlumberger]" and "suggested by or result from any task or work of [Barstow]" are ambiguous, this Court is to review Barstow's and Schlumberger employees' conduct to determine the construction and interpretation they attributed to these ambiguous portions of the Agreement.  DDB argues that the additional discovery shows that Schlumberger was fully aware of Barstow's personal baseball project, believed Barstow's project was not covered by the Agreement, and that Schlumberger conveyed such belief to Barstow. Further, DDB contends that Barstow did everything required of him with regard to disclosing his invention to Schlumberger, which included fully apprising Schlumberger through Huston, Cornish, and Smith about his project.

In summary, the parties present the Court different approaches to resolving the jurisdictional issue.  MLB would have the Court review the additional discovery and determine only whether the evidence supports a finding that the patents in suit "relate in any way to the business" of Schlumberger or "are suggested by or result from any task or work of [Barstow]" such that the patents are or are not within the Agreement and thus, by the Agreement, Barstow's portion of the patents either was or was not directly assigned to Schlumberger.  DDB would have the Court review the additional discovery with regard to Barstow's and Schlumberger's conduct only, because the law

of the case established by the circuit's opinion is that the Agreement is ambiguous, so no further analysis or interpretation need be given to the language of the Agreement.

The Federal Circuit established as the law of the case that the portions of the Agreement focusing on whether Barstow's personal baseball project and particularly the patents in suit were related to Schlumberger's business or were suggested by or resulted from Barstow's work for Schlumberger are ambiguous. When construing an ambiguous contract under Texas law, a court "must find the true intention of the parties." *Superior Oil Co. v. Stanolind Oil & Gas Co., Inc.*, 150 Tex. 317, 240 S.W.2d 281, 284 (Tex. 1951). To determine such intention, the court follows "the construction [of the contract] given by the parties." *Id.* at 285. Therefore, this Court, in seeking to determine the true intent and interpretation of the Agreement, reviews the evidence developed during the period of additional jurisdictional discovery regarding Barstow's and Schlumberger's construction of the Agreement.

***Additional discovery***

### Nature of Schlumberger's business

During the after-remand discovery period, Schlumberger produced its 1992 Annual Report, which reflects the variety of business in which Schlumberger is engaged. The report reflects that Schlumberger's business includes activities such as (1) "Wireline and Testing", which is the "measurement of physical properties of underground formations to help locate, define and produce oil and gas reservoirs"; also "well testing, pressure measurements; perforating, completion and workover services; through-casing reservoir evaluation and production monitoring services"; (2) "Anadrill", which are "drilling services that integrate realtime, surface and downhole measurements with geological data to optimize the drilling process; Measurement-While-Drilling; Directional

Drilling"; (3) "GeoQuest", which is a "software and services, on mainframe computers and workstation systems, located in customer offices and data services centers, to process and interpret exploration and production data"; (4) seismic services, Geco-Prakla, which does "[a]cquisition, processing, and interpretation of seismic data to define subsurface structures where oil and gas may be trapped"; (5) "Electricity Management:  Electricity meters, load and rate management and automatic meter reading and billing systems"; (6) Water and Gas meters for measuring water, gas, thermal energy and industrial fluids consumption; gas regulation systems; automatic meter reading and billng systems"; (7) Defense systems, "civil and military mass storage, telemetry and signal processing systems"; (8) Applicon, which is a "computer-based solutions for mechanical engineering design and manufacturing processes"; and (9) Test and Transactions, which include "test equipment for telecommunications and mechanical vibration analysis; functional and in-circuit testing of printed circuit boards; cards, terminals, systems and service to automate point-of-sale payments; parking management systems; public pay phones and smart cards".

Chad Huston was Schlumberger's in-house counsel for intellectual property and software matters and all parties agree he was, pursuant to the Agreement, the legal department at Schlumberger Laboratory and the person with whom Barstow was obligated to discuss the details of his personal baseball project during Barstow's employment at Schlumberger.  Huston identified Schlumberger's main business activities for the time he was at Schlumberger from 1990 to 1995 as oilfield services, water and electricity metering, gas pumps, CAD/CAM software, automated test equipment, and smart card services.  Huston also explained that Schlumberger's activities included realtime transmission of data, similar to what is accomplished by the patents in suit.

13

Reid Smith, Barstow's supervisor, Schlumberger vice-president, and director of Schlumberger Laboratory during Barstow's employment, stated that Schlumberger's information-technology business alone ranged from oil well services to government businesses and telecommunications.

Dale Gaudier, who is currently Schlumberger's Deputy General Counsel, Intellectual Property, and has been an attorney with Schlumberger since 1979, expressed his belief that, after reviewing the four patents in suit, particularly the subject matter, the summary of the invention, the description, and the claims of all four patents, and based on his personal knowledge of and having considered Schlumberger's annual reports, the breadth and lack of limitations in the claims of the patents, the four patents fell within the scope of Schlumberger's business during the relevant time period.  In a December 1993 email from Barstow with a copy sent to Smith, Barstow describes Schlumberger's interests in "special purpose customized telecommunications systems" and Schlumberger's extensive experience in "various communication media" and transmitting "specialized representations of information."  MLB argues that these activities are closely related to the patents, which also use telecommunications systems to broadcast symbolic descriptions of live events and, therefore, demonstrate the direct relationship of the patents to Schlumberger's business.

Two patents issued to Schlumberger during Barstow's employment name Barstow as the inventor:  (1) U.S. Patent No. 4,827,404 (the "'404 patent") and (2) U.S. Patent No. 5,204,965 suggest two features of the patents in suit, (A) the use of symbols and symbolic data for computer programming; and (B) simulation techniques, including animated displays.  Additionally, the '404 patent is listed as prior art by the PTO examiners of the patents and is listed on the face of the '479, '347, and '862 patents.  Contending that a common thread of Schlumberger's business is the

14

collection, processing, storage, transmission, and presentation of data in the form of a simulation or graphically animated display, MLB argues that the patents relate to the business or activities of Schlumberger.

### Barstow's work at Schlumberger

The additional discovery reveals little new information about Barstow's work at Schlumberger. From 1980 through 1988 Barstow wrote computer software programs used to control and record data from sensors used in logging oil wells. MLB argues that the patents in suit were suggested by or resulted from Barstow's work particularly on these patents. During his employment at Schlumberger, Barstow also worked on card payment systems. MLB contends that an article written by Barstow in July 1991 demonstrates several similarities between the card payment systems Barstow developed at Schlumberger and the patents, that is that individuals use remote terminals to input subevents occurring at their location to be transmitted in realtime to a central location for further processing and simulation. Further, in support of its argument that Barstow's Schlumberger work went hand in hand with his personal baseball project, MLB directs the Court to a letter dated November 24, 1992, from David Barstow to his brother Daniel, in which David Barstow states, "It's curious how [the personal baseball project] and my Schlumberger work go hand-in-hand: the work I did on [the personal baseball project] helped get me ready for my card payment work, and the work I did on that helped get me ready for the next piece of [the personal baseball project]."

Despite the apparent similarities between Barstow's invention and Schlumberger's business and activities, Huston and Darryl Cornish, who led Schlumberger's new business development group, each stated that they were aware of Barstow's card payment systems work and his personal baseball project, and neither Huston nor Cornish, thought the card payment systems work and

Barstow's personal invention were related. Huston was asked if Barstow's invention had been written in "C++"[5], would Schlumberger have asserted ownership rights in the project. Indicating no, Huston responded, "That's like saying you would assert an ownership right because the document was in English, I mean, or Spanish. I mean, it's just a language you could have put [it in] and certainly not proprietary to Schlumberger."

**Schlumberger's written policies and practices regarding employee personal inventions**

During the additional discovery period, evidence was produced regarding Schlumberger's company policies and practices with regard to employee personal inventions. Specifically detailed is what occurred with regard to Barstow's baseball project and what Schlumberger knew about that project at the time Barstow was employed at Schlumberger. Schlumberger's employee handbook provides, "If, while working for Schlumberger, you develop a device, technique, or process that is related to our business, the invention will belong to Schlumberger." Schlumberger's 1988 employee handbook states, "All inventions by employees must be brought to the attention of the Legal Department."

The uncontroverted evidence is that for Barstow's personal baseball project, "the Legal Department" was Huston. Although, according to the Agreement and Schlumberger's employee handbook, an employee is required to "promptly furnish to [Schlumberger] a complete record" of an invention, no guidance is provided about what constitutes a complete record, nor does any evidence presented to the Court further explain this requirement. Additionally, Huston confirmed

---

[5] C++ is a widely used computer programing language, which is object oriented and is considered a high level language. *See* BJARNE STROUSTRUP, PROGRAMMING PRINCIPLES AND PRACTICE USING C++, at xxiii-xxv (2008). Barstow used the C++ programming language on several projects he developed for Schlumberger.

that there was no written or unwritten policy at Schlumberger that describes particular documents or details employees were to disclose to Schlumberger regarding personal inventions.

When asked about Schlumberger's practice regarding employee inventions, Huston explained that his practice was to have a conversation with the employee about the personal invention and that Huston relied on the individual scientist to tell him about anything the employee had done or was doing that might present a conflict of interest with Schlumberger or if the invention was something that might be of interest to Schlumberger. Huston testified, "In most of those instances, I would simply ask them questions on how the technology at issue may relate to Schlumberger businesses." "If the subject matter didn't appear to have any relationship to Schlumberger's current businesses or prospective businesses, then the second issue would have been could the technology be employed in a Schlumberger business?" Typically, Huston explained, he would only discuss these issues with the employee, as he did not have time to review the programming source code or the often many documents related to an employee's personal invention. Huston testified that there was no company requirement that employees provide him with any particular or specific written documentation about a personal invention. Although Schlumberger produced a paper invention-disclosure form, Huston testified that the policy and practice at Schlumberger Laboratory was "not to do anything by paper." Huston explained that although Reid Smith tasked him with creating an electronic version of the invention-disclosure form, employees at Schlumberger Laboratory were not required to use either the paper or electronic form.

### Extent of Schlumberger's knowledge of Barstow's invention

The Federal Circuit's opinion provides that, "the extent of Huston and Smith's knowledge of Barstow's project is unclear from the record." MLB contends that the record is now clarified and

shows that Schlumberger lacked sufficient information about Barstow's personal baseball project

to have taken any effective action or have made any binding representations to Barstow regarding

the project or, more specifically, the patents in suit.  Conversely, DDB contends that deposition

testimony elicited during the additional discovery period reveals that Schlumberger had extensive

knowledge of Barstow's project.

It is undisputed that Barstow and Huston discussed Barstow's personal baseball project.

Huston recalled that Barstow had discussed the project with Barstow's supervisor, Smith, and that

Smith sent Barstow to speak with Huston about the specifics of Barstow's project.  Huston testified

that he did not recall receiving a copy of Barstow's patent application for the invention, but at the

time was aware that Barstow had filed a patent application related to the project.  Huston explained

that he and Barstow discussed fully the subject matter of Barstow's project and all of the nuances

of the invention.  Huston testified that Barstow answered all of Huston's questions and further

Huston testified that if he had needed more information about Barstow's project he would have

asked Barstow for it.  Huston explained that it was often his practice to consult with other scientists

at Schlumberger Laboratory who might be more knowledgeable about a particular invention's

technology. In Barstow's case, Huston spoke with Darryl Cornish about whether Barstow's personal

project had a commercial application within Schlumberger.  As for the extent of Cornish's

knowledge about Barstow's invention, Cornish recalled, described, and accurately sketched

Barstow's invention.  Cornish specifically described Barstow's invention as

> a simulation system that took realtime events where you—where
> somebody would be keying in the event—basically keying in events
> and then potentially attaching parameters to those events, storing that
> information in a database or some kind of a taxonomic data structure,

and then—that would allow you to replay those events in sort of a simulated mode or search those events to get replays.

Cornish communicated to Huston his conclusion that Barstow's project had no commercial application for Schlumberger. Huston also stated that he concluded Barstow's project had no relation to Schlumberger's current or future business interests. Huston testified that he also had a conversation with Smith, and that Smith wanted to know if Barstow's project might affect Schlumberger's business. According to Huston, he and Smith came to the conclusion that there was no way Barstow's baseball project related to Schlumberger's business. Huston testified that he could not recall if he or Smith communicated their conclusion to Barstow, but Huston believed that it was Smith who told Barstow that each of them believed Barstow's project would not affect Schlumberger's business. Huston testified that with regard to communications among him, Smith, Cornish, and Barstow about Barstow's invention, nothing was done in writing, although he excluded email communications. When asked why he and Smith concluded that Barstow's invention did not relate to Schlumberger's business, Huston replied,

> we couldn't think of a possible use for that technology or how that would relate to Schlumberger's current or prospective business interests. In fact, Schlumberger at the time, and still is, is trying to become more focused and not less focused and that was one of the drivers behind the new business initiative believe it or not. It was to spinoff businesses away from Schlumberger that were not focused on its core businesses.

Huston testified, "What [Smith's] and my discussion was, is that we didn't see how [Barstow's personal baseball project] related to Schlumberger's business and we weren't going to assert Schlumberger an ownership interest in it." And further Huston testified, that conclusion was communicated to Barstow.

The additional discovery reveals that Huston knew the details of Barstow's personal baseball project to the extent that he was able to discuss the invention with others at Schlumberger. Further, following Huston's discussions with other Schlumberger employees, Huston determined that Barstow's personal baseball project did not relate to Schlumberger's business. Further, Huston testified that Schlumberger was not going to assert an ownership interest in Barstow's invention and that position was communicated to Barstow.

### Schlumberger's document-retention policy

Guardier testified about Schlumberger's document-retention policy and stated that any emails from the time frame at issue would have, by company policy and practice, been erased or destroyed. Indeed, the only email exchange in the record was produced by DDB which was sent February 12, 1992, from Barstow to Smith and Huston.

### Analysis

MLB moves to dismiss for lack of jurisdiction, therefore, at issue is whether DDB has standing to bring this patent-infringement suit. *See* Fed. R. Civ. P. 12(b)(1); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551 (Fed Cir. 1995) (standing to sue for patent infringement is jurisdictional issue and party alleging infringement bears burden of proving standing). To have standing, DDB must have been the sole holder of legal title to the patents in suit at the time suit was filed. *See* 35 U.S.C. § 281; *Israel Bio-Engineering Project v. Amgen Inc.*, 475 F.3d 1256, 1264-65 (Fed. Cir. 2007); *Ethicon*, 135 F.3d at 1468. DDB claims it has standing to proceed with this action because, by virtue of the Barstows' patent assignments executed for each of the patents, at the time this action was filed, DDB was the sole owner of the patents. *See* 35 U.S.C. § 261 ("Patents shall

have the attributes of personal property. Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument of writing.").

MLB, conversely, claims that DDB lacks standing to maintain the action because under of the Agreement, which Barstow executed at the commencement of his employment with Schlumberger in May 1980, Barstow assigned all of his right, title, and interest in the invention revealed by the patents in suit to Schlumberger. Thus, since the inception of each of the patents, Schlumberger has been a co-owner.

Based on the evidence produced during the post-remand discovery period, the Court finds that Barstow's and Schlumberger's interactions and representations disclose the construction they attributed to the Agreement. The Court finds that under a broad reading of the Agreement, Barstow's personal baseball project and the related patents were, at a minimum, suggested by or related to Barstow's work at Schlumberger. Barstow's November 24, 1992 letter to Daniel Barstow reflects how his work at Schlumberger went "hand-in-hand" with his work on his baseball project, one complementing the other. Gaudier's testimony that the patents fell within the scope of Schlumberger's business also points toward such a construction.

However, this Court finds that Schlumberger never intended the Agreement to be read so broadly. Schlumberger's policies and practices required Barstow to disclose to Huston the details of his baseball project, which the Court finds Barstow did. Further, the Court finds that Huston well understood the details of Barstow's baseball project. The Court finds that Schlumberger had no written or unwritten policy that details or even suggests specific information that its employees must or should disclose about a personal invention. Specifically, nothing in the record indicates that Barstow failed to disclose or reveal to Huston all relevant information about his personal baseball

21

project or the patents. The Court finds that Schlumberger's practice was that Schlumberger employees at Schlumberger Laboratory would converse with Huston about a personal invention, during which time Huston would ask the employee questions about the invention. Huston expected the inventing employee to be forthcoming about a personal invention. Huston's practice was that often he would discuss a personal invention with other Schlumberger employees who might have more familiarity with the technology at issue in an employee's personal invention. The Court finds that Barstow had such discussions with Huston about his personal baseball project. Huston included Cornish, the leader of Schlumberger's New Business Development Group, in discussions about Barstow's personal baseball project, as Cornish had detailed knowledge about the technologies and methods Barstow used in developing the baseball project. Although no written documents exist regarding the conversations among Huston, Cornish, and Barstow, the evidence reflects that pursuant to its record-retention program, Schlumberger probably destroyed all email communications that might have related to Barstow's personal baseball project.

Further, testimony by Huston and Cornish reveals that each believed Schlumberger lacked interest in Barstow's invention. Although the testimony is unclear as to who informed Barstow that Schlumberger was not interested in Barstow's personal baseball project, uncontroverted testimony from Huston was that either he or Smith informed Barstow that the baseball project did not relate to Schlumberger's business. Huston and Smith each concluded that they failed to see how Barstow's baseball project related to Schlumberger's business and that neither of them would assert on behalf of Schlumbereger an ownership interest in the invention. Additionally, the Court finds lacking from the evidence any action related to Barstow's personal baseball project or the patents in suit by Schlumberger from the time Barstow described his invention to Huston and the issuance of the

22

patents until 2006, when MLB approached Schlumberger about purchasing any rights and interest Schlumberger had in the patents.

The Court finds that Schlumberger, acting through Huston, Smith, and Cornish, construed the Agreement more narrowly that a facial reading might indicate. The Federal Circuit's holding condemns a broad reading. It is the very breadth of the language that creates the ambiguity. Schlumberger's contemporaneous construction required an employee's invention to either have application to Schlumberger's *current* or *prospective* business or embody technology that could be employed in a *Schlumberger* business. In other words, under Schlumberger's construction of the Agreement, for an employee invention to have been related to or suggested by the employee's work at Schlumberger or relate to Schlumberger's business, the invention must have practical benefit to *Schlumberger*. If the employee invention appeared to have only benefit to the employee, Schlumberger construed the Agreement to exclude the invention. Such was the case with Barstow's personal baseball project. Cornish went so far as to note the baseball project's lack of "commercial application" for Schlumberger. Simply, the Agreement was drafted by Schlumberger for Schlumberger's benefit. Barstow's invention did not benefit Schlumberger.

In summary, in light of discovery developed following remand, the Court holds that, based on Barstow's and Schlumberger's consistent construction of the Agreement, Barstow's invention and the patents in suit are not covered by the Agreement. The Court further holds that Barstow's personal baseball project, including the patents in suit, belong to Barstow and his successors in interest. The Court holds that at the time DDB filed this action, DDB had legal title to the patents and consequently has standing to proceed with this action.

23

**IT IS ORDERED** that MLB's motion to dismiss (Clerk's Document No. 214) is **DENIED**.

**IT IS FURTHER ORDERED** that MLB's motion for reconsideration (Clerk's Document No. 357) is **DENIED**.

Because the Court denies MLB's motion for reconsideration, the Court addresses MLB's alternative request for certification of an interlocutory appeal of this Order and a stay of proceedings pending appeal to the United States Court of Appeals for the Federal Circuit. *See* 28 U.S.C. § 1292(b) (district court may certify in writing and allow party interlocutory appeal of order involving controlling question of law as to which substantial ground for difference of opinion exists and immediate appeal may materially advance ultimate termination of litigation). MLB asserts that as standing is a threshold matter of federal-court jurisdiction, certification to the Federal Circuit is appropriate for the legal question of ownership of the patents in suit. DDB opposes certification, contending that all that is at issue is a factual question, which is inappropriate for interlocutory review, and that allowing an appeal would not materially advance the ultimate termination of this litigation.

The Court finds present all of the statutory requirements for certification of an interlocutory appeal: the controlling question of law at issue is standing, there is a substantial difference of opinion about ownership of the patents in suit, and an immediate appeal from this Order will materially advance the ultimate termination of the litigation. This Court's jurisdiction should be finally determined at this juncture and not await the outcome of the substantive litigation.

**IT IS THEREFORE ORDERED** that MLB's motion for certification of question for interlocutory appeal (Clerk's Document No. 357) is **GRANTED**.

**THE COURT HEREBY CERTIFIES** MLB and DDB and either of them to seek permission from the United States Court of Appeals for the Federal Circuit for an interlocutory appeal from this Order as to the issue of standing with regard to the ownership of the patents in suit. Any party desiring to seek an interlocutory appeal of this Order shall file its petition for permission to appeal with the United States Court of Appeals for the Federal Circuit within 10 days of the entry of this Order.  *See* 28 U.S.C. § 1292(b).

**IT IS FURTHER ORDERED** that this action is **STAYED** until the later of (1) the expiration of the time for the parties to file a petition for permission to appeal to the United States Court of Appeals for the Federal Circuit or, if such permission is granted, (2) the Federal Circuit finally disposes of any such appeal.

**IT IS FURTHER ORDERED** that because this Court anticipates one or both parties may seek permission for an interlocutory appeal from this Order, DDB Technologies' Request for a Status Hearing for the Purpose of Setting a Trial Date and Entering a Scheduling Order for Remaining Issues (Clerk's Document No. 356) is **DISMISSED** without prejudice to DDB's refiling same.

**IT IS FINALLY ORDERED** that this Court shall entertain no motion for reconsideration of this Order.

SIGNED this _30th_ day of December, 2009.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE